UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | DOCKET 4:22-CR-162 |
| | JULY 27, 2022 |
| VS. | |
| | 10:10 A.M. |
| EDWARD WALSH VAUGHAN | SHERMAN, TEXAS |

---

VOLUME 1 OF 1, PAGES 1 THROUGH 138

REPORTER'S TRANSCRIPT OF DETENTION HEARING

BEFORE THE HONORABLE AMOS L. MAZZANT, III,
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

FOR THE GOVERNMENT: ANAND VARADARAJAN
HEATHER HARRIS RATTAN
GLENN R. JACKSON
U S ATTORNEY'S OFFICE - PLANO
101 EAST PARK BLVD, SUITE 500
PLANO, TX 75074

FOR THE DEFENDANT: JOSEPH DAVID BROWN
ATTORNEY AT LAW
100 N. TRAVIS STREET, SUITE 205
SHERMAN, TX 75090

COURT REPORTER: CHRISTINA L. BICKHAM, CRR, RDR
FEDERAL OFFICIAL REPORTER
101 EAST PECAN
SHERMAN, TX 75090

PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

(Open court, defendant not present.)

THE COURT: Our next case is 4:22-cr-162, the first defendant, *United States of America versus Edward Walsh Vaughan*.

MR. VARADARAJAN: Good morning, your Honor. Anand Varadarajan for the United States along with Mr. Glenn Jackson and Ms. Heather Rattan.

THE COURT: You've brought everybody for a detention hearing, okay.

It's just kind of funny, though, on the defense side.

MR. BROWN: Just me, your Honor. Joe Brown on behalf of the defendant, Mr. Vaughan.

THE COURT: This is your first time to appear in a government case, I think, isn't it?

MR. BROWN: It is with you, your Honor.

THE COURT: Oh, okay, well, welcome.

And then it's my understanding your client has waived his appearance because -- I assume he's still in California, in custody?

MR. BROWN: He is, your Honor; and we have a declaration from the lawyer that's working with him in California. They've been making diligent attempts to contact him to get a written waiver of his appearance here today. But I do have, as part of the exhibits -- and I'll

submit it as Exhibit 8 -- a declaration from his California lawyer stating that he has agreed to waive his appearance and for us to proceed here today.

THE COURT: Okay. That's fine, if you'll file that with Ms. Conrad.

So the question I have is -- at the time we set this, I did not have a transcript. I read the transcript yesterday. Does the government have additional evidence? It's a *de novo* review. So the question is: Do you have additional evidence to present? I have reviewed everything that was presented to the trial court in California. It's really the government's option.

MR. VARADARAJAN: Yes, there is, your Honor. There is additional evidence --

THE COURT: Okay.

MR. VARADARAJAN: -- specific exhibits as well as a PowerPoint presentation.

THE COURT: Okay. I'll let you go ahead and present whatever evidence you have and then we'll hear from the defense and then -- the Court doesn't do very many detention hearings, but I've done plenty in the past so --

MR. VARADARAJAN: Thank you, your Honor.

MS. RATTAN: May we call our first witness?

THE COURT: Yes, please.

MS. RATTAN: Your Honor, the United States calls

Special Agent Jason Rennie.

THE COURT: Agent, if you'll raise your right hand and be sworn in.

(The oath is administered to the witness.)

THE COURT: Go ahead and proceed.

MS. RATTAN: Thank you, your Honor.

DIRECT EXAMINATION OF JASON RENNIE

CALLED ON BEHALF OF THE GOVERNMENT

BY MS. RATTAN:

Q. Please state your name, and if you would spell your name.

A. Jason Rennie, R-E-N-N-I-E.

Q. And where do you work?

A. I'm a special agent with the FBI.

Q. And what do you do there?

A. I investigate violations of Federal laws.

Currently I'm assigned to the Frisco resident agency out of the Dallas Division, where I primarily investigate white-collar crime, securities fraud, things of that nature.

Q. And you've been with the FBI about 18 years as a special agent?

A. Correct.

Q. Let me direct your attention to this case and this defendant. Of course, there's multiple defendants in this

case; but we're here this morning on Defendant Number 1, Edward Walsh Vaughan.

Are you familiar with this defendant and the case and evidence against him?

A. I am.

Q. And, of course, this hearing is in support of Judge Mazzant's decision to stay the defendant's release. So we're, of course, focusing on detention issues and we've reviewed that evidence; is that right?

A. Correct.

Q. Has a PowerPoint been prepared to assist you and assist the Court as you explain and testify?

A. It has.

MS. RATTAN: Your Honor, we'd ask to publish our PowerPoint and just start with page 1.

THE COURT: Go ahead.

BY MS. RATTAN:

Q. Now, of course, the first screen is just "*U.S. versus Edward Vaughan*."

But let me ask you in terms of an overview of the crime. Would you say that this is a long-term, large-scale, sophisticated fraud that the defendant was the mastermind of?

A. It is.

Q. So let's look at page 1 and just do an overview of what

the fraud involved.

So page 2 of the PowerPoint. Essentially here it says, "Sophisticated and Expansive Fraud Scheme." Can you give us an overview of this?

A. Sure.

Mr. Vaughan owned Electronic Transaction Systems Corporation, which is a credit card processing company, essentially the company that sits between the credit card issuer -- Visa, MasterCard, or the debit card for banks -- and the individual who is conducting a credit card transaction such as at a convenience store or Target or something of that nature.

They had clients, approximately 7,000 municipal businesses and charities which were clients that used their credit card processing services.

They handled -- during the scope of the conspiracy handled approximately $5 billion worth of transactions.

87 million, approximately, separate transactions were processed by ETS with, the investigation has shown, potentially $200 million worth of losses to the victim municipalities, charities, and businesses.

Q. Okay. So let's bring it down local. Here we are in Sherman, Texas. Is the municipality of Sherman one of the victims in this case? And explain how.

A. It was. The municipality of Sherman was a client of

ETS to process their credit card or debit card transactions and incurred a loss as a result of the scheme.
Q. So, essentially, when you talk about credit card processing, I as a customer, for example, show up at 7-Eleven and I use my credit card to buy something. It doesn't go directly to Visa. There is the third party that intervenes; and that's where this defendant, Edward Walsh Vaughan, had a company that processed --
MR. BROWN: Objection to leading.
THE COURT: Go ahead and proceed.
BY MS. RATTAN:
Q. And how did the defendant's company become involved in the process?
A. Well, like I said, the user clients -- they had clients that they had agreements with. Primarily they had a stated what they call "interchange fee."
So the way the credit card companies in general make money is there is a small markup, right, on each transaction; and a lot of times those are very similar. It depends on the type of credit card, the type of establishment. But essentially there is a interchange fee that is established.
In this scheme the interchange fee, the percentage that's charged on each transaction, was manipulated by the defendant and the codefendants to reap additional funds

which they used to enrich themselves.
Q. Okay. And then I'll turn to the next slide, which talks about how sophisticated and expansive the fraud scheme was. We've talked about the victim, that Sherman -- the municipality of Sherman, Texas, was one of the many, many victims.
And then the first thing here is leadership, and you've touched on that. Was this defendant before the Court today, Edward Walsh Vaughan, the leader in the company but also the fraud scheme?
A. He was. He was the president of ETS, and he was directly involved in the manipulation -- the investigation has shown that he was directly involved in the manipulation of the markup fees -- or the marked up fee interchange fees.
Q. And you've talked about the fees, the pass-through interchange fees; and on the PowerPoint slide, it says there is a hidden .3 percent markup.
First, talk about the hidden nature of it. What do you mean?
A. So the investigation has shown that the markup -- that the agreed-upon fee when they signed up these clients was a certain amount. There was an -- unbeknownst to the client or the credit card companies themselves, the markup fee was manipulated to add an additional .3 percent to every

transaction, to 87 million transactions that were processed during this time; and Mr. Walsh and the codefendants were directly involved in the manipulation of the markup unbeknownst to the client.

In addition, they were involved in the manipulation of the statements that were sent to the clients every month. If you have a credit card processor, you get a statement that shows here's the transactions we processed, here's the amount of money it cost you, just like a credit card statement.

So the markup fee, the .3 percent that was manipulated/added for the enrichment of the defendants, was not on the statement as well.

Q. So it's lying, fraud. It's stealing; is that right?

A. Correct.

Q. From thousands of victims?

A. 7,000-plus victims, yes, the investigation has shown.

Q. And he's the leader of the fraud and also the company?

A. Correct.

Q. And we've got on here that it's a hidden .3 percent markup. That doesn't sound like very much, .3 percent. But when you start looking at the number of times that it happens, does that add up?

A. It does when you -- when you process $5 billion worth of transactions. During the course of the conspiracy, that

.3 percent is calculated on top of that -- the volume of the transactions is less important with the markup fee. It's more the value of the transaction because of the multiplier.
Q. And the amount of markup, the .3 percent, is part of the brilliance of the scheme. Is that fair to say?
A. Correct.
If you can mark that number up, it's as if I said, you know, I'll charge you $5 an hour to, you know, work at your store and then I, you know -- I go into the -- I go into the payroll system and adjust my pay to $6 an hour and I get paid $6 an hour and you're none the wiser. It's -- the brilliance of the scheme is changing the markup and then hiding it from the clients.
The credit card processing company, from what I understand, they set a fee with the processor; so they are really unaware of what's going on kind of downstream of their agreement with the processor, ETS.
Q. So it's large-scale, but it's also long-term. What's the length of the conspiracy, the lying, the stealing?
A. I think the start of the -- the start of the company was 2012. I believe the start of the conspiracy was 2013 and ran through 2019.
Q. Now let's talk about the evidence against this defendant, Edward Walsh Vaughan. We've talked about the

company and how the sophisticated stealing scheme was set up. Let's focus specifically on the evidence against this defendant.

What is it? Give us an overview.

A. Sure.

As I said, he's the president of ETS; and the investigation has shown that he was a very hands-on leader of the company. Like I said before, he designed contracts and account statements which omitted the markups. He was involved -- the investigation has shown that he was involved in the design of the altered contracts and monthly statements.

And there's digital evidence that would show that Mr. Walsh logged in to the system where the markup percentage was held. He logged in with his log-in user ID. And during those log-ins my understanding, the investigation has shown that that's -- he personally manipulated the markup.

Q. So --

A. In addition, there were multiple clients that uncovered the additional .3 percent markup, notified ETS; and there was email notifications, calls from employees and victims which Mr. Walsh was aware of when the scheme was starting to become uncovered.

Q. Now, before we started the hearing, Judge Mazzant said

that he'd already reviewed the evidence and the transcript from California and asked whether there was going to be anything new presented. And a minute ago when you were talking about the evidence against the Defendant Vaughan, you said that in terms of the fraud scheme and the lying, he was very hands-on and that's --
A. Correct.
Q. -- what the evidence is going to show.
A. That's correct.
Q. One thing that we're going to cover later in more detail in the hearing is the fact that he is a serious risk for obstructing justice; is that right?
A. Correct.
Q. Now, in this screen we're talking about employees who are aware of the fraud scheme. Are employees also codefendants and witnesses in this case?
A. They are.
Q. And are they expected to cooperate against this defendant, Edward Vaughan?
A. They are.
Q. And you said earlier in your testimony that in terms of committing the lies and the fraud and the stealing, that he was very hands-on; is that right?
A. That's what the investigation has shown, yes.
Q. Has the investigation also shown, in terms of him being

a risk for obstructing justice, that he's very hands-on with the employees who are witnesses in this case?
A. Yes.
Q. Okay. And just bullet-point, what do you mean by that?
A. He was hands-on. He directed employees -- after the fraud became known to multiple merchants, he directed the employees to misrepresent what their billing practices were. In addition, used intimidation towards employees that did not agree with the way he ran the company. And the investigation has uncovered multiple instances of unwelcomed sexual advances, sexual contact, and sexual assault.
Q. Against company employees and potential witnesses in the case?
A. Correct.
Q. So hands-on during the crime and hands-on during the investigation in terms of attempts to manipulate witnesses and evidence?
A. Correct.
Q. Now continuing the evidence against Defendant Vaughan, of course, whenever it's a financial crime, the question turns to who had the motive to commit this crime, who benefitted significantly from the commission of the crime. And is the evidence going to include that?
A. Yes.

Q. What is that?
A. Mr. Vaughan benefited financially from -- during the scheme, before the -- ultimately ETS was sold to another processing company. But during the scheme, before the sale, Mr. Vaughan paid himself bonuses, additional bonuses, which was, the investigation showed, funded primarily, or at least in some part, with the .3 markup, the additional revenue that was coming into the company. So bonuses he paid to himself totaled $13.3 million.

Like I said, there was employees that he -- there was allegations of -- you know, documented allegations of sexual assault. There was indications that employees said that Mr. Vaughan would pay people more than typical, higher wages, pay people with gifts to keep them quiet, keep them happy, keep them doing what they were -- you know, what he -- the scheme that was essentially hatched by him and other codefendants at ETS.

Again, when it was sold, the company was sold, I believe it was sold for $170 million. Of that -- that was sold in 2018, August of 2018. Of that, he received $107 million on the sale of ETS.

And it's important to know that upon the sale to the other company for $170 million, the scheme, the markup scheme which increased the revenues of the company and increased the profit to Mr. Vaughan and other codefendants,

was not known to the company that purchased it.

The purchases after -- you know, during the scheme and then, you know, kind of accelerated after $107 million came into his account -- purchased multiple vehicles, luxury vehicles, Audis, Mercedes, Ferraris; purchased houses in Virginia, purchased three houses in -- two in Pebble Beach, one in Malibu; and purchases of private aircraft as well.

Q. And because those were linked to the fraud and purchased with fraud money, Judge Johnson issued warrants directing the government to seize those properties or file *lis pendens* on them; is that right?

A. That's what I understand.

Q. Now detention issues. And we've already mentioned these. Do you believe that this defendant is a serious risk of flight?

A. I do.

Q. And have you bullet-pointed those things here?

A. Yes.

Q. And do you believe he's a serious risk of obstructing justice?

A. I do.

Q. And do you believe, on balance, that the 3142(g) factors that the Court considers weigh in favor of detention?

A. I do.
Q. Now, here for flight risk you talk about travel, the fact that he owns planes and he has international business ties. And are those fleshed out in a minute?
A. They are.
Q. And in terms of obstruction of justice, he's been dishonest with the Court when he was interviewed by the United States probation officer; and you've touched already on witness tampering and witness issues; is that correct?
A. Correct.
Q. Let's talk about flight risk. Can you just give us an overview of his risk of flight?
A. Right. He has extensive travel history; and as he had at least three private planes, much of that travel is through general aviation. It's not on commercial aircraft. He's traveled to France, Scotland, Ireland, St. Martin, Anguilla, Turks and Caicos, Toronto, Ireland, so extensive history of travel.

Financial means goes without saying. You know, at least at a time in August of 2018, he was worth in excess of probably 125 to $130 million.

He has three personal aircraft; and he owns an aviation company, Vaughan Aviation. So with connections to the aviation industry, connections to general aviation, not unreasonable to believe that he has connections at small

commuter airports, friends with planes, has the financial means to rent or, you know, even purchase a plane, if needed.

International business contacts. He's made investments overseas related to hotel purchases.

And he lives where he lives, and I think that he relayed to Probation that his primary residence is in Malibu. And I can't throw a baseball that far, but I could probably throw a baseball and it would land in the ocean from his house.

So he has proximity to the coast, proximity to international waters, availability of general aviation, friends -- possible friends or acquaintances in general aviation, and access -- means to access a private jet even if he doesn't have access to the private jets that we've mentioned, the three at this time.

Q. Now, on the personal aircraft and an aviation company, there are warrants that have been issued for seizure of his planes; is that right?

A. That's my understanding.

Q. But he has an aviation company and significant contacts, common sense tells you, within the aviation community; is that right?

A. I would agree with that, yes.

Q. You've been an FBI agent for 18 years. You investigate

these types of cases, and you've seen defendants with significant wealth; is that correct?
A. That's correct.
Q. Have you ever had a defendant who had a personal aircraft, let alone owned personally an aviation company?
A. No, not owned an aviation company. I think I've -- thinking back, I might have had -- I've had people with significant wealth but maybe not to this level.
Q. And does that concern you in terms of his contacts and his ability to flee this Court's jurisdiction?
A. Yes. Somebody without the means -- the financial means or the access to planes or access to general aviation -- even if Mr. Vaughan doesn't have access to the planes because they are under seizure, if he shows up to a local airport, Teterboro or a small airport near Malibu, and gets on a plane, people aren't going to say anything about it. He's not going to look out of place.
Where other defendants I've had, they don't have the means to rent a private plane. They don't have friends who have private planes. They don't have, you know, relationships with people in general aviation in multiple airports that he flies through often.
I just think that the risk of flight with the financial means and the access to those things, which a lot of other defendants don't have, does increase the risk of

flight, in my opinion.
Q. And he had not just one plane but three planes.
A. Correct.
Q. And not just three planes but an aviation company.
A. Correct.
Q. Now let me direct your attention to, of course, the flight risk and his travel history. The first part of this screen, the next PowerPoint slide, the defendant self-disclosed that he last traveled in 2017 and within the last five to six years visited Europe on multiple occasions.
MS. RATTAN: Now, this is in the bond report and, your Honor, we've marked the bond report as an exhibit and all of the exhibits that we reference we'll offer under seal. But the bond report -- and I know the Court has it and has reviewed it -- we're focusing in terms of this language on Government's Exhibit 3, page 4. If we can publish that?
THE COURT: Right. And you don't have to offer the -- that's part of the Court's record --
MS. RATTAN: Okay.
THE COURT: -- the pretrial services reports from both courts.
MS. RATTAN: Thank you.
If we can just publish Government's Exhibit 3,

page 4.

And then if we can look at the top of page 3, the first paragraph that starts with the word "passport."

Well, its not pulling up. But I know the Court has reviewed it; and, your Honor, this is -- oh, here we go. Here it is.

BY MS. RATTAN:

Q. This is, of course, from the bond report; and the United States probation officer, acting on behalf of the Court, asked the defendant about his travel. The defendant says he's unsure if his passport is at his residence in California or Virginia; but he says he last traveled out of the country to Greece for employment purposes in 2017, thinks he may have traveled to Ireland after that, traveled to Scotland five or six years ago and to France in 2016 or 2017, to Germany in 2017. He says he combines his leisure travel with his employment travel.

Now, his wife, Lisa Vaughan, is asked to verify a number of things in the bond report; and she says the family traveled to Ireland in 2018.

So the defendant, when he's interviewed by the Probation Department, says that he's last traveled internationally in 2017. Did you review the government records -- we call them the TEC records, T-E-C records -- and did you compare those records that related to the

defendant's travel to what he told the United States probation officer?
A. I did.
MS. RATTAN: And if we can go back to the PowerPoint presentation, Slide 8.
BY MS. RATTAN:
Q. Is this the travel records since 2018, the defendant's travel records; and is a summary of his travel records included on the PowerPoint slide which is Slide Number 8?
A. That's correct.
Q. So when the defendant says he last traveled internationally in 2017 and he says that to the United States probation officer, is that correct or incorrect?
A. Incorrect.
Q. And can you walk us through this slide and help us understand how many times beyond what he reported to the probation officer he actually has traveled internationally?
A. Sure.
And the codes are a little bit difficult, but essentially within here there's multiple travel. Some of this is local. This is within-the-United-States travel.
But within this transaction here, on 8-13 of '18 the defendant arrived in SNN. That's Shannon Airport in Ireland. I believe there's -- right above that, yeah, Shannon Airport.

And then there is an arrival in -- there is an arrival in the Bahamas in 2019, and there is an arrival and departure in Toronto in 2019 as well.
Q. Okay. And when you hear that he's traveled to the Bahamas and you're an FBI agent and there's a bunch of money stolen from victims in a fraud case, is the Bahamas a special concern for you?
A. The Bahamas or the Caribbean in general is a place that's just -- in general I think it's pretty common knowledge that the Caribbean in general -- Bermuda, St. Martin, Turks and Caicos, St. Martin -- the Bahamas are all places that have a lot -- where people park a lot of money offshore.
Not to say that's illegal to do that. It's illegal if you don't notify -- as a U.S. citizen if you don't notify the IRS of that. But that part of the world is really the closest place to park money offshore without the authorities or the IRS knowing.
Q. And, in fact, in this case the travel to the Bahamas that he didn't reveal to the United States Probation Department, was that travel, the unrevealed travel, after he received the significant -- over $100 million -- amount of money for the sale of the company ETS?
A. It was.
Q. So he sells ETS, makes over $100 million, travels to

the Bahamas; and then when Probation asks him about it, he doesn't mention it?
A. Right. He failed to tell Probation about the trip to the Bahamas and two other international trips. So there's three international trips that he did not disclose to Probation.
Q. And one is to the Bahamas. Where are the other two locations?
A. One is to Ireland, and one is to Toronto.
Q. And speaking of Ireland, he does disclose to the Probation Department that he's got a deal going down currently to buy a hotel in Ireland and he says that the deal is supposed to close in the fall of 2022; is that right?
A. Correct.
Q. So even on what he does disclose to the United States Probation Department -- significant international travel, purchasing property internationally -- does that indicate to you a serious risk of flight, along with his contacts within the aviation world?
A. Yeah, not disclosing accurate data to Probation would consider that he's not taking -- he's either not taking the situation seriously or he's omitting certain things for certain reasons.
He did not speak about the most recent travel. If

he forgot about travel six, seven, eight years ago, that might be understandable; but the last international trips that he took were completely omitted from Probation.

Q. Well, and especially during COVID people remember when their last travel was, the last time I did this or the last time I did that before the world shut down; and he left off those three.

A. Correct.

Q. Now, is it also concerning that he has significant financial means in terms of him being able to flee this court?

A. Right. We mentioned that before, is that's usually a pretty big factor for people fleeing. People with financial means have access, you know, to large sums of money and have access to acquaintances, business acquaintances, personal acquaintances overseas, the availability to rent or use private aviation to get out of the United States. I would say that's --

You know, if it was a person that, you know, is a blue-collar worker that committed a fraud that had, you know, $25,000 in their bank and 100,000-dollar 401(k), you don't worry about them absconding to Switzerland or Costa Rica or some non-extradition country. But defendants like this, especially defendants with knowledge of the financial industry, may have accounts that are undeclared overseas,

the ability to travel and the financial means to do so is -- would be concerning to me as an agent.
Q. Right, because we know based on the fraud scheme here that he has intimate sophisticated knowledge of finances; is that right?
A. That's my understanding, yes.
Q. And he has a lot of money?
A. Yes.
Q. So here on the PowerPoint slide in terms of the amount of money that he has, you've indicated that it could allow him to buy new identification, purchase transportation, set up a new life abroad.
And then we're offering as Government's Exhibit Number 4 his account statement, and this account statement is from September of 2018. This is after the company is sold; is that right?
A. Correct.
Q. So we've pulled out a significant -- or highlighted a portion of the account statement. Can you walk us through that?
A. Sure.
My understanding is on 8-30 these two transactions -- the one for 99 million-plus, almost $100 million, plus the 7.541 million -- those two transactions were the proceeds of the sale of ETS to the

other credit card company.

So at least, you know, in September of 2018, he had a balance in his account, or a deposit balance, of $107.5 million.

Q. Again, you've been an FBI agent for 18 years working these types of crimes. Have you ever seen an account statement like this?

A. Not a real one. I've seen a fake one that had more money in it than this, but that was just a fraudulent statement.

I found it -- yeah, just the fact that, you know, there's 99 million on one line and 7.5 on the other line -- I've never seen a balance in an account -- an actual true balance in an account of this high, so high the bank had to split up the amount into two different lines, so --

Q. Correct. They couldn't put 100 million on one line?

A. Apparently not.

Q. Okay. So he got -- had in his account in late -- the fall of 2018 over $100 million?

A. Correct.

Q. $107 million.

And then is that a significant concern in terms of fleeing the court?

A. Well, you have the means to flee. You don't have to worry about the financial aspect of it, so that's a -- you

know, that's a big consideration.
Q. And then the next thing -- and we've already covered this. There is a slide on the fact that he has personal aircraft, he has at least three personal aircraft, has made $3.5 million to purchase the planes in stolen money, and he operates the aviation company called Vaughan Aviation.
A. Correct.
Q. What about international business contacts? What does he have there?
A. Yeah, he stated that he combines his leisure travel with his employment. So the draw to take from that is that his international travel is connected to his employment. It's reasonable to believe that he has business contacts in multiple countries and at least one pending, you know, business transaction in Ireland which is current and due to close, it's my understanding, in November of 2022.
Q. Proximity to the coast, you already mentioned that.
What is this?
A. Right. So that's his house in the center picture. The map is on the left, kind of where it is. And, again, proximity to the coast; proximity to private, you know, general aviation; proximity to -- you don't have to travel very far to get outside the United States.
Q. Now, we've got -- that's an overview of his serious risk of flight. The next thing that we'll focus on is the

serious risk of obstruction of justice. Now, we've talked about this as representation versus reality.

We've already talked about certain representations, things that he said to the United States probation officer during the bond interview. Did the probation officer also ask, along with international travel, about his finances and his money?

A. They did.

Q. And, of course, the officer recorded what he said, what his responses were, in the bond report; is that right?

A. Correct.

Q. Is there a difference between what he said to the probation officer about his money and what the reality is in terms of his money?

A. Yes.

Q. So in the bond report he tells the probation officer that he has about how much money?

And we've got that as a -- represented on the slide there at the top.

A. Correct.

Q. So in the bond report, totaling everything that he says, he reports basically that he has less than $10 million; is that right?

A. Correct.

Q. Now, nobody's saying that's not a significant amount of

money. It is. And he's reported a significant amount of money to Probation; is that right?
A. Correct.
Q. But when you contrast what he reported with what he appears to actually have, is there a significant difference?
A. Based upon the investigation, there appears to be a significant amount of money that's not reported.
Q. Not accounted for?
A. Correct.
Q. So we know, based on the balance sheet -- his bank report -- bank statement that we reviewed earlier, which is Government's Exhibit 4, that in September of 2018 he had in his bank account over $107 million; is that right?
A. Correct. On deposit in that -- at one time he had in excess of $107 million in his account.
Q. Okay. And then he reports to the Probation Department last week that he has less than 10 million?
A. Correct.
Q. Now, he's purchased significant properties, cars, made all sorts of purchases since he got the $107 million; is that right?
A. Yeah. I think he's purchased three properties in California and -- so the -- when taking into account -- you know, pursuant to the investigation, what I understand of

the calculation is that taking into account the large purchases he made, payments he made to the IRS subsequent -- or, you know, after the purchase or the sale of the company, taking into account lifestyle, taking into account things like that, that there is still a very large sum of money missing.
Q. Okay. So the FBI's done the accounting, and there was $107 million in the fall of 2018. He spent quite a bit of money. The FBI backed that money out of the 107 million and then backed out the less than 10 million that he reported. And even with that math, there is still a significant amount of money that's unaccounted for in this defendant's possession; is that right?
A. Yes.
Q. Can you estimate for Judge Mazzant the amount of money that's unaccounted for?
A. I think it's -- I would say it's between 25 and $50 million is unaccounted for.
Q. And it's during this time period and the time period after the $107 million was in his bank account, on his bank statement, that he fails to report to the United States probation officer that he traveled to the Bahamas?
A. Correct.
Q. And then you're saying that the FBI estimates that around $20 million is unaccounted for?

A. Yeah. I would say I think giving him -- a conservative, conservative estimate would be $25 million.

And if you think about it, he had $107 million at almost the end of 2018. So he's expecting Probation to believe, like, I purchased these properties, okay, they have value.

But that's a significant sum of money to go from I have this much money -- you know, I have $107 million and made purchases. It just, like -- it doesn't appear -- based upon what I've learned of him, he doesn't appear to be an unsophisticated individual. He's made purchases of property, planes, cars. Okay, that has an expense. You have daily expenses. You have lifestyle expenses, things like that.

But to go from 107 to 7 in essentially three years, it's pretty significant, just from a -- just from a liquid cash standpoint so --

But I would say conservatively my understanding is when all of the purchases are backed out, it is conservatively 20 to $25 million.

Q. And when you say "conservatively," it's calculated to his benefit in an abundance of caution; is that right?

A. Right. Like, we looked -- asked and looked for any payments to the IRS because did he make payments to the IRS? When you've got $107 million, the IRS is going to

know about that. So there were significant payments in 2018 to the IRS, so that was taken into consideration so --

But it's -- if it is between 20 and $25 million, which it appears to be, that would say his net worth is underreported by 75 percent. So, you know, what can you do with, you know, 7, $8 million -- or what can you do with, you know, $28 million that you can't do with $8 million? You can do a lot so --

Q. You can flee.

A. You can flee. You can purchase passports. You can purchase a house abroad. You can -- there is a lot of -- you have a lot of options.

And if your options are to stay here and face, you know, potential lengthy jail time, I think that somebody with his means would be a consideration. I think that's reasonable to believe.

Q. It's a serious risk.

And then we're focusing on this $107 million that was in his bank account in September of 2018, but that's just what he got from the sale of the company. He was already well off even before that because the fraud scheme was ongoing from 2013 through the investigation, so he was well-to-do even before that.

A. Right. So if you're just taking it on its face, seven and a half now, 107 then, but he paid -- during the

scheme -- we went over, in the previous slide, 13 and a half million dollars worth of bonus payments plus his salary. This was just the pot at the end of the rainbow. This is -- this was the culmination of -- the markup fee from 2013 to 2019 overvalued the company, essentially. The revenues were increased because the amounts were increased. Profit was high. Another company bought them for $170 million, and this was the product of it -- or at least from Mr. Vaughan's standpoint.

Q. All right. So is there a pattern here? Over 7,000 victims, the municipalities and the charities that were lied to and then he left out, when he was interviewed by the probation officer, the fact that he had traveled internationally three times and --

MR. BROWN: Your Honor, I object at this point. This is argument and repetitive.

THE COURT: Ms. Rattan, go ahead and move on. I mean, you've -- this will be argument. You've already established those facts.

MS. RATTAN: Yes, your Honor.

BY MS. RATTAN:

Q. And if we can just go forward. And we were highlighting the dishonesty about his travel history, and does that dovetail and relate to the FBI's concern about his finances?

MR. BROWN: Argument and repetitive.

THE COURT: Well, Ms. Rattan, it is -- it is probably repetitive, so let's go ahead and move on to additional information.

BY MS. RATTAN:

Q. Now, one thing we touched on earlier in your testimony in terms of his obstruction is his interaction with employees and the concern that he will obstruct justice during the pendency of the Indictment.

Is that a concern?

A. Yes.

Q. So let's focus on examples of his intimidation and coercion of employees at the company. Can you use this PowerPoint slide and give us an overview of that?

A. Sure.

Former chief technology officer of ETS explained how Mr. Vaughan kept a gun in his office. This individual feared for -- feared retaliation from Mr. Vaughan for meeting with law enforcement during the course of the investigation and witnessed Vaughan making lewd comments and inappropriately slapping employees during his employment with ETS.

Another employee, another CTO, commented that employees stayed with the company because they were overpaid, which is corroborated by codefendants receiving

exorbitant bonuses at the direction of Mr. Vaughan and one defendant -- codefendant receiving a vehicle from Mr. Vaughan.

Another codefendant saw a hole punched by Mr. Vaughan in his office and --

Q. In the wall? A hole punched in his wall?

A. Yes, punched in the wall of his office.

-- and heard Mr. Vaughan say that he does not care about the law and heard Mr. Vaughan brag that he told judges what to do during legal proceedings.

Q. Now, in terms of the sexual misconduct that was referenced earlier, the next PowerPoint slide highlights those events; is that right?

A. It does.

Q. Okay. Can you give us an overview of that and how it relates to a concern that he will obstruct justice?

A. Sure.

Again, this case was opened and investigated as a white-collar crime case; but during the investigation at least eight sexual assault victims were uncovered by the FBI, which included former employees, an executive, and codefendants.

At least one of those complaints was filed with the local police department.

The nature of the allegations are -- there's a

pattern. In almost -- the way that Mr. Vaughan would refer to female employees and subordinates was even consistent among different victims. The nature of the allegations, repeated groping, nonconsensual penetration, verbal harassment.

The allegations were raised and suppressed during the course of the conspiracy and during the course of the investigation.

They are aware that Mr. Vaughan has entered into multiple civil settlements with many of the complainants.

Q. And did the witnesses, as the FBI interviewed them, express fear and concern about saying things about the defendant?

A. Yes. And I think on one of the victims where there was a formal complaint filed, I think at the end the victim requested the case be closed out of fear of her name being known or known that she went to law enforcement.

MS. RATTAN: And then, your Honor, does the government have the -- I mean, does the Court have the government's exhibits?

THE COURT: I do.

MS. RATTAN: Okay. And in relation to this, the sexual misconduct, we would direct the Court's attention to Government's Exhibit Number 1.

*

BY MS. RATTAN:
Q. And, Agent Rennie, can you explain what Government's Exhibit Number 1 is?
A. Sure. It's a Case Report from the Loudoun County Sheriff's Office dated -- looks like it's dated January 11th of 2018.
Q. And this relates to one of the specific victims who worked for the company who described how she was treated when she was employed there; is that right?
A. Correct.
Q. And, of course, her name is listed. And I'm looking on page 4 of Government's Exhibit Number 1.
A. Sure.
Q. And that begins the narrative where she describes what happened while she was working there; is that right?
A. Correct.
MS. RATTAN: And we'll, for the purposes of the record here, call her KH.
BY MS. RATTAN:
Q. And I think it's significant, too, as you talk about KH, to look on Government's Exhibit 1, page 10. And in the bottom right corner, it describes that her height is 5'4" and she's 115 pounds; is that right?
A. Correct.
Q. So she's a small lady.

And she was employed by the defendant during the term of the conspiracy; is that right?
A. Correct.
Q. And she was employed as a chief financial officer, a CFO, a significant position within the company, the corporation?
A. Correct.
Q. And she went to the Sheriff's Office, and she described that she was sexually assaulted and repeatedly sexually harassed over a long period of time by the defendant; is that right?
A. Correct.
Q. So if we can look at the second paragraph, it starts with her name and it starts with a K. She stated that Edward "Ed" Vaughan is the CEO of Electronic Transaction Systems, ETS, which is currently located -- and she gives the address -- and she says she was hired as the CFO in 2014; and she detailed the sexual abuse and harassment that followed after her taking the position.
And then she goes on to describe in detail the things that the defendant said and did to her; is that right?
A. Correct.
Q. She says that he was extremely vulgar, he would say to her, "How's my" -- and then he would use an expletive

referring to her private parts. "How is my" -- expletive -- "doing today?" "What color of underwear are you wearing?" He would rub his genitals outside of his clothing and it would be apparent to her that he had an erection at the time.

He physically touched her. He would massage her shoulders, ask to touch her breasts. At one time she reported that he came into her office and rubbed his genitals and asked her to rub her private area for him, using a crude term for her private area, so that he could watch. She told him she was disgusted and asked him to stop.

When she identified to him that he had touched her on her stomach area at one time, he responded, right after he had touched her, saying that he wasn't touching her; is that right?

A. Correct.

Q. Did he talk to her about her -- did she report that he talked to her about her underwear and grabbed her shoulders and pushed her on one occasion into an office chair?

A. Yes.

Q. And then I'm looking at one, two, three, four -- the fourth paragraph from the top which starts with "A few days after this happened."

A. Yes.

Q. And did she report that he put one of his hands over her private area over her clothes and then later told her that he didn't want to wash his hands after touching her private area and he used an expletive to describe her private area?

A. Correct.

Q. Now, even more concerning is the next paragraph that starts with "A week or two later" --

MR. BROWN: Objection, argument.

THE COURT: Overruled. Go ahead.

BY MS. RATTAN:

Q. -- where she describes that she, as the CFO of the company, is approached by the defendant, as the chief officer of the company. He grabs her around her back and waist and aggressively put his hands inside her dress pants and his hand went underneath her underwear and he forcibly inserted his fingers inside her private area for approximately five seconds and when he took his fingers out of her private area, he stuck them in his mouth and said that she tasted great.

Was there a time that she reported when she needed him to sign a document and he screamed at her about a past event and said, "I don't give a" -- expletive -- "what you think and if you don't" -- expletive -- "like it, you can" -- expletive -- "leave"?

Is this the type of behavior that she described that he exhibited repeatedly and over a period of time toward not just her but other employees?
A. Yes, that's correct.
Q. And, of course, other employees have been interviewed?
A. Correct.
MS. RATTAN: And if we can go back to the slide.
BY MS. RATTAN:
Q. The slide says that there are at least eight sexual assault victims, based on FBI interviews, including former employees, executives, and codefendants?
A. That's what the investigation has shown, yes.
Q. Is there a concern, based on this reporting and this type of behavior, that the defendant will engage in obstruction of justice and attempt to intimidate witnesses?
A. Yes.
Q. Has there been a pattern of conduct where, in fact, he has done that?
A. Yes.
Q. And it's been reported in interviews to the FBI?
A. Correct.
Q. Now, this victim is the only one who went forward to law enforcement; is that correct?
A. Correct.
Q. And what ultimately happened with the investigation

after she went to law enforcement?
A. Ultimately she requested -- and I'm looking for the -- ultimately the investigation was closed at the request of the victim.
Q. But her information was corroborated by what other victims said; is that right?
A. Correct.
Q. And there was also the witness who you mentioned earlier who was the chief technology officer who said he saw things like this in the office?
A. Correct.
Q. Now, along with the sexual misconduct toward employees and individuals who are ultimately witnesses in the case, is he also known to have firearms?
A. Yes. I think he reported an extensive amount of firearms that he has currently.
Q. And this next slide which is part of the PowerPoint presentation describes his possession of firearms; is that right?
A. Correct.
Q. And can you give us an overview of his association with firearms?
A. He told law enforcement on arrest that he has 30 guns, that he has four AR-15 rifles and multiple pistols, and then mentioned that he has a shooting range.

Q. Now, there's one bullet point here where he's brandished a firearm when he was -- there was an attempted service by a 20-year-old female. Can you describe what happened there?
A. My understanding is that there was a process server that arrived at his front door. Mr. Vaughan -- and the process server was a 20-year-old female. Mr. Vaughan came to the door holding a firearm. The process server went to lengths -- obviously was afraid, went to lengths to explain to Mr. Vaughan what was going on. Mr. Vaughan did not relinquish the firearm, and the process server was not able to serve the papers due to the fear of the brandished firearm.

Ultimately, I believe the papers were served, either a few hours or the next day, by a male process server under armed escort by the local Sheriff's Office.
Q. And that's what they had to resort to just to serve process?
A. Right.
Q. And the person trying to serve process was a young woman about 20 years old?
A. Correct.
Q. And she was just at his front door?
A. Right. My understanding is that she didn't hop a fence and run into his backyard or anything of that nature. My

understanding is that access to the front door, went to the front door, knocked on the front door, and Mr. Vaughan came to the door with a gun.

Q. And he brandished a firearm?

A. He had a firearm while he was conversing with the process server.

Q. So the whole picture, the big picture in terms of the firearms, his behavior toward employees who are ultimately witnesses in this case, is this a concerning picture in terms of his -- the probability that he will attempt to obstruct justice if this Court were to release him?

A. Again, it's -- you know, some of the codefendants or some of the individuals that made sexual assault allegations against the defendant, that the defendant has a pattern of domineering activity as proven when somebody shows up to your door with paperwork and you show up with a gun at your door. So it's concerning, the gun ownership, the access to guns and, again, the overall activity. The pattern of activity is concerning on many levels but concerning in relation to the codefendants.

Q. Now let's talk about another issue of concern, and this relates to obstruction in the sense that it shows potential pressure placed on people who would be witnesses against him.

And this slide talks about -- it's entitled "Child

Endangerment," but it also relates to a changing story or changing information; is that right?
A. Correct.
Q. So the child endangerment factor is a abuse claim that was reported to Child Protective Services in California; is that right?
A. That's my understanding.
Q. Can you give Judge Mazzant an overview of what happened here?
A. Sure. There was an outcry made by Mr. Vaughan's child related to physical contact with the child.
Obviously, that was followed up by CPS, whatever the agency is in the state of California; and when the follow-up occurred, the story had changed. The child did not claim that there was any physical contact, and obviously the parents denied any physical contact with the child.
Q. And this is very recent?
A. Right. This was in March of 2022, March of this year.
Q. Okay. February -- yesterday -- rather, May 23rd of 2022?
A. Oh, excuse me, May. May of '22, yeah. I apologize.
Q. Before school ended, the 11-year-old told the caller that his father had been hitting him; is that right?
A. Correct.

Q. Now, it's also reported that this child had been absent a lot from school.
A. "A lot" would be putting it lightly.
Q. Thirty-one unexcused absences and 80 school approved absences.
A. Right.
MR. BROWN: Your Honor, this is irrelevant to the detention issues. This is -- doesn't have anything to do with witnesses in this case or an attempt to obstruct. This is simply an attempt to muddy the character of the defendant, and we've heard -- I haven't objected to a lot of this, but this is totally irrelevant to the obstruction issue.
THE COURT: Ms. Rattan, why is this relevant?
MS. RATTAN: I think it's important to note that CPS responded quickly to this allegation that was made by the child's teacher and when they went out and interviewed the child, the child didn't say to CPS what the child said to the teacher. So very quickly in time, the child's information changed.
And I think it's important because it goes to the defendant -- a reasonable inference is -- exerting pressure, placing pressure on someone to provide different information than what they've provided previously.
And, of course, the Court is called upon to look

at the factors under 3142(g) -- and they are very broad, they include the defendant's family history, the defendant's characteristics -- in any way and evaluate all of those in determining the appropriate decision in this case.

MR. BROWN: Your Honor, this is totally speculation that it is in any way the defendant that is putting any kind of pressure on this child. It doesn't -- the child does not report when they interview that the incident occurred, and --

THE COURT: Well --

MR. BROWN: -- parental discipline is allowed. And for them to create some kind of improper behavior or that it was Mr. Vaughan who in any way intimidated this child, there is no evidence that Mr. Vaughan did anything.

THE COURT: Well, I'm going to overrule the objection. I mean, it does go to the general characteristics of the defendant but -- I understand. I mean, it is what it is so -- go ahead and proceed.

BY MS. RATTAN:

Q. Okay. In the defendant's response to the United States' motion for emergency stay and in Judge Mazzant granting the motion for stay, the defendant explains to Judge Mazzant -- and I'm focusing now on page 3 of the defendant's response. There's no -- I don't have the

docket number. I believe it was filed under seal.

Anyway, the defendant in his response says that he learned of the federal investigation related to the legacy of ETS in January of 2019. And he says that after he learned, in response, Mr. Vaughan neither fled the jurisdiction nor interfered with the investigation. Instead, he personally called the FBI agents and offered to meet with them to discuss the matter.

When the defendant says that he called the FBI and offered to meet with them to discuss the matter, can you describe for Judge Mazzant what happened?

A. Right. I think there was some indication that one employee had notified Mr. Vaughan that the FBI had approached them.

Upon learning this, Mr. Vaughan reached out to the case agent and was angry, very angry that the FBI had spoken to an employee without a lawyer present, was indicating that the FBI was doing something illegal by speaking to his employees, and was essentially saying that he was offended and that there was some inference that the FBI is, again, doing something wrong.

And there was no offer of, "Hey, I'll come and meet with you"; "Hey, I'll come and speak with you"; "Hey, let's meet at the Starbucks so we can clear this up." The FBI is in the business of getting information from people.

If Mr. Vaughan had even, you know, a slight interest in speaking with the FBI, they would have spoken with him immediately.

So the details of the conversation from the case agent to me was he was none too interested in meeting with the FBI and none too interested in the FBI being anywhere near ETS.

Q. Is it fair to say that he was angry and yelling?

A. Yes.

Q. And did he also complain -- he and his lawyers complain about the FBI contacting the victims?

A. Yes.

Q. And did this complaint go to the point where an administrative charge was filed against the lead agents by Mr. Vaughan and his counsel?

A. That's my understanding.

Q. Can you describe that for Judge Mazzant?

A. My understanding is that there was -- at a time the case in the district -- the Northern District of Virginia -- or in the district in Virginia where the case started, there was some indication that the case was not going to be pursued by the United States Attorney's Office in that district.

Subsequent to that, ETS learning of that decision, the FBI was still contacting victims related to the case,

notifying them of the decision made by the U.S. Attorney's Office, which is, my understanding is, standard operating procedure as they are victims -- identified as victims of the case.

And there was some offense taken to -- by Mr. Vaughan and ETS, and there was some administrative -- some complaint that was filed by ETS and Mr. Vaughan related to that activity.

Q. Okay. Because the FBI is under a legal obligation to notify victims of crime and keep them apprised of what's going on; is that correct?

A. Correct.

Q. So bottom line, overall, big picture, based on your review of the evidence and your review of this case, do you have concerns that the defendant is a serious risk of flight?

A. I do.

Q. And, of course, you've testified to those before the Court?

A. I have.

Q. And you additionally have serious concerns -- do you have concerns that this defendant is a serious risk of obstructing justice if the Court were to release him?

A. I do.

MS. RATTAN: Your Honor, we pass the witness.

THE COURT: Cross-examination?

CROSS-EXAMINATION OF JASON RENNIE

BY MR. BROWN:

Q. Agent Rennie, how are you today?

A. Very well, Mr. Brown. How are you?

Q. Good. Fine, thank you.

What has your role been in this case?

A. I became aware of the case -- actually, I take that back.

I was aware of the case prior to this, but I was brought into the case and briefed on the details that I testified today just very recently.

Q. Very recently, in the last week?

A. Yeah, I would say within the last week, yes.

Q. So have you prepared any reports, 302s, statements of any kind?

A. I have not.

Q. Okay. So you have been called -- despite the fact that there are case agents involved in this case, you've been just asked in the last week just to review the case and testify to the Court to what you testified today?

A. Right. I was -- we had multiple conversations with the case agent, reviewed the reports that are here, reviewed the Indictment, reviewed the seizure affidavit.

Q. And the case agents, are they available to testify

today?
A. I don't know what the availability is of the case agents, sir.
Q. Have you had conversations with the case agents?
A. I did, yes, like I said, multiple times during the preparation for my testimony.
Q. And who are those case agents that you've had conversations with?
A. The only -- is it -- her last name is Lawrence. Her first name is escaping me, but that's the agent. There was another male agent, but I am not aware -- I can't recall his name.
Q. All right. Are they here today?
A. I'm not aware of where they are physically.
Q. When is the last time you talked to them?
A. Yesterday.
Q. So -- and were they out of the area when you talked to them, or do you know?
A. I don't know.
Q. Do you know why they're not testifying?
A. I do not.
Q. Now let's go over a little bit of what Ms. Rattan has covered with you.
A. Sure.
Q. Mr. Vaughan found out about this matter in

approximately 2019? 2018? Or do you know?
A. 20 -- well, it wouldn't have been -- 2019.
Q. And he would have found out about it when the FBI asked the employee to wear a wire and go in and talk to Mr. Vaughan? Did you see that?
A. That's my understanding.
Q. And that employee went in and ultimately felt guilty about wearing a wire, tells Mr. Vaughan about it, and then Mr. Vaughan picks up the phone and calls the FBI; is that correct?
A. I don't know how the employee felt, but it's fair to say that after the recording -- I understand there was a recording made and then subsequent to that, there was some communication with Mr. Vaughan related to the activity.
Q. And he in no way intimidated that employee that wore the wire, no retribution on that employee, correct?
A. None that I know of, no.
Q. You would have told us about that if he had retaliated against that employee?
A. If there was -- yeah, if there was retaliation, I'm sure I would have been apprised of that.
Q. And when you say that he did not offer to speak to the FBI at that point, very shortly thereafter he had counsel call the FBI and engage in a conversation, did he not?
A. I'm not certain about -- I mean, I'm sure there is some

communication; but I'm not certain how close after that that it was.

Q. But he didn't at any point show any intention to flee, correct?

A. Not that I -- not that I'm aware of.

Q. And in this whole case up until now, he's known since 2018 that he's being investigated by the FBI and he has shown no intention to flee, has he?

A. The travel that I know of is what's in the TEC report, and I don't have any information that he's attempted to flee.

Q. And we'll talk about that travel. But all that travel has explanation, correct, either vacation or business travel?

There is no intention to flee by traveling on vacation or business, is there?

A. In this situation I'm not aware of any intention that he had or attempt to flee. But, again, he wasn't -- he wasn't under Indictment during that time so wouldn't be -- you know, I mean, fleeing to me means that he's been charged -- after charges and then he intends to leave to avoid the jurisdiction of whatever agency. In that situation he wasn't charged, so that would just be travel to me.

Q. But you're trying to use legal travel, vacation travel

and business travel, and bootstrap now and somehow say that that's evidence that now he's going to flee, now that he's been indicted.
A. I think --
Q. Isn't that the argument?
A. No, no. I think the argument was that he has a sense of travel.
Some people have no travel, Mr. Brown. Some people have traveled to Greece and Scotland and Ireland and Turks and Caicos, Anguilla, St. Martin.
He's wealthy. I'll agree with you that he might travel just because he likes to see other places, but we are just -- I was just -- my testimony was that he has extensive travel prior to Indictment.
Q. So would you say any defendant that is wealthy and has a history of travel would, therefore, be at risk to flee?
A. I think they have a -- their availability to flee -- their financial situation gives them more access or more chances or more propensity to flee. That's what I would say.
Q. So after the FBI attempts to have someone come in wearing a wire and Mr. Vaughan becomes aware of it, he hires legal counsel -- or maybe he had legal counsel before that. But his legal counsel engages with the FBI and with the U.S. Attorney's Office out of the Eastern District of

Virginia, correct?
A. That's my understanding.
Q. And they exchanged several letters and communications about this case and Mr. Vaughan was aware of it, correct?
A. I'm not sure what they exchanged, but it's fair to say that he had counsel and they engaged in conversations with the prosecutor's office in Virginia and Mr. Vaughan was aware of it, yes.
MR. BROWN: Your Honor, have we provided the Court our --
THE COURT: I don't have any of your exhibits.
MR. BROWN: We've provided to the government, your Honor, these exhibits; and we tender at this point Exhibits -- Mr. Vaughan's Exhibits 1 through 7, which are letters in between Mr. Vaughan's counsel, Williams & Connolly, in the summer of 2019 and the FBI and the U.S. Attorney's Office in the Eastern District of Virginia, which document Mr. Vaughan's engagement and involvement in not fleeing but fighting the charges at that time.
THE COURT: Any objection?
MS. RATTAN: Your Honor, we don't object; and we'd also go ahead at this time and offer our exhibits, which are Government's Exhibits 1 through 6. And with the Court's permission we would offer them under seal because there is some sensitive information in there.

THE COURT: That's fine. And the Court will admit the government's exhibits and admit those under seal as well as the defense exhibits.

MS. RATTAN: Thank you, your Honor.

BY MR. BROWN:

Q. So would you agree with me that there was communication with Mr. Vaughan and his attorneys and the U.S. Attorney's Office in Virginia in the 2019 time period?

A. Sure. If the exhibits that you proffered are letters between counsel and the U.S. Attorney's Office, then I have no reason to doubt that.

Q. Now, despite that interaction between Mr. Vaughan's counsel and the government, he was not allowed to self-surrender in this case; is that right?

A. My understanding is he was arrested at his home.

Q. The Marshals Service went in last week at 6:00 a.m. and arrested Mr. Vaughan in front of his two children and his wife, correct?

A. I'm not certain who was home at the time; but I'm certain if there was a law enforcement action, it was standard operating procedure. The arrest would take place early in the morning. There is a reason for that, usually for officer safety. But other than that, I don't know who was home at the arrest, during the arrest.

Q. All the other defendants in this case have been allowed

to self-surrender; is that correct?
A. I'm not aware of that.
Q. Do you know of any other defendants who were arrested as Mr. Vaughan was?
A. I don't -- I don't know what the arrest situation or summons situation was for any of the other codefendants.
Q. Do you know of any engagement the government attempted with Mr. Vaughan or his counsel in order to allow him to self-surrender?
A. I am not.
Q. So if there was none, you wouldn't be able to say anything differently?
A. Correct.
Q. So let's talk a little bit about the allegations in this case. This has to do with disclosures that were given, or not given, with regard to credit card agreements between merchants and Mr. Vaughan's company, ETS, correct?
A. It has to do with markup fees that were not -- merchants who were using ETS were not aware of, and it was not -- on an ongoing basis, monthly basis, on statements was not provided to them; and only after independent investigation, they learned of the markup.
Q. And that subject has been the subject of civil litigation ever since 2018, correct, between various companies and Mr. Vaughan's company?

A. I'm not aware -- I know there is some civil litigation going on, but I don't know who -- with Mr. Vaughan, but I'm not certain. I don't know the details of that.
Q. And Mr. Vaughan's position in those civil litigations has been that disclosure was made, correct, that an adequate disclosure was made of the fee that was charged?
That's his position, has it not been, in the civil litigation?
A. I have no knowledge of the civil litigation or any of the documents or docket that was filed, so I would have no way to answer that.
Q. And are you aware that the fee itself, the fee was not illegal, right?
It was legal to charge the three-basis-point markup. That's a legal fee, correct? There's nothing illegal about it?
A. Well, I think that --
Q. The question is whether the fee is illegal.
A. The companies are allowed to -- I think they -- you know, I don't know if there is some restriction; but I think there is -- it's a competitive advantage if you can charge less than your competitors. I think they have, you know, certain availability to charge whatever percentage they want --
Q. Correct, and that's my --

A. -- as long as it's --

Q. That's my point, Agent Rennie, is the fee itself is not illegal. The question is about the disclosures; is that fair?

A. Well, I think that if you're -- I think if the -- I will agree with you that a credit card processor can charge the percentage they want.

But if you're sold a bill of goods and then you change the bill of goods and then you don't disclose that you are charging them more, I don't know if --

Q. I'm not asking you that, Agent Rennie. She'll be able to ask you all those things.

What I'm asking you particularly is the fee itself is not illegal.

A. If you're saying that there -- if there's no rule or state law that allows people to charge a certain amount, I think competition would set the rate; and if they want to charge .3 more than somebody else, then I can't say that it's *per se* illegal.

But it's the -- it's the way within which the -- in this case the investigation shows the way that the percentage --

Q. Which is exactly what I said.

A. -- that was marked up was -- was --

MR. BROWN: Objection.

A. -- unbeknownst --

MR. BROWN: Not responsive.

THE COURT: Well, go ahead and ask your question again.

BY MR. BROWN:

Q. I understand the complaint -- the government's complaints about the disclosure. I'm trying to focus on the fee itself so that the Court can see the defensibility of this case. That's the point, Agent Rennie.

A. Uh-huh.

Q. So would you just agree with me that the fee -- charging a fee if it's agreed to -- and I understand there is a question about whether it was disclosed. But the fee itself, there's nothing illegal about --

A. No, I think I said that. I think if a merchant and a -- a merchant and the credit card processing company agrees to a fee *per se*, as long as it's within the rules or whatever state laws there are, then that's not *per se* illegal.

Q. And that's all I'm asking.

A. Sure.

Q. And do you know what the -- who the Elavon corporation is?

A. I believe that's the company that purchased ETS.

Q. Okay. So in 2018 Elavon purchases ETS and takes over

the credit card processing business?
A. That's my understanding.
Q. Right.
And they continued to charge the same fee, did they not?
A. I don't know what occurred after the purchase of ETS.
Q. So if Elavon continues to this day to charge that same fee, would you know that?
A. I would not.
Q. Okay. And do you know if Elavon continued the same disclosures after the company was sold?
A. I do not.
Q. Okay. So if Elavon continued the same disclosures for close to a year after this, you wouldn't be able to tell the Court to be able to explain how this case may be defended?
A. That's correct. I have no knowledge of what continued on or did not continue on after the purchase.
Q. Have you looked at any of the civil litigation that's gone on between the companies?
A. I have not.
Q. So if that subject matter is covered at length in civil litigation, you wouldn't know that?
A. I would not.
Q. Okay. Now, there is a lot of talk about the

vacation -- the travel that Mr. Vaughan has done; and it has been made out to be some kind of reason that he might flee now, correct?
A. His travel was extensive. And if he's under restrictions with access to travel, I think that's a reasonable concern.
Q. He has not traveled internationally since 2019, correct?
A. That's correct.
Q. So for the last three years, Mr. Vaughan has not been traveling internationally, correct?
A. He did not travel since 2019, but there is a lot of people that didn't travel the last few years.
Q. So how do you understand he goes about his disclosures to the pretrial services officer out there in California? What's your understanding of how she gets her information about his travel history?
A. My understanding is an interview.
Q. So after he's been pulled out of his bed at 6:00 a.m. by the marshals, taken down to the jail, he's interviewed by a pretrial services officer who is taking notes and asking him his travel history, correct?
A. Yeah, I don't know when the interview occurred; but it's a -- it's a face-to-face interview with Mr. Vaughan and Pretrial.

Q. But he's not allowed to access his calendar or anything like you have where you can push a button and get all his interactions with Customs and Border Patrol -- he doesn't have access to that when he speaks to a probation officer to get his travel history, does he?
A. If it was -- if it was subsequent to his arrest and he was -- he was detained, I would agree. He would not have access to that.
Q. Okay. And were you there when his lawyer was there with him when he interviewed with that pretrial services officer and he told her he can't remember all of his travel?
A. I was not.
Q. Okay. And were you there when she said, "Just do the best you can"? Were you there?
A. I was not there, so I can't comment on what statements were made.
Q. And it's true, isn't it, that he had -- between 2015 and 2019, he had a couple dozen trips abroad, correct?
A. Quite a few trips, yes.
Q. Okay. So there's nothing nefarious or improper about him forgetting to list a couple of trips on his -- when he's being interviewed in a jail cell, is it?
A. Well, I just -- I just think it's odd that the trips that he omitted were his most recent trips. So that's --

that's the point of the testimony.

Is it nefarious that he has a lot of trips? No.

Is it unreasonable to believe that he forgot a few trips? No.

But he forgot the trips that are the most recent. So that would be, to me, the ones that he would remember first. But maybe they were uneventful trips or maybe they were boring trips. I don't know. But it's just the ones that he forgot are the most recent. That was what we were -- that's what I had pointed out in direct --

Q. Well, he forgot a trip to the Bahamas and to Toronto. The Bahamas is a vacation spot, correct?

A. It is.

Q. Okay. So you don't go there -- I assume we have an extradition treaty with the Bahamas. Is that correct?

A. That was -- I don't know. I don't know if we do or not.

Q. Okay. Same thing with Toronto, with Canada, correct? If you're going to hide places you go, it's more likely that he forgot those kind of trips than if he was saying he was going to someplace that, you know, might hide somebody, correct?

A. I don't know why he didn't disclose those.

He also didn't disclose a trip to Ireland. Now, he disclosed that he has an investment in a hotel in

Ireland; but he didn't disclose that trip. So he didn't disclose his last three international trips.

Q. Okay. So we put this obligation on him to remember all his trips while he's sitting there talking to a pretrial services officer without any kind of resource. We tell him, "Just do the best you can" and he forgets two -- four trips out of a dozen, 16, 18, however many there were and that -- somehow he's trying to pull something over on the Court. Is that your testimony?

A. So the Court -- it's the Court's obligation that he -- he provides, you know, accurate, truthful information to Pretrial. So we're not involved.

And, in addition, since learning that he -- you know, since uncovering in the California, you know, hearings that he did not provide truthful information, my understanding is it hasn't been amended at this time. There hasn't been an additional tranche of information provided to Pretrial to more accurately depict in his pretrial report to the Court, so --

Q. Now let's talk a little bit about his assets. You've presented to the Court his bank account that shows the $107 million that was put in his account in 2018; and you said, did you not, that the FBI had done some accounting to determine that there's $50 million that they don't -- that they don't know where it is?

Is that what you testified to?
A. Right. My understanding is the case agents and, I believe, some either forensic accountants or some accountants or financial analysts were involved in doing a high-level review of his finances in an effort to get an idea of how much money was not disclosed.
Q. Okay. Is there something in writing to that effect that you've been provided?
A. I was not provided anything, no.
Q. Okay. So what did you deduct from that $107 million to be able to determine that $50 million is absent?
A. I'm sorry?
Q. What did they deduct?
You said they --
A. Oh.
Q. -- they factored out everything and decided that $50 million is missing. Tell us what they deducted.
A. My understanding was after the purchase, it was the three houses in California.
Q. Okay. How much did they deduct for that?
A. I'm not certain. I think those houses were purchased 7, $8 million each.
Q. Okay. Do you know if they were paid for outright or whether there's loans on them?
A. I -- I'm not certain. I think they are paid for.

Q. Okay. So how much in total did they deduct for the real estate that he's purchased since he --
A. I don't have the exact calculations, Mr. Brown. What I can tell you is what items we discussed that were considered when they were trying to get a ballpark figure of money that was not reported.
Q. Well, you've asked the Court to take that in consideration --
A. Sure.
Q. -- in keeping him in jail; so I'm asking what level of detail you can provide to the Court --
A. So, yeah, the three houses that were purchased.
Q. And how much was deducted for the houses?
A. Like I said, my understanding is they were 7, 8, $9 million each so --
Q. All right. So if we go $9 million each --
A. 27 million.
Q. -- times three, $27 million for those.
What else was deducted from the $107 million?
A. His payment of his taxes.
Q. How much in taxes did he pay?
A. I think it was between 25 and $30 million.
Q. 25 and $30 million for taxes.
A. Uh-huh.
Q. Okay. What else was deducted?

A. Purchases of vehicles. I don't know what the exact amount of the vehicles were. I think, you know, I saw some -- I think in the seizure affidavit we saw some amounts.

But ultimately it was portrayed to me that taking his taxes into account, it was between 25 and $50 million.

Q. What else was -- and you have no idea how much was deducted for vehicles that he may have purchased?

A. I don't.

Q. How much was deducted for anything else? What else was deducted --

A. I think there was some consideration for lifestyle that was made. There was some consideration that, you know, he purchased vehicles, that he has travel, he has expenses related to planes.

But ultimately I was provided a number -- a range of money that appears to not be reported; and that was after, like, we took into account the tax situation, which I think the 50-million-dollar number did not take in the tax situation. So I think it's between, you know, 20 -- I think on direct I said 20 to 25 million, but let's just say 25 million.

Q. Wait a minute. What do you mean the $50 million didn't take into consideration the tax issue?

A. Well, I think that when there was $50 million, it was

discussed originally and then I don't -- the IRS -- the payments to the IRS which were significant. So that's why when I testified, I said between 20 to 25 million conservatively.
Q. Okay. So originally the government files a document with the Court saying that he hasn't disclosed $50 million; and you-all figure out that that's not accurate after that, correct?
A. Well, I don't know what went into that filing; but I -- what I'm testifying to is that that number -- and then my understanding is the taxes weren't taken into account. So I -- when I testified on direct it's between 20 and 25, that's a rough estimate.
Q. Okay. Anything else, any other category that was deducted in order to come to this twenty -- now -- it used to be 50 and now it's $25 million?
A. Not that I can recall.
Q. Anything deducted for what he may have paid to his ex-wife or for his children? Anything deducted for that?
A. Not that I recall.
Q. So if he made --
A. It might have been, but it wasn't discussed with me.
Q. So if he's made more than 10-million-dollar payments to his wife, that wasn't deducted -- his ex-wife and his child -- that wouldn't have been deducted?

A. It wasn't discussed with me.
Q. Okay. How much was deducted for any charity that he may have given?
A. That wasn't discussed.
Q. How much was deducted for any lawyers that he may have had to hire during this litigation that's been going on civilly and now criminally?
A. It wasn't discussed with me.
Q. Okay. So there's big, broad categories that the FBI didn't deduct for and just come in to court and saying that there's $50 million missing?
A. I can't say if it was or it wasn't, Mr. Brown. All I can say is it wasn't discussed with me when they got to that figure. What was discussed was the properties, the cars, and ultimately the taxes.
And, again, we're talking about the $107 million that he got in August of 2018. Mr. Vaughan was wealthy before that. So, you know, 13 and a half million dollars worth of bonus payments including, you know, whatever salary he drew between 2013 and 2019 is not -- in addition is not calculated in that 107.
Q. So was this available -- this accounting available to the agent in California who testified on Friday and said the government has done no accounting of this amount of $50 million that's missing?

A. I'm not aware of the testimony by the agent in California.

Q. Okay. So there is no reason -- when that agent stood up on Friday and said the government has no accounting of this $50 million, we just believe that there's $50 million missing, you don't have any reason why that agent would have testified to that?

A. I can't comment on what the agent said or why they said it or what information they used when they testified.

Q. Did you have any conversation with this Agent Oh, Young Oh, that testified in California?

A. No, sir.

Q. Now, I didn't hear you saying much about these guns that the government has alleged that somehow make Mr. Vaughan a danger. But there's nothing inherently dangerous about legal gun ownership and possession, is there, Agent Rennie?

A. If it's legal -- if the guns are owned legally, then that's a right afforded to us by the Constitution.

Q. But it's put in the government's motion as some kind of negative impact on him being a danger, is it not?

A. He brandished a firearm on a process server so, I mean, that --

Q. Well, we're going to talk about that, but let's just talk about the fact --

A. Just him owning guns --
Q. -- that he owns 30 guns and --
MS. RATTAN: Your Honor I object. The witness isn't having an opportunity to respond.
THE COURT: Go ahead and finish your answer, Agent.
A. I think the concern with the guns, he has a lot of guns. If this was somebody that was arrested and they had a bunch of guns in their house, I don't think that slide would have appeared.
But there's been at least one instance where -- one instance where Mr. Vaughan has brandished a firearm on a process server. So I think the takeaway from that is that Mr. Vaughan has had in his possession a firearm during a time when he was not thrilled with what was going on, which is a dangerous situation.
The ownership of guns, if it's 30 or 50 or 100, there is nothing illegal or concerning to me about that. It's the fact that --
BY MR. BROWN:
Q. So when the government puts that in their motion as a reason the Court should hold against Mr. Vaughan, you don't agree with that?
A. Well, I think it's an accounting of what he reported to law enforcement.

In addition, he has a -- at least on one occasion had a propensity to handle a firearm during a time when he's upset.

Q. Well, let's talk about that. So on a Sunday night between 9:00 and 10:00, a process server that he doesn't know who it is comes to his door, banging on his door in a neighborhood in Los Angeles that people don't come to front doors very often. Isn't that what happened?

A. I know that the process server arrived at his door, knocked; and after some time, Mr. Vaughan came to the door.

I live in a neighborhood where not a lot of people knock on my door and I have guns in my house and I don't go to the door with a gun.

Q. Well, but he has -- he could have reason to fear, in certain circumstances in the dark and depending on what's going on in his life, to fear for somebody coming to his door, could he not?

MS. RATTAN: Calls for speculation. I object.

THE COURT: Overruled, if you can answer.

A. I can't speak to the reasons why, you know, he went to the door with a gun. All I'm saying is that would not be my first choice if I went to the door -- if somebody was knocking at between 9:00 and 10:00 at night in a neighborhood where I don't get a knock at the door and I'm in law enforcement and I wouldn't -- that seems out of --

odd to me.

And then my understanding is there was back-and-forth conversation where Mr. Vaughan was upset; and once he realized who the process server -- it was a process server, there was a period of time where the gun was not put down.

So, again, it's -- the fact that you are going to go to the front door of your house when somebody's knocking and it's a 20-year-old female and --

BY MR. BROWN:

Q. Well, you don't --

A. -- you have a gun in your hand, that's concerning.

Q. Will you agree you don't know what was going on in Mr. Vaughan's life and what kind of threat he might have been under at that point?

A. I will agree with that. I don't --

Q. And you're --

A. -- know what his motivations were.

Q. You're aware that a federal judge's son was killed by somebody coming to the front door and pretending to be somebody innocent. Have you heard about that case?

MS. RATTAN: I object to relevance.

MR. BROWN: It's very relevant, your Honor.

THE COURT: Overruled. Go ahead.

*

BY MR. BROWN:
Q. Are you aware of the federal judge's son being killed by somebody who comes and pretends at the front door to be somebody else?
A. I don't know that particular case. I'm not -- I'm not here to say that people don't come to the door and knock and people get robbed and -- but I just look at my situation and I'm in law enforcement and I, unfortunately --
Q. I'm just asking you if you are aware of the case.
A. I'm not aware of that case.
Q. Okay. Are you aware of the district attorney in Kaufman County that was gunned down and killed by somebody pretending to be a delivery person at the front door?
A. Sure. I think I helped on the investigation of that case.
Q. Okay. You're aware of that.
So depending on what's going on in somebody's life and what threat they may have, they may have a reasonable fear of somebody coming to their house at night in a neighborhood that people don't normally come to front doors?
A. I think that's definitely possible but not ordinary.
Q. But in this instance it's a reason to fear Mr. Vaughan?
A. If Mr. Vaughan is handling a firearm during a time

where he is upset and arguing with people, that is a concern.

Q. All his guns are legally owned, are they not?

MS. RATTAN: I'll object. I think it's asked and answered.

THE COURT: Well, go ahead and answer.

A. I haven't heard anything to the contrary; so my guess would be yes, all of his guns are legally owned.

BY MR. BROWN:

Q. There's nothing illegal or uncommon about having a gun in your desk at work?

A. I wouldn't -- I wouldn't say it's common, but if --

Q. It's not uncommon is what I said.

A. Well, the opposite of uncommon is common.

So, I mean, it's -- I don't know anybody that -- well, I take that back. I know a lot of people that keep guns in their desk, but they are in law enforcement. So not in law enforcement, I don't know if it's common or not. I can't comment on that.

Q. Most of the people in this room, do you think they keep a gun in their desk?

A. No.

Q. Okay. No charges filed on the process server case. There was never any criminal investigation in that; is that correct?

A. Not that -- not that I'm aware of. I mean, I -- I'm sure there was some in -- but I don't think there was any charges filed; and if there were, I'm not aware of it.
Q. And this was in 2017 that this happened, correct?
A. I'll have to take your word for it. I think that sounds right, but I'm not -- I'm not certain on the date.
Q. Now, Ms. Rattan has gone to some length to make sure the Judge is aware of these sexual harassment claims that were filed by employees against Mr. Vaughan. You called them assaults; but there was never any arrest or criminal case that was filed against Mr. Vaughan as a result of these complaints, was there?
A. Well, he was not arrested. I think the case was closed --
Q. That's my question.
MR. BROWN: Objection to nonresponsive.
A. Could you repeat the question?
BY MR. BROWN:
Q. The question was: There was no criminal case filed, and he was never arrested or otherwise charged with any kind of crime resulting from those complaints?
A. Well, I think the Loudoun County case was opened and it was subsequently closed. I have no indication that he was --
MR. BROWN: Objection.

A. -- arrested or convicted.

MR. BROWN: Nonresponsive.

THE COURT: Well, ask the question again.

BY MR. BROWN:

Q. There were no kind of criminal charges filed and no kind of arrests made for any case resulting from that -- those complaints of sexual harassment or what you called assault?

A. So the end of my sentence that I was trying to finish was "I have no indication that he was arrested or convicted of any sexual assault."

Q. And those occurred -- those are all prior to his sale of the company; so most of this is 2015, 2016, 2017 time period, correct?

A. I don't know the dates of the -- I don't know the specific dates of the individuals that the FBI's investigation revealed that there were additional assaults. I know that this one in Loudoun County was in 2017.

Q. Well, the Loudoun County one that she -- when this lady -- what initials did we use? J?

A. I think it was KH.

Q. KH.

Is she the same person that went in with the wire undercover to talk to the --

A. That's not my understanding.

Q. Okay. But she -- the report reflects that she was asked to wear a wire to go into Mr. Vaughan's office, or the business, as well. Did you see that?
A. I think there was some investigative interest in this, yes.
Q. Okay. But you're telling the Court that this is not the same person that ultimately told Mr. Vaughan that she didn't want to go forward with it and apologized for wearing a wire?
A. No, and my understanding is it was somebody different.
Q. Okay. So that person with the initials -- I apologize. The initials again?
A. KH.
Q. KH made a report in 2018, and I noticed in that report -- and this is the first that we've been able -- we've received that report. But she's reporting about conduct that occurred in 2014, correct?
A. 2014 and I think continuing on, 2014, 2015, 2017.
Q. Okay. So in 2018 she's reporting about the conduct that's happening four years before, correct?
A. Correct.
Q. And do you know if she filed any kind of complaint and received any kind of settlement?
A. I don't.
Q. Okay. So it would be possible that she files, in 2018,

a complaint and seeks a settlement for conduct occurring years before that?

A. I have no knowledge of any settlement offer or, you know, anything like that.

Q. Well, you testified that settlements had been made.

A. My understanding is there's nondisclosures that are -- that exist related to possible settlements, but obviously I don't know the details of those.

Q. So on all of these eight occasions that Ms. Rattan has indicated, there's never been any litigation filed as a result of that, has there?

A. Not that I'm aware of.

Now, there may be civil litigation. I don't know. But not that I'm aware of. That's all I can say.

Q. So there's been no airing of both sides of that. You've only given us one side of what the complaints are, correct?

A. I've given you information on what I'm aware of. This police report was obtained in the course of the investigation; and during the course of the investigation, there was indications of assaults and there's indications that there's nondisclosure agreements that can't be broken.

Q. So no lawsuits, no criminal charges for any of those allegations, correct?

A. I don't know of any criminal charges. And lawsuits, I

would have no -- I don't have any knowledge of that.
Q. You told the Court that Mr. Vaughan told witnesses to misrepresent certain things?
A. Correct.
Q. What exactly did you mean there?
A. Well, in relation to the -- my understanding is the investigation showed that there's emails related to Mr. Vaughan's direction of codefendants.
There's the design of the statements that does not indicate the markup. He was involved in the design, essentially hiding it from the merchants.
Q. Okay. So this is not after -- this is not in regard to obstruction of anything. This is with regard to hiding the markup?
A. Well, I think the direction of Mr. Vaughan telling people to misrepresent items is related to the investigation. That's correct.
Q. The investigation of the markup, correct?
A. That's my understanding.
Q. Okay. So there's nothing where Mr. Vaughan has told witnesses to misrepresent anything with regard to this investigation or in any way attempting to obstruct justice?
A. Well, I'm not, you know, versed in all the conversations that Mr. Vaughan has had with the codefendants, as stated; but my understanding is -- I would

have to say I don't know. I don't know. To my knowledge, there's been no direction to lie to law enforcement.

I don't know -- there's been -- my understanding is there's been comments made about not cooperating with law enforcement and his anger towards people speaking to law enforcement, obviously, as indicated during the call with the special agent in Virginia. But direct indications of lying to law enforcement, I'm not aware of that.

Q. Well, there's nothing wrong with him being angry that the FBI is, in his opinion, unjustly investigating him. There's nothing wrong with being angry about that, is there?

A. It's his -- yeah, I mean, I guess if that's how he feels, that's --

Q. So you're using it as a circumstance that he somehow is a bully or is aggressive because he's angry that he's being unjustifiably investigated. That's not true.

A. Well, I think how -- really we were just juxtaposing how it was portrayed in the response to the stay motion where he offered to speak to the FBI.

My understanding is he was not interested in having the FBI anywhere near ETS, any of the employees, or in northern Virginia.

Q. But, again, his counsel engages -- within days, his counsel is engaging after that with the --

A. I'd have to take your word for that. I don't know how long after it was.
Q. But there is nothing wrong with him about being -- there is nothing wrong with him being angry and it doesn't show he's a bad guy or is going to obstruct just because he was ticked off that somebody sent an employee with a wire in on him.
A. No. I mean, it's his prerogative to be angry about the FBI looking into his affairs.
Q. And this concern about he has airplanes -- you're seizing the airplanes, aren't you?
A. I think they are in the process of being seized at this time.
Q. Okay. So he doesn't have access to them, and that shouldn't be a concern to the Court?
A. He doesn't have access to the planes that are in his name and the company's name.
Q. And as far as traveling to Ireland, he's Irish, correct, and has an interest in his country of his ancestors?
A. I actually don't know where Mr. Vaughan is from or where his ancestors are but -- yeah, so I'll have to take your word for that.
Q. Now, the FBI has had plenty of opportunity to track that $107 million that he received, have you not?

A. The investigation -- I mean, I'm certain they have the finances. I don't know what the status is of them scheduling every penny that Mr. Vaughan has spent during the course of the investigation, though.
Q. Has any of that $107 million been moved offshore or in any way tried to be hidden that you're aware of?
A. I'm not aware of any large wires out of the country.
Q. And you haven't done and the FBI has not done any kind of accounting to be able to tell the Judge where that alleged 50 million and now it's 25 million -- where that actually is, right?
A. As I -- as I stated, I was given, you know, a kind of a rough outline of what's been done. I don't know -- I haven't seen their work papers. I haven't seen the spreadsheets. I haven't seen the bank account records or anything.
My understanding is after some consideration of all of his major expenditures, that there appears to be a large sum of money that hasn't been reported.
Q. And that's the idea of putting you, Agent Rennie, up here on the stand, not having been involved in this investigation, is so you can just get up here and tell Judge Mazzant that generally $25 million; and then when we try to get into the details, you don't have any information so that we can effectively cross-examine you; isn't that --

MS. RATTAN: I object. It's argumentative.
THE COURT: Sustained.
BY MR. BROWN:
Q. The hole in the wall that was punched that is somehow indicative of a temper problem, do you know the reason that he punched a hole in the wall, if he did?
A. I'm aware that there was a hole punched -- there was a hole in his wall that was put there by Mr. Vaughan, but his motivations on why he hit an inanimate object would be beyond my scope.
Q. So many reasons that he might have punched a hole in the wall that don't have to do with intimidating somebody, correct?
A. He seems to be angry a lot. But other than that, I have no idea why he would be punching holes in walls.
Q. I noted in that report that we just got today from Loudoun County that the witness, KH, wore a wire in to speak to Mr. Vaughan about the alleged sexual contact and there was no admission made. Nothing was obtained from that -- from that wire; is that true?
A. I don't have access to the wire or the contents of the reports.
Q. You've read the report, right?
A. Sure. If you could point me to a page, that would be helpful.

Actually, it's page 13. It says, "There were not any admissions of sexual abuse or assault on the call." Is that what you're referring to?
Q. And as far as you know, he has contested every one of those. There may have been settlements; but he's never admitted to any of that, correct?
A. I don't -- I don't have any knowledge of that.
THE COURT: Mr. Brown, how much more do you have?
MR. BROWN: I'm very close, your Honor, just going over the last --
THE COURT: It's more we just need to break here because of my court reporter.
MR. BROWN: Okay. I may just have one more question.
BY MR. BROWN:
Q. You made a point -- or Ms. Rattan made a point of having you talk about how when Mr. Vaughan and his lawyers became aware of the case, they made a complaint about how victims -- alleged victims were being notified.
Do you remember that?
A. I do.
Q. In other words, there were no criminal charges in this case and the U.S. Attorney's Office in Virginia was sending out notices all over to all of the clients saying that "You may be a victim of crime," right? Isn't that what the

complaint was about?
A. All I know is that the victims of the allegations up in Virginia were notified of some status by the U.S. Attorney's Office in the case.
Q. They sent out notice to thousands of people saying, "Hey, you may be a victim of crime" and referred to this company that was trying to do business. Isn't that what happened?
A. I don't know what the letter said. If -- I take your word for it. If that's what it said, I'll --
Q. And you can understand why that might make a company upset and file a complaint that a U.S. Attorney's Office, before charging anything, was sending notices and destroying somebody's business by telling people that they are a victim of crime.
A. Again, I don't know what the motivation was to send the letters or if it was an accident or it was on purpose or what the letter said. I have no knowledge --
Q. If it was your business, you'd be outraged, wouldn't you?
MS. RATTAN: I object. That's not a proper question. It's argumentative.
THE COURT: Sustained.
MR. BROWN: I'll pass the witness.
THE COURT: Ms. Rattan, do you have -- I don't

know how many questions you have.

MS. RATTAN: Not many.

THE COURT: Okay. Go ahead.

MS. RATTAN: Okay. Thank you.

REDIRECT EXAMINATION OF JASON RENNIE

BY MS. RATTAN:

Q. Now, in terms of the unaccounted for money, is it 50, is it 25, suffice to say it's millions; is that right?

A. Yes, millions.

Q. Now, you weren't the lead investigator on the case; but you've got 18 years' experience and you've done many, many cases similar to this or like this, fraud cases?

A. Correct.

Q. Are you basing your testimony -- are you relying on the lead FBI agents on the case, forensic accounting, and FBI analysts?

A. I am.

Q. And based on what you're relying on, are you testifying before this Court that the defendant has money that he didn't report, large amounts of money that's not reported when he was asked about it by the United States probation officer?

A. Yes, the -- after consideration by the FBI, the investigation has shown there's large sums of money that appears to be unaccounted for. What the exact amount is is

an estimate, but it's fair to say that it would greatly increase his net worth if those numbers hold true.
Q. And, of course, as the Court considers flight, hidden money, money that's not accounted for is money that is a concern that can be used to flee; is that right?
A. Correct, in addition to the money that he has disclosed, which is significant.
Q. Uh-huh. Or when the Court considers obstruction, it's money that can be used to obstruct justice, pay someone off; is that right?
A. That's definitely a possibility.
Q. And then the missing money dovetails with the lack of disclosure by the defendant to the United States probation officer about his recent travel internationally; is that right?
A. Correct.
Q. So not only did he not report recent travel to the Bahamas, he never told Pretrial that he ever went to the Bahamas or Toronto; is that right?
A. Correct.
Q. And it's not just one oversight. There was more than one instance of international recent travel that he neglected to tell the probation officer about?
A. Correct.
Q. So there's missing money, travel that's undisclosed.

Do all of those paint a picture that creates a concern for risk of flight?
A. They do.
Q. Now, defense counsel was asking about whether any of the charges that the victims alleged -- and, again, did the sexual assault victims corroborate each other?
A. They did.
Q. And counsel was asking, well, has there ever been a civil lawsuit or a civil finding or criminal charges that have been filed; is that right?
A. Correct.
Q. Well, in a similar way where we were talking about people coming to the door and are there examples of that, we've got Harvey Weinstein, we've got Bill Cosby. There's numerous examples of years and years of misconduct, criminal deeds that were not charged; is that right?
A. Correct.
Q. But today here this victim, KH, has come forward; and she was corroborated by at least seven other people who reported similar information; is that right?
A. Correct.
Q. And, in fact, if you look at Government's Exhibit Number 1, page 8, which is the Loudoun County report, there's a male employee, on page 8 -- Government's Exhibit 1 page 8 -- who worked at ETS for years; and he

corroborates what the women are saying.

In fact, he reports that he overheard the defendant saying, "I" -- to women in the company -- "I can't see your" -- expletive referring to their private area -- "on the floor." "I can see your" -- expletive -- "on the floor."

He said that he has seen the defendant, Ed Vaughan, grab arms and hip area, speak in an aggressive manner, and establish ownership over of the victim KH.

So this is an arguably neutral witness who is another employee at the company who says, "I saw stuff that's what she said"; is that right?

A. That's correct.

Q. And, again, going back to obstruction and concern that the defendant will attempt to intimidate witnesses, does this information cause concern?

A. It does.

Q. Now, there was a discussion about how the defendant was arrested. Does the FBI have a SWAT team that they use to effect arrests?

A. We have a SWAT team. That's correct.

Q. And are there specific criteria that are used to assess whether the SWAT team should be used?

A. That's correct.

Q. And, in fact, was the SWAT team used when this

defendant was arrested?
A. I'm not certain if it was or not.
Q. But he was arrested in early morning, and all the factors that the FBI takes into consideration would have been evaluated in determining when and where to arrest him; is that right?
A. Right. You know, guns in the household, use of weapons, criminal history, overall, you know, disposition are all taken into account as to if it's going to be a squad arrest or a SWAT team arrest if it needs, you know, a higher level of attention due to certain factors.
Q. And those factors were present here, and the FBI arrested this defendant?
A. The FBI arrested him at 6:00 in the morning. That, to me, is pretty typical. We don't wait until the middle of the day, and we don't give people a heads-up that we're coming. And that's for officer safety.
MS. RATTAN: I'll pass the witness, your Honor.
THE COURT: Mr. Brown, anything else?
MR. BROWN: Nothing further.
THE COURT: Okay. You may step down.
THE WITNESS: Thank you, your Honor.
THE COURT: Does the government rest?
MR. VARADARAJAN: We do, your Honor.
THE COURT: Okay. And is the defense going to

have any evidence other than what you've already given?

MR. BROWN: No.

THE COURT: So let's just take a short break, and then we'll come back and have argument. We'll just take like a five-minute break, and then we'll come back and continue.

(Recess, 12:08 p.m. to 12:15 p.m.)

(Open court, defendant not present.)

THE COURT: Please be seated.

Government can go ahead and go first for argument.

MR. VARADARAJAN: Yes, your Honor.

I know the detention hearing has been long. You've heard a lot of evidence. But if there is a fraud case, a fraud defendant that fits cleanly within Section 3142(f)(2) and the factors laid out there, risk of flight, risk of obstruction, it's this case and it's Mr. Ed Vaughan.

Let's start with the flight risk. Now, the defense claimed in its response to the motion to stay that was granted by this Court on Friday that the Government's argument about flight risk rests solely on the financial assets that the defendant has. And I quote from their motion. "The government failed to identify any other facts that suggest Mr. Vaughan is at risk of absconding."

Well, your Honor, that's just not true. He checks

off all the red flags for a flight risk:

International travel, extensive international travel, check;

International travel that he hasn't reported to pretrial services, check;

Substantial financial means, however you want to cut it, whether it's $7 million or $107 million, check;

Foreign financial connections and international business investments, check;

Private aircraft and a personal aviation company, check;

Proximity to international waters, check.

All the red flags are here for a serious flight risk, your Honor.

Now, the response to that -- and we've heard it during the questioning, the cross-examination of Agent Rennie -- is that, well, Ed Vaughan has known about the investigation since 2019 and since then, he hasn't fled.

Well, your Honor, that's half true. Yes, the defendant knew about the investigation in 2019; but he thought it was over after he called the FBI agent, yelled at her, after there was all this correspondence that the Court has between --

THE COURT: So, wait, where is the evidence that he thought it was over?

MR. VARADARAJAN: Well, that's the inference, your Honor, because there was no Indictment brought by the Eastern District of Virginia in 2019, 2020, 2021, or 2022. So the silence makes him believe that he's free and clear, there's nothing for him to do.

THE COURT: That's something you're speculating on. I mean, there is no evidence that he thought the investigation was over.

MR. VARADARAJAN: No. It's purely based on the actions from the government, your Honor, the silence, so to say, from the Eastern District of Virginia when he was approached in 2019.

But now, obviously, that's changed. Now he's under Indictment. He's under Indictment in a district that's far away from any of his homes. If he's convicted, he faces significant jail time. His accounts and his assets, they're under criminal scrutiny, not civil liability that he could just pay his way out of.

His incentive to flee is now greater than ever, your Honor; and on that basis alone, the risk of flight, this Court can and should detain Mr. Vaughan.

But we also have the obstruction issues. And the government is concerned with the facts relating to obstruction; and we know this Court has also been concerned with facts as they relate to obstruction, even in fraud

detention cases.

And I know the Court's recently ruled and held multiple defendants detained in the *United States versus Kingsley Ita* case, largely based on concerns about the defendants' disclosures to Pretrial Services and the misrepresentations that were made about international travel and the financial situations of those defendants. And that's exactly what we have here, your Honor, lies about international travel, lies and at the very least misrepresentations about the financial situation.

Let's talk about the financial situation to begin with. We know less than four years ago there was over $107 million sitting in one, just one, of Mr. Vaughan's bank accounts. Four years later, to Pretrial Services, he accounts for less than 10 percent of that.

Now, does the defense really expect the Court to believe that this man who is, mind you, a sophisticated business executive who worked in the financial services industry, that he just burnt away $100 million? Even accounting for taxes, even accounting for lavish lifestyle on these properties, that this $100 million is just gone?

On top of that, your Honor, we have the black-and-white bald-faced lies about the international travel. We know that he said -- he told Pretrial Services the last time he left the country was in 2017; but we know

there have been at least three international trips in 2018 and 2019, including to the Bahamas.

And what did Agent Rennie tell us about individuals who travel to the Bahamas? Significant wealth is oftentimes deposited there, your Honor.

And here's the thing about those disclosures, or the lack thereof, your Honor. Those are the two things that the defendant can't and shouldn't lie about, his travel and his finances. That's the heart of what we're dealing with here. That's the heart of 3142, risk of flight and obstructing justice.

And, of course, he chose to, at best, shade, at worst, conceal and lie to the Court. That tells us that he is a serious risk for obstructing justice.

And there is another thing here, your Honor. The defense has known about the government's concerns about these disclosures, or lack thereof, now for five days; and they know that the hearing has been set for Wednesday. They've had time to prepare. They haven't offered any evidence to show us where that money is. They haven't put on a witness to explain the international travel or the nature of his international business contacts or investments.

And here is the other thing. Even if they did, it doesn't change the fact that he lied to Pretrial Services

last week when he was arrested.

And, again, on that basis alone, on the basis of obstruction of justice, this Court can and should detain the defendant.

But then there's the other part of this and the latter part of the presentation, your Honor, and that was the defendant's dealing with potential witnesses in the case and the history and personal characteristics of the defendant, which the Court can and should consider under 3142(g).

And on behalf of the government, I submit to the Court that it's rare that at this stage of a case the Court can get a good sense, a true sense of who a defendant is, how he would behave if he was released, what he thinks of law enforcement, what he thinks of other witnesses, what he thinks of female witnesses, what he thinks of the legal process.

Here, your Honor, I think you have, granted, anecdotal information; but that starts to add up and paint a picture of who Ed Vaughan is. Let's not forget he is the same person who when he found out about the FBI investigation, his instinct was to call and yell at the FBI agent.

He's the same man that, when approached by a 20-year-old female process server, brandishes a firearm and

doesn't put it down for several minutes.

He's the same man who kept a 9-millimeter handgun in his office and who, multiple reports and multiple interviews confirm, bullied and intimidated other employees at his company.

He's the same man who, allegedly, assaulted, sexually harassed, sexually assaulted multiple female employees at the company.

He's the man who, again allegedly, hit his own child over the head and has caused -- and this is -- this is pretty black-and-white, your Honor. That child, if you look at the report, did not attend school over 100 times that year. Over 100 times.

Like I said, I think it's rare that you get a good sense of who a defendant is at this stage of the case; but given the information that's presented -- and the Court knows who Ed Vaughan is, how he would behave if he was released. He would be empowered. He would continue to act like he's above the law and potentially be dangerous, your Honor, to other witnesses and maybe even his own family.

And so because he's a flight risk, because he's a risk to obstruct justice, because there is a potential danger to other witnesses in the case and his own family, your Honor, we ask that he be detained pending trial.

THE COURT: Thank you.

Would defense like to make their closing argument?

MR. BROWN: Your Honor, detention is not appropriate in this case; and as the California Magistrate found, it's not even a close case.

This defendant is 58 years old. He's a business owner, an Army veteran, three children, two young children at home, wife, no meaningful criminal history, no convictions.

And, your Honor, despite however they want to muddy him up, this is a financial crime. It is not a violent crime. There's no allegations regarding any of the outside issues that they have brought up today. They're just part of this Indictment. This is a fraud case with no allegations of any kind of violence.

It involves business practices. It involves vagaries of contract terms and whether disclosures are appropriate on credit card amounts, and they want to turn him into some kind of mob boss that's going to go out and put hits on witnesses. There is just not that kind of evidence, no matter how much they run around with their hair on fire. It's just not the case. This is a businessman.

The case is extremely defensible. They get to put in their Indictment all this information to show the Court the strength of their case, and so you're entitled to hear

the defensibility of the case from our side.

This case has been litigated in civil litigation ever since, continues to be litigated; and this fee that is the subject of this continues to be charged to this day by the subsequent company.

The disclosure has over and over been debated, and it is our position that disclosure was appropriate. But that is the nature of this case. This is not any kind of violent case. The disclosure -- the same disclosure was used by the same company for months after this even though they had done due diligence a year before. So they had a year before of due diligence, and they kept the same disclosure even though this was an issue after the fact.

So this is a defensible case that the Court is able to take that into consideration.

Your Honor, they are -- they chose this defendant as the Number 1 defendant on the Indictment to arrest even though he had been engaging with the government. They go in at 6:00 a.m., don't give him any opportunity to self-surrender, in front of his wife and kids, and they make this arrest.

They are trying to make -- they are trying to make a point. Let's call this what it is. They are trying to show that they mean business, and this Court stands in between that kind of effort to punish in detention versus

the right of innocence before -- the protection of his innocence rights.

And so the default under this case is release unless they can prove a serious risk of flight or a serious risk of obstruction. The factors weigh favorably in favor of release in every instance, just as the California Magistrate found it was not even close. He is stable. He has ties to the community. He's got no family issues. He's got no mental health issues. He's got no drug problem, all of these things they would be bringing up if it were there.

He does not own this company anymore, so he doesn't have access to continue the ongoing activity that they allege. He doesn't have access to these witnesses. He has no -- he is willing to abide by all the conditions that the California Court has put in place. They've put in place monitoring bracelets, bonding of his residence, 10-million-dollar bond, passport surrender, travel restrictions, avoid contact with witnesses.

The Court has plenty of opportunities through its conditions to require his appearance and to prevent these things that they have exaggerated as far as potential obstruction.

The government wholly exaggerates any flight risk and has even less danger -- even less evidence of the

danger of obstruction.

It was argued that he hits all the red flags of flight, yet the only reason they are saying that he's a risk of flight is because he has a lot of money. They just want to say he has a lot of money and has the means to flee. Everybody who has money of this amount has got that argument. And so just because he has assets, he has planes -- the planes are not available. Apparently there's warrants for those. But there's lots of conditions that the Court can put in place to restrict that kind of travel.

He has known about this investigation for years. Was he mad when the FBI sent what he considered an unjustified intrusion into his business? Yeah, he was mad. And they want to hold that against him. They just want him to say come -- they want him to say, "Can I have another" instead of just being able to argue and be mad about it.

There is nothing improper about him calling up an FBI agent and saying, "Hey, if you want to talk to me, we'll talk to you." And then he follows up, not directly but through counsel; and he engages.

So he has shown a full intent to fight this case, not to fight -- not to be a flight risk but to fight it. He has fought it in civil litigation. He will continue to fight it in this criminal investigation.

We've shown you letters that show his engagement

with the government, his willingness, his intent to fight. They have shown you no evidence of any preparation to flee, no plane tickets, no converting money into cash, no off-site accounts. When Mr. Varadarajan talks about having all the red flags, there's none of the red flags that you usually hear about him preparing, buying tickets, putting money into cash, all the things that need be to show some kind of preparation to flight.

His international travel is well explained, and he hasn't traveled since 2019. So it's not like he has been jetting back and forth and has some current connection. The travel was connected to his business and was connected to vacations.

And, you know, this idea of what he calls a bald-faced lie about his travel, Judge, I'm not familiar; but you're entitled, you are, as to what kind of interview they do with Pretrial Services.

But the lawyer in California stood right there as the pretrial services officer asked about that travel and the officer says, "Do the best you can."

And he says, "I'm not going to be able to remember all my travel."

"Just do the best you can."

And for them to come in here and then say he should be detained for months on end because he can't

remember travel trips with that kind of history from years ago is just not right. It is gamesmanship, and it does not need to be -- he doesn't need to be held to that kind of requirement unless they can come in here and have the pretrial services officer say something more.

What they do is they bring an officer who has no idea and is just repeating things without any kind of detail that we can't get behind and creates some kind of guise that he's a bad guy and a liar without us being able to know what exactly the pretrial services officer said to him, what kind of warning she gave, what kind of access he had to his travel trips.

They want to punish him for forgetfulness of trips. There is no evidence that he intended -- and if you're going to intentionally not list trips, a trip to Toronto and the Bahamas is not the kind of trip that you would try to hide. He traveled a lot and he can't remember and there is nothing improper about him not putting that -- forgetting that in an interview in a jailhouse.

He is willing to submit to stringent conditions in that regard, and those have been put in place by the California Court.

As far as obstruction, he does not own the company or have any contact with these witnesses; and the conditions prevent him from having contact with the

witnesses.

You know, the government wants to talk about his gun ownership and somehow say that he has a gun and he has a temper, that therefore he's a risk to witnesses. That's just a bridge too far. Anybody can legally own weapons, and it should not be held against them.

And a single incident at 58 years old with no kind of context or history as to why he would have a reasonable fear of somebody coming to his house on a Sunday night late is not a reason to think after peaceful -- without any kind of criminal history behavior over 58 years, that he is some kind of monster that they are trying to make him out to be.

The other allegations. This $50 million of assets is just total speculation, Judge. There is just nothing there to it. Friday the government officer testifies in California that they have no kind of calculation of any kind of what happened with that $107 million.

They've got all the assets -- all the ability in the world and tools to be able to track that $107 million; and they can't tell the Court where it is, if he's somehow --

THE COURT: Mr. Brown, can you give me an accounting of -- I mean, we're down to --

MR. BROWN: He has --

THE COURT: Well --

MR. BROWN: He has --

THE COURT: -- let me finish.

MR. BROWN: Sorry.

THE COURT: Agent Rennie gets us down to 50 million. And I know there's other things he can't account for, for the vehicles and things like that. So based on taxes and the homes, that gets you down to about 50 million.

Can you give this Court an accounting of where the rest of the money has gone?

MR. BROWN: Mr. Vaughan has indicated to his counsel that he paid 50 percent in taxes, that it was twice what they are indicating, that it was a 50 percent tax debt on that -- on the $107 million. All I have of that is by secondhand account, but it was 50 percent tax debt.

He had paid $10 million plus to his wife and child in some kind of family payment.

The rest of it -- it is their burden to prove. What they want to just do is just throw up that it looks like there should be 50 million more dollars. They have done no accounting and shown nothing. They just say there is an accounting and don't bring you anything. And it's their burden to show that somehow that he has $50 million missing.

Tell us where it is. Surely they have tracked his

finances and know -- I mean, it all shows up in his account where they can track it as it comes out of that. They show no putting money in any kind of offshore accounts, any transfers like that --

THE COURT: Well, Mr. Brown, you have a little bit wrong there because it is not just the government's -- it is the government's burden generally. The government has raised an issue of where is all this money.

Have they done a complete forensic accounting of all of his bank accounts to try to trace it all? They haven't done that yet, but that's not necessary at this detention hearing. But they have raised a question, and I'm asking whether you can answer that question of where that missing money is at.

So -- and, again, I understand you're indicating -- of course, it's all third-hand but --

MR. BROWN: My understanding, your Honor --

THE COURT: That is a concern, I mean, with the Court, that there is a huge amount of money that is not accounted for.

MR. BROWN: My understanding is there was a 50 percent tax debt, $10 million to the wife, that the money went to properties and to living expenses which, as you can imagine, are considerable with Mr. Vaughan.

So, you know, we are certainly -- if the Court has

some concern, we can present more on that; but at this point there is certainly evidence -- you know, that doesn't change the fact that he's got plenty of money, if he wanted to, to flee. I mean, that doesn't change the fact that he's got money. And just because you have money does not mean that you are intending to flee.

THE COURT: No, but what's been disclosed to Pretrial Services is roughly about $10 million of assets, of liquid assets.

MR. BROWN: Well, if the Court would like us to supplement that, I'm glad to do that, to have the client --

THE COURT: Well, go ahead and complete your argument. I just -- those were just questions since you raised the issue of the money, so --

MR. BROWN: Otherwise, they want to muddy this defendant up and make you think he's a bad guy by bringing in unsubstantiated allegations related to hostile work environment claims that were made over five, ten years ago that were brought up that have been litigated that resulted in no kind of criminal charges, no kind of civil judgment. And you don't have -- you only have just the bare allegations. You don't have Mr. Vaughan's side of that.

And it is not alleged in this Indictment, it's not part of the case, and it is more akin to a hostile work environment claim than it is any kind of assault that they

want to claim.

The evidence that you saw today was a 2018 report about incidents that occurred in 2014 and 2015 that were brought up in the context of a civil complaint where a settlement was made, and there is obviously a lot more to that story.

And these witnesses are not in the same company with Mr. Vaughan. There are conditions that the Court can put in place to keep them away -- Mr. Vaughan away from them.

So it is their obligation to present clear and convincing evidence that there is a serious risk of flight and a serious risk of obstruction, and it's -- all they want to do is make this guy a bad guy. They have created a -- tried to make a businessman into some kind of Mafia Don, which is not the case. There is just not the evidence of it, Judge.

And we are asking you to keep the conditions in place that will adequately provide for his appearance and will prevent any concern that the Court may have with obstruction.

THE COURT: Thank you, Mr. Brown.

Anything additional?

MR. VARADARAJAN: Only one small thing, your Honor. I would clarify that our burden under 3142 is a

preponderance of the evidence for flight risk and it's clear and convincing for a danger to the community. But for flight risk and obstruction, I believe it's preponderance of the evidence. I believe Mr. Brown just stated that the standard was clear and convincing evidence, so just to clarify.

THE COURT: Clear and convincing is just for the danger and -- I had to look it up. It's been awhile since I had a detention hearing on the issue of obstruction, but I believe that is also -- it doesn't say; so it has to be preponderance of the evidence, I believe, for that as well. And, of course, flight risk is preponderance.

Okay. Anything else, then, from anybody before --

MR. VARADARAJAN: No, your Honor.

THE COURT: Okay. So this is a unique case that -- this is a gentleman that certainly has issues in terms of his conduct at the workplace; and, of course, what we have here -- of course, I've read the transcript of the detention hearing. I think that it's not that there's a lot of new evidence, but maybe more meat on the bones was placed on it in terms of details that Agent Rennie was able to give than the agent who testified who really knew nothing about the case at all.

And I guess what the Court looks at is, of course, this is a nonpresumption case. Normally we're in a

presumption situation and then -- so in a nonpresumption case, there is really a presumption that a person should be able to attain a bond unless there is a serious risk of flight or -- in this case danger is not an issue but the issue of whether there is a concern for obstruction.

I guess when I look at the conditions placed by the Magistrate Judge, I don't know why those conditions aren't sufficient to alleviate the concerns, with maybe one additional condition the Court would like to add to what the Magistrate Judge there placed on the defendant.

It seems to me that -- I know the issue -- there is a concern that, you know, he wasn't as forthcoming on his travel; but I think that's understandable. When you try to think about -- when you're giving an interview and asking all international travel and he hasn't traveled in the last three years, trying to think of all of those -- you would think he would remember the ones closer in time, but he had done a significant amount of travel.

And considering when I had to go through my background check, I had to go pull my records to try to figure out -- I didn't have a lot of international travel, but I knew I had crossed over to Mexico. But trying to figure out when I did those things, I wouldn't necessarily remember that and had to go find records and ask other people to try to figure out the details.

I do have concerns regarding the lack of accountability of the money, and I'm going to add a condition that he provide to the Court an accounting of where all the money went. And it can be done through Probation, but it has to be approved by the Court as a condition before he can be released.

Otherwise, I think all of the other conditions set by the Magistrate Judge which include a 10-million-dollar bond -- I don't know about the issue of the house. Is there any unencumbered property that the government hasn't placed a hold on or *lis pendens*?

MR. VARADARAJAN: I don't believe so, your Honor, not that I'm aware of.

THE COURT: So I'm not sure about that. Mr. Brown, have you -- I'm not sure I can impose that condition by the Magistrate Judge. I know the Magistrate Judge there indicated about having a certain hearing on that issue, which I'll tell you -- confess I am unfamiliar with because typically in our district as a Magistrate Judge, it's either -- we never did those kind of bonds typically. It's either you got detained or released on a PR bond. So I don't know that restriction, how that's overcome.

MR. BROWN: The case law that I saw that has been referenced there was that even if the government is seeking

to seize, it can still be used for bonding purposes. They are in the process at that -- the bond will be completed today, so the California Court is engaged in that regard.

THE COURT: And let me ask the government. I presume that even though the government is trying to seize that, the house, since it is unencumbered, could be used as collateral for the bond.

MR. VARADARAJAN: My understanding, your Honor, is that's a finding that the Court needs to make after a Nebbia hearing; and I don't believe that's just a --

THE COURT: But that's a hearing that the Judge out there -- I mean, I'm trying to figure out who that hearing.

MR. VARADARAJAN: My assumption is if this Court is setting that condition, it would be this Court that would have the hearing; but I'm not familiar with the --

THE COURT: Well, I'm just basically affirming and using the same conditions the Magistrate Judge there found. And since he is there -- I just wasn't sure who does that hearing. That Judge raised that hearing at the -- at the end of his detention hearing, he raised that issue about having to do that hearing. I'm just not --

MR. VARADARAJAN: But I don't know exactly where that was chronologically with the stay or -- that was issued, your Honor, so that's where I -- I don't know. We

can look it up and --

THE COURT: And I guess I don't have a problem necessarily with the Magistrate Judge there having that hearing, whether this Court directs that be done. It seems more suitable that it be done there, with the lawyers there, but -- unless the government has some objection to that. I mean --

MR. VARADARAJAN: No, we don't your honor.

THE COURT: I've never done one of those hearings, so it's just foreign to me because it's not something I usually did. Just, again, our procedures and practices in our district are very different than others. And our clerk's office never deals with those kind of bonds so --

So my view is we'll let the Magistrate Judge there do that. The only other condition I'm adding, because he has electronic monitoring as part of that, too, I think, that he ordered as well in terms of location monitoring and that but -- but the only other condition I'm adding is the issue of some kind of accounting that has to be approved by this Court, not by the Magistrate Judge. I'd just like to have a better idea of what happened to the money, and that may factor into whether or not the bond ever gets issued and he gets released but --

MR. VARADARAJAN: And, your Honor, if I may inquire if the government would have an opportunity to

review that financial accounting when it is done.

THE COURT: Mr. Brown?

MR. BROWN: I have no objection to that.

THE COURT: Yeah. I don't see a problem with that, either, so -- I would ask that whenever it gets filed, it be done under seal --

MR. VARADARAJAN: Of course.

THE COURT: -- and provided to the government. But, you know, for the -- I do know the Magistrate Judge found that it was not a close call; and after hearing everything today, I don't know that that's necessarily true. But since I just don't -- I don't see with his planes being seized -- as soon as I figure out about where this -- in terms of where the money is at, in terms of what he disclosed to the probation officer.

I would also note that the probation officer there recommended release, as did our Pretrial Services also recommended release, too. So I think there are conditions that the Magistrate Judge set. I just had the one additional condition that the Court has to approve -- that an accounting be presented and approved by the Court before the bond would allow him to be released.

MR. BROWN: Judge, can this be entered -- can the accounting be done after release?

THE COURT: No. It has to be -- no. My condition

is it has to be approved before he is released.

MR. BROWN: Okay. So --

THE COURT: Because the issue is that if somehow I have concerns, it may change the result in terms of his detention and so -- he has stated what he said to the pretrial service officer, and maybe that's true. Maybe that $10 million or whatever is all that's left. But I want to see that, okay?

So he will not be released until the Court signs off on and is satisfied. Okay?

MR. BROWN: Understood.

THE COURT: Any questions from the government?

MR. VARADARAJAN: No, your Honor.

THE COURT: Any questions from defense?

Okay. Very good. Then, we'll be in recess. Thank you.

MR. VARADARAJAN: One small thing, your Honor. I'm sorry. Just a logistical thing. To the extent it hasn't been done already, can we unseal the Indictment?

THE COURT: Oh, I don't see a reason why not to.

MR. BROWN: I assumed it had already been done, so --

MR. VARADARAJAN: No. I believe all of the defendants have made an appearance, not in this district but --

THE COURT: That's fine. You can go ahead and -- Ms. Conrad can make that docket entry that it can be unsealed, and we'll get that done.

MR. VARADARAJAN: Thank you, your Honor.

THE COURT: Thank you.

(Proceedings concluded, 12:50 p.m.)

COURT REPORTER'S CERTIFICATION

I HEREBY CERTIFY THAT ON THIS DATE, JULY 31, 2022, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

/s/
CHRISTINA L. BICKHAM, CRR, RDR

# INDEX


| | PAGE |
|---|---|
| JASON RENNIE | |
| DIRECT EXAMINATION BY MS. RATTAN | 4 |
| CROSS-EXAMINATION BY MR. BROWN | 51 |
| REDIRECT EXAMINATION BY MS. RATTAN | 89 |
| GOVERNMENT RESTS | 93 |
| ARGUMENT BY MR. VARADARAJAN | 94 |
| ARGUMENT BY MR. BROWN | 101 |
| COURT REPORTER'S CERTIFICATION | 119 |


# INDEX OF EXHIBITS


| | PAGE |
|---|---|
| Government's Exhibit 3 | 19 |
| Government's Exhibit 4 | 25 |
| Government's Exhibit 4 | 29 |
| Government's Exhibit 1 | 36 |
| Government's Exhibits 1 through 6 | 56 |
| Government's Exhibit 1 | 91 |
| Defendant's Exhibit 8 | 3 |
| Defendant's Exhibits 1 through 7 | 56 |

## $

**$10** [5] - 28:23, 108:16, 109:22, 110:8, 118:7
**$100** [6] - 22:22, 22:25, 25:24, 26:19, 97:19, 97:21
**$107** [23] - 14:21, 15:3, 26:21, 29:14, 29:16, 29:21, 30:8, 30:20, 31:3, 31:8, 31:25, 32:18, 66:22, 67:10, 68:19, 71:16, 84:25, 85:5, 95:7, 97:13, 107:17, 107:19, 108:14
**$130** [1] - 16:21
**$170** [3] - 14:19, 14:23, 33:8
**$20** [1] - 30:25
**$200** [1] - 6:20
**$25** [5] - 31:2, 31:20, 32:3, 70:16, 85:23
**$25,000** [1] - 24:21
**$27** [1] - 68:18
**$28** [1] - 32:7
**$30** [2] - 68:22, 68:23
**$50** [14] - 30:18, 66:24, 67:11, 67:17, 69:6, 69:23, 69:25, 70:6, 71:11, 71:25, 72:5, 107:13, 108:23

## '

**'18** [1] - 21:22
**'22** [1] - 45:22

## /

**/s** [1] - 119:12

## 1

**1** [16] - 5:1, 5:15, 5:25, 36:24, 37:3, 37:12, 37:21, 56:14, 56:23, 91:23, 91:25, 102:17, 120:17, 120:18, 120:19, 120:23
**10** [4] - 29:18, 30:10, 37:21, 97:15
**10-million-dollar** [3] - 70:23, 103:18, 114:8
**100** [4] - 26:16, 73:17, 100:12, 100:13
**100,000-dollar** [1] - 24:21
**101** [1] - 120:7
**107** [4] - 30:9, 31:15, 32:25, 71:21
**107.5** [1] - 26:4
**10:00** [2] - 74:5, 74:23
**11-year-old** [1] - 45:23
**115** [1] - 37:23
**119** [1] - 120:8
**11th** [1] - 37:6
**125** [1] - 16:21
**12:08** [1] - 94:7
**12:15** [1] - 94:7
**12:50** [1] - 119:6
**13** [3] - 33:1, 71:18, 87:1
**13.3** [1] - 14:9
**16** [1] - 66:7
**18** [5] - 4:21, 17:25, 26:5, 66:7, 89:11
**19** [1] - 120:14

## 2

**2** [1] - 6:2
**20** [8] - 31:20, 32:3, 43:21, 53:2, 69:20, 69:21, 70:3, 70:12
**20-year-old** [4] - 43:3, 43:7, 75:9, 99:25
**2012** [1] - 10:22
**2013** [4] - 10:22, 32:22, 33:5, 71:20
**2014** [5] - 38:18, 80:17, 80:18, 111:3
**2015** [4] - 64:18, 79:13, 80:18, 111:3
**2016** [2] - 20:15, 79:13
**2017** [11] - 19:9, 20:13, 20:16, 20:23, 21:12, 78:4, 79:13, 79:18, 80:18, 97:25
**2018** [25] - 14:20, 16:20, 20:20, 21:7, 25:15, 26:2, 26:19, 29:13, 30:8, 31:4, 32:2, 32:19, 37:6, 53:1, 54:7, 58:24, 61:25, 66:22, 71:17, 80:14, 80:19, 80:25, 98:1, 111:2
**2019** [19] - 10:23, 22:2, 22:3, 33:5, 48:4, 53:1, 53:2, 56:16, 57:8, 63:7, 63:12, 64:19, 71:20, 95:18, 95:20, 96:3, 96:12, 98:2, 105:10
**2020** [1] - 96:3
**2021** [1] - 96:3
**2022** [6] - 23:13, 27:16, 45:19, 45:21, 96:3, 119:9
**23rd** [1] - 45:20
**25** [11] - 30:17, 68:22, 68:23, 69:6, 69:21, 69:22, 70:3, 70:12, 85:10, 89:8, 120:15
**27** [1] - 68:17
**29** [1] - 120:16

## 3

**3** [16] - 8:18, 8:25, 9:11, 9:20, 9:21, 10:1, 10:5, 11:21, 14:7, 19:17, 19:25, 20:2, 47:24, 60:18, 120:14, 120:22
**3.5** [1] - 27:5
**30** [3] - 42:23, 73:2, 73:17
**302s** [1] - 51:15
**31** [1] - 119:8
**3142** [2] - 98:10, 111:25
**3142(f)(2** [1] - 94:15
**3142(g** [2] - 15:23, 47:1
**3142(g)** [1] - 99:10
**36** [1] - 120:17

## 4

**4** [8] - 19:17, 20:1, 25:14, 29:13, 37:12, 120:3, 120:15, 120:16
**401(k** [1] - 24:21

## 5

**5** [3] - 6:17, 9:24, 10:9
**5'4** [1] - 37:22
**50** [11] - 70:16, 73:17, 85:10, 89:7, 108:5, 108:8, 108:12, 108:13, 108:15, 108:20, 109:22
**50-million-dollar** [1] - 69:19
**51** [1] - 120:4
**56** [2] - 120:18, 120:23
**58** [3] - 101:5, 107:7, 107:11

## 6

**6** [4] - 10:11, 10:12, 56:23, 120:18
**6:00** [4] - 57:16, 63:19, 93:14, 102:19

## 7

**7** [7] - 31:15, 32:6, 56:14, 67:22, 68:14, 95:7, 120:23
**7,000** [2] - 6:13, 33:10
**7,000-plus** [1] - 9:17
**7-Eleven** [1] - 7:5
**7.5** [1] - 26:12
**7.541** [1] - 25:24
**75** [1] - 32:5

## 8

**8** [11] - 3:1, 21:5, 21:9, 32:6, 32:7, 67:22, 68:14, 91:23, 91:24, 91:25, 120:22
**8-13** [1] - 21:22
**8-30** [1] - 25:22
**80** [1] - 46:4
**87** [2] - 6:18, 9:1
**89** [1] - 120:4

## 9

**9** [2] - 68:15, 68:16
**9-millimeter** [1] - 100:2
**91** [1] - 120:19
**93** [1] - 120:5
**94** [1] - 120:6
**99** [2] - 25:23, 26:12
**9:00** [2] - 74:5, 74:23

## A

**a.m** [3] - 57:16, 63:19, 102:19
**abide** [1] - 103:15
**ability** [3] - 18:10, 25:1, 107:18
**able** [16] - 24:10, 43:11, 58:11, 60:11, 62:14, 62:15, 67:11, 80:15, 85:9,

102:15, 104:16, 105:21, 106:9, 107:19, 112:21, 113:3
**abroad** [3] - 25:12, 32:11, 64:19
**absconding** [2] - 24:22, 94:24
**absences** [2] - 46:4, 46:5
**absent** [2] - 46:1, 67:11
**abundance** [1] - 31:22
**abuse** [3] - 38:18, 45:4, 87:2
**accelerated** [1] - 15:3
**access** [22] - 17:14, 17:15, 18:12, 18:13, 18:24, 24:14, 24:15, 44:1, 44:18, 55:18, 63:5, 64:1, 64:4, 64:8, 84:14, 84:16, 86:21, 103:13, 103:14, 106:11
**accident** [1] - 88:17
**account** [28] - 11:9, 15:4, 25:14, 25:19, 26:3, 26:6, 26:13, 26:14, 26:18, 29:14, 29:16, 29:24, 30:1, 30:4, 30:5, 30:20, 32:19, 66:21, 66:22, 69:6, 69:18, 70:11, 85:15, 93:9, 108:6, 108:15, 109:1
**accountability** [1] - 114:2
**accountants** [2] - 67:3, 67:4
**accounted** [3] - 29:9, 90:4, 109:20
**accounting** [20] - 30:7, 66:23, 71:22, 71:24, 72:4, 73:24, 85:9, 89:15, 97:20, 107:23, 108:9, 108:21, 108:22, 109:9, 114:3, 116:19, 117:1, 117:21, 117:24
**accounts** [7] - 24:25, 96:16, 97:14, 97:15, 105:4, 109:3, 109:10
**accurate** [3] - 23:21, 66:11, 70:7
**accurately** [1] - 66:18
**acquaintances** [4] - 17:13, 24:15, 24:16
**act** [1] - 100:18
**acting** [1] - 20:9
**action** [1] - 57:20
**actions** [1] - 96:10
**activity** [6] - 44:15, 44:18, 44:19, 50:8, 53:14, 103:13
**actual** [1] - 26:13
**add** [5] - 8:25, 9:23, 99:19, 113:9, 114:2
**adding** [2] - 116:15, 116:18
**addition** [7] - 9:5, 11:20, 13:8, 66:13, 71:20, 74:1, 90:6
**additional** [14] - 3:8, 3:10, 3:14, 7:25, 8:25, 11:21, 14:5, 14:7, 34:4, 66:17, 79:17, 111:23, 113:9, 117:20
**additionally** [1] - 50:21
**address** [1] - 38:17
**adequate** [1] - 59:6
**adequately** [1] - 111:19
**adjust** [1] - 10:11
**administered** [1] - 4:4
**administrative** [2] - 49:14, 50:6
**admission** [1] - 86:19
**admissions** [1] - 87:2
**admit** [2] - 57:1, 57:2
**admitted** [1] - 87:6
**advances** [1] - 13:11
**advantage** [1] - 59:21
**affairs** [1] - 84:9
**affidavit** [2] - 51:24, 69:3
**affirming** [1] - 115:17
**afforded** [1] - 72:19
**afraid** [1] - 43:9
**agency** [3] - 4:18, 45:13, 54:22
**Agent** [15] - 4:1, 4:2, 37:2, 51:4, 60:2, 60:11, 61:9, 72:10, 72:17, 73:6, 85:20, 95:16, 98:3, 108:4, 112:21
**agent** [21] - 4:14, 4:22, 17:25, 22:5, 25:2, 26:5, 48:16, 49:5, 51:23, 52:10, 52:11, 71:23, 72:1, 72:3, 72:6, 72:8, 83:7, 95:21, 99:23, 104:18, 112:22
**agents** [9] - 48:7, 49:14, 51:19, 51:25, 52:3, 52:4, 52:7, 67:2, 89:15
**aggressive** [2] - 83:16, 92:8
**aggressively** [1] - 40:15
**ago** [6] - 12:3, 20:15, 24:1, 97:12, 106:2, 110:18
**agree** [10] - 13:9, 17:24, 55:11, 57:6, 60:6, 61:11, 64:7, 73:23, 75:13, 75:16
**agreed** [3] - 3:2, 8:22, 61:12
**agreed-upon** [1] - 8:22
**agreement** [1] - 10:18
**agreements** [3] - 7:15, 58:16, 81:22
**agrees** [1] - 61:17
**ahead** [17] - 3:18, 4:5, 5:16, 7:10, 33:17, 34:3, 40:10, 47:19, 56:22, 61:3, 73:5, 75:24, 77:6, 89:3, 94:10, 110:12, 119:1
**aircraft** [8] - 15:8, 16:15, 16:22, 17:17, 18:5, 27:4, 95:10
**airing** [1] - 81:15
**airplanes** [2] - 84:10, 84:11
**airport** [2] - 18:15
**Airport** [2] - 21:23, 21:25
**airports** [2] - 17:1, 18:22
**akin** [1] - 110:24
**allegation** [1] - 46:16
**allegations** [14] - 14:11, 35:25, 36:3, 36:6, 44:14, 58:14, 81:24, 88:2, 101:11, 101:14, 107:13, 110:17, 110:22
**allege** [1] - 103:14
**alleged** [6] - 72:14, 85:10, 86:18, 87:19, 91:5, 110:23
**allegedly** [2] - 100:6, 100:9
**alleviate** [1] - 113:8
**allow** [3] - 25:10, 58:8, 117:22
**allowed** [5] - 47:12, 57:13, 57:25, 59:19, 64:1
**allows** [1] - 60:16
**almost** [3] - 25:23, 31:4, 36:1
**alone** [3] - 18:5, 96:20, 99:2
**altered** [1] - 11:11
**amended** [1] - 66:16
**amount** [19] - 8:23, 9:9, 10:5, 22:22, 25:9, 26:15, 28:25, 29:1, 29:8, 30:12, 30:15, 42:15, 60:16, 69:2, 71:24, 89:25, 104:6, 109:19, 113:18
**amounts** [4] - 33:6, 69:4, 89:20, 101:17
**analysts** [2] - 67:4, 89:16
**ancestors** [2] - 84:20, 84:22
**anecdotal** [1] - 99:19
**Angeles** [1] - 74:7
**anger** [1] - 83:5
**angry** [9] - 48:16, 49:8, 83:9, 83:11, 83:16, 84:4, 84:8, 86:14
**Anguilla** [2] - 16:17, 55:10
**answer** [5] - 59:11, 73:5, 74:19, 77:6, 109:13
**answered** [1] - 77:5
**anyway** [1] - 48:2
**apologize** [2] - 45:22, 80:11
**apologized** [1] - 80:8
**apparent** [1] - 39:4
**appear** [2] - 31:9, 31:10
**appearance** [4] - 3:2, 103:21, 111:19, 118:24
**appeared** [1] - 73:10
**apprised** [2] - 50:10, 53:21
**approached** [4] - 40:13, 48:14, 96:12, 99:24
**appropriate** [4] - 47:4, 101:3, 101:17, 102:7
**approve** [1] - 117:20
**approved** [5] - 46:4, 114:5, 116:19, 117:21, 118:1
**AR-15** [1] - 42:24
**area** [11] - 39:9, 39:10, 39:14, 40:2, 40:4, 40:5, 40:17, 40:19, 52:17, 92:5, 92:8
**arguably** [1] - 92:10
**argue** [1] - 104:16
**argued** [1] - 104:2
**arguing** [1] - 77:1
**ARGUMENT** [2] - 120:6, 120:7
**argument** [12] - 33:16, 33:18, 34:1, 40:9, 55:5, 55:6, 94:4, 94:10, 94:21, 101:1, 104:7, 110:13
**argumentative** [2] - 86:1, 88:22
**armed** [1] - 43:16
**arms** [1] - 92:8
**Army** [1] - 101:6
**arrest** [12] - 42:23, 57:21, 57:24, 58:5, 64:6, 78:10, 93:5, 93:10, 102:17, 102:21
**arrested** [14] - 57:15, 57:17, 58:3, 73:8, 78:13, 78:20, 79:1, 79:10, 92:19, 93:1, 93:3, 93:13, 93:14, 99:1
**arrests** [2] - 79:6, 92:20
**arrival** [3] - 22:1, 22:2
**arrived** [3] - 21:23, 43:6, 74:9
**aspect** [1] - 26:25
**assault** [10] - 13:12, 14:12, 35:20, 41:10, 44:13, 79:8, 79:11, 87:2, 91:6, 110:25
**assaulted** [3] - 38:9, 100:6, 100:7
**assaults** [3] - 78:10, 79:17, 81:21
**assess** [1] - 92:22
**assets** [8] - 66:20, 94:22, 96:17, 104:7, 107:13, 107:18, 110:8, 110:9
**assigned** [1] - 4:17

**assist** [2] - 5:11
**association** [1] - 42:21
**assume** [1] - 65:14
**assumed** [1] - 118:21
**assumption** [1] - 115:14
**attain** [1] - 113:3
**attempt** [6] - 41:15, 44:10, 46:9, 46:10, 54:18, 92:15
**attempted** [3] - 43:2, 54:10, 58:7
**attempting** [1] - 82:22
**attempts** [2] - 13:17, 55:21
**attend** [1] - 100:12
**attention** [4] - 4:24, 19:6, 36:23, 93:11
**attorney** [1] - 76:12
**Attorney's** [9] - 49:22, 50:1, 55:25, 56:17, 57:7, 57:10, 87:23, 88:4, 88:12
**attorneys** [1] - 57:7
**Audis** [1] - 15:5
**August** [3] - 14:20, 16:20, 71:17
**authorities** [1] - 22:18
**availability** [5] - 17:12, 24:17, 52:2, 55:17, 59:23
**available** [4] - 51:25, 71:22, 104:8
**aviation** [19] - 16:15, 16:23, 16:24, 17:12, 17:14, 17:17, 17:21, 17:22, 18:5, 18:6, 18:12, 18:21, 19:4, 23:20, 24:17, 27:6, 27:22, 95:10
**Aviation** [2] - 16:23, 27:6
**avoid** [2] - 54:22, 103:19
**aware** [35] - 11:23, 12:15, 36:9, 51:8, 51:10, 52:11, 52:14, 54:5, 54:17, 55:22, 56:4, 56:8, 58:2, 58:19, 59:1, 59:12, 72:1, 75:19, 76:2, 76:10, 76:11, 76:12, 76:17, 78:1, 78:3, 78:8, 81:12, 81:14, 81:18, 83:8, 85:6, 85:7, 86:7, 87:18, 114:13
**awhile** [1] - 112:8

## B

**back-and-forth** [1] - 75:3
**backed** [3] - 30:9, 30:10, 31:19
**background** [1] - 113:20
**backyard** [1] - 43:25
**bad** [4] - 84:5, 106:9, 110:16, 111:14
**Bahamas** [18] - 22:2, 22:5, 22:6, 22:8, 22:11, 22:19, 23:1, 23:4, 23:7, 30:22, 65:11, 65:12, 65:15, 90:18, 90:19, 98:2, 98:4, 106:16
**balance** [6] - 15:23, 26:3, 26:13, 26:14, 29:11
**bald** [2] - 97:23, 105:15
**bald-faced** [2] - 97:23, 105:15
**ballpark** [1] - 68:5
**banging** [1] - 74:6
**bank** [12] - 24:21, 26:14, 29:11, 29:12, 29:14, 30:20, 32:19, 66:21, 85:15, 97:14, 109:10
**banks** [1] - 6:9
**bare** [1] - 110:21
**baseball** [2] - 17:8, 17:9
**based** [11] - 25:3, 29:7, 29:11, 31:10, 41:10, 41:13, 50:13, 89:18, 96:9, 97:4, 108:7
**basing** [1] - 89:14
**basis** [6] - 58:20, 59:14, 96:20, 99:2
**Beach** [1] - 15:7
**became** [3] - 13:6, 51:8, 87:18
**become** [2] - 7:12, 11:24
**becomes** [1] - 55:22
**bed** [1] - 63:19
**begin** [1] - 97:11
**begins** [1] - 37:14
**BEHALF** [1] - 4:8
**behalf** [2] - 20:9, 99:11
**behave** [2] - 99:14, 100:17
**behavior** [5] - 41:1, 41:14, 44:8, 47:13, 107:11
**behind** [1] - 106:8
**benefit** [1] - 31:22
**benefited** [1] - 14:2
**benefitted** [1] - 13:23
**Bermuda** [1] - 22:10
**best** [5] - 64:15, 66:6, 98:12, 105:20, 105:23
**better** [1] - 116:21
**between** [21] - 6:8, 28:12, 30:17, 32:3, 56:15, 57:10, 57:12, 58:17, 58:24, 62:20, 64:18, 68:22, 69:6, 69:20, 70:3, 70:12, 71:20, 74:5, 74:23, 95:23, 102:25
**beyond** [2] - 21:16, 86:10
**BICKHAM** [1] - 119:12
**big** [5] - 24:13, 27:1, 44:7, 50:13, 71:9
**bill** [2] - 60:8, 60:9
**Bill** [1] - 91:14
**billing** [1] - 13:7
**billion** [2] - 6:17, 9:24
**bit** [6] - 21:19, 30:8, 52:22, 58:14, 66:20, 109:5
**black** [2] - 97:23, 100:11
**black-and-white** [2] - 97:23, 100:11
**blue** [1] - 24:20
**blue-collar** [1] - 24:20
**bond** [17] - 19:12, 19:13, 19:15, 20:8, 20:19, 28:5, 28:10, 28:16, 28:21, 103:18, 113:3, 114:9, 114:22, 115:2, 115:7, 116:22, 117:22
**bonding** [2] - 103:17, 115:1
**bonds** [2] - 114:20, 116:13
**bones** [1] - 112:20
**bonus** [2] - 33:2, 71:19
**bonuses** [4] - 14:5, 14:8, 35:1
**bootstrap** [1] - 55:1
**Border** [1] - 64:3
**boring** [1] - 65:8
**boss** [1] - 101:18
**bottom** [2] - 37:22, 50:13
**bought** [1] - 33:7
**bracelets** [1] - 103:17
**brag** [1] - 35:9
**brandished** [5] - 43:2, 43:12, 44:4, 72:22, 73:12
**brandishes** [1] - 99:25
**break** [3] - 87:11, 94:3, 94:5
**breasts** [1] - 39:7
**bridge** [1] - 107:5
**briefed** [1] - 51:11
**brilliance** [2] - 10:6, 10:13
**bring** [3] - 6:22, 106:6, 108:22
**bringing** [2] - 103:10, 110:16
**broad** [2] - 47:1, 71:9
**broken** [1] - 81:22
**brought** [5] - 51:11, 96:2, 101:12, 110:19, 111:4
**BROWN** [48] - 7:9, 33:15, 34:1, 40:9, 46:7, 47:6, 47:12, 51:3, 56:9, 56:12, 57:5, 60:25, 61:2, 61:5, 73:20, 75:10, 75:23, 76:1, 77:9, 78:16, 78:18, 78:25, 79:2, 79:4, 86:3, 87:9, 87:13, 87:15, 88:24, 93:20, 94:2, 101:2, 107:24, 108:1, 108:3, 108:11, 109:17, 109:21, 110:10, 110:15, 114:24, 117:3, 117:23, 118:2, 118:11, 118:21, 120:4, 120:7
**Brown** [12] - 51:5, 55:8, 68:3, 71:12, 87:8, 93:19, 107:22, 109:5, 111:22, 112:4, 114:15, 117:2
**bullet** [3] - 13:4, 15:18, 43:1
**bullet-point** [1] - 13:4
**bullet-pointed** [1] - 15:18
**bullied** [1] - 100:4
**bully** [1] - 83:16
**bunch** [2] - 22:5, 73:9
**burden** [4] - 108:18, 108:23, 109:7, 111:25
**burnt** [1] - 97:19
**business** [23] - 16:3, 17:4, 24:15, 27:8, 27:13, 27:15, 48:25, 54:13, 54:16, 55:1, 62:1, 80:3, 88:7, 88:14, 88:19, 95:9, 97:18, 98:22, 101:5, 101:15, 102:24, 104:13, 105:12
**businesses** [2] - 6:14, 6:21
**businessman** [2] - 101:22, 111:15
**button** [1] - 64:2
**buy** [3] - 7:5, 23:12, 25:11
**buying** [1] - 105:6
**BY** [29] - 4:9, 5:17, 7:11, 20:7, 21:6, 33:21, 34:5, 37:1, 37:19, 40:11, 41:8, 47:20, 51:3, 57:5, 61:5, 73:20, 75:10, 76:1, 77:9, 78:18, 79:4, 86:3, 87:15, 89:6, 120:3, 120:4, 120:4, 120:6, 120:7

## C

**Caicos** [3] - 16:17, 22:11, 55:10
**calculated** [3] - 10:1, 31:21, 71:21
**calculation** [2] - 30:1, 107:16
**calculations** [1] - 68:3
**calendar** [1] - 64:1
**California** [20] - 3:1, 3:11, 12:2, 20:12, 29:24, 45:5, 45:13, 63:15, 66:14, 67:19,

71:23, 72:2, 72:11, 101:3, 103:6, 103:16, 105:18, 106:22, 107:16, 115:3
**CALLED** [1] - 4:8
**caller** [1] - 45:23
**Canada** [1] - 65:18
**card** [21] - 6:7, 6:8, 6:9, 6:10, 6:15, 7:1, 7:3, 7:5, 7:17, 7:20, 8:24, 9:7, 9:10, 10:15, 26:1, 58:16, 60:6, 61:16, 62:1, 101:17
**care** [1] - 35:8
**Caribbean** [2] - 22:8, 22:10
**cars** [3] - 29:20, 31:12, 71:15
**Case** [1] - 37:4
**case** [89] - 4:24, 5:1, 5:3, 6:24, 12:16, 13:2, 13:14, 22:6, 22:19, 35:18, 35:19, 36:16, 42:13, 44:9, 46:9, 47:5, 48:16, 49:4, 49:19, 49:20, 49:21, 49:25, 50:4, 50:14, 51:7, 51:8, 51:10, 51:11, 51:19, 51:20, 51:23, 51:25, 52:2, 52:4, 52:7, 54:6, 56:4, 57:14, 57:25, 58:15, 60:21, 61:9, 62:15, 67:2, 75:21, 76:5, 76:10, 76:11, 76:16, 77:23, 78:11, 78:13, 78:19, 78:22, 79:6, 87:18, 87:23, 88:4, 89:10, 89:15, 94:14, 94:16, 97:4, 99:8, 99:12, 100:15, 100:23, 101:3, 101:4, 101:13, 101:21, 101:23, 101:25, 102:1, 102:2, 102:8, 102:9, 102:14, 103:3, 104:21, 110:24, 111:16, 112:15, 112:23, 112:25, 113:2, 113:4, 114:24
**cases** [4] - 18:1, 89:12, 97:1
**cash** [3] - 31:17, 105:3, 105:7
**categories** [1] - 71:9
**category** [1] - 70:14
**caused** [1] - 100:10
**caution** [1] - 31:22
**cell** [1] - 64:23
**center** [1] - 27:19
**CEO** [1] - 38:15
**certain** [20] - 8:23, 23:23, 23:24, 28:3, 53:25, 54:1, 57:19, 57:20, 59:3, 59:23, 60:16, 67:21, 67:25, 74:15, 78:6, 82:3, 85:1, 93:2, 93:11, 114:17
**certainly** [3] - 109:25, 110:2, 112:16
**CERTIFICATION** [2] - 119:7, 120:8
**CERTIFY** [1] - 119:8
**CFO** [3] - 38:5, 38:17, 40:12
**chair** [1] - 39:20
**chances** [1] - 55:19
**change** [5] - 60:9, 98:25, 110:3, 110:4, 118:4
**changed** [3] - 45:14, 46:20, 96:13
**changing** [3] - 10:13, 45:1, 45:2
**character** [1] - 46:10
**characteristics** [3] - 47:3, 47:18, 99:8
**charge** [10] - 10:9, 49:14, 59:14, 59:22, 59:23, 60:6, 60:16, 60:18, 62:4, 62:7
**charged** [7] - 7:24, 54:21, 54:23, 59:6, 78:20, 91:16, 102:4
**charges** [11] - 54:21, 56:19, 77:23, 78:3, 79:5, 81:23, 81:25, 87:22, 91:5, 91:9, 110:20
**charging** [3] - 60:10, 61:12, 88:13
**charities** [3] - 6:14, 6:21, 33:11
**charity** [1] - 71:2
**check** [7] - 95:3, 95:5, 95:7, 95:9, 95:11, 95:12, 113:20
**checks** [1] - 94:25
**chief** [4] - 34:16, 38:4, 40:13, 42:9
**Child** [2] - 44:25, 45:5
**child** [16] - 45:4, 45:10, 45:11, 45:14, 45:17, 46:1, 46:18, 47:8, 47:9, 47:15, 70:25, 100:10, 100:11, 108:16
**child's** [2] - 46:17, 46:19
**children** [4] - 57:17, 70:19, 101:6
**choice** [1] - 74:22
**chose** [2] - 98:12, 102:16
**CHRISTINA** [1] - 119:12
**chronologically** [1] - 115:24
**circumstance** [1] - 83:15
**circumstances** [1] - 74:15
**citizen** [1] - 22:15
**civil** [16] - 36:10, 58:23, 59:1, 59:4, 59:7, 59:9, 62:19, 62:22, 81:13, 91:9, 96:17, 102:2, 104:23, 110:20, 111:4
**civilly** [1] - 71:7
**claim** [4] - 45:4, 45:15, 110:25, 111:1
**claimed** [1] - 94:19
**claims** [2] - 78:8, 110:18
**clarify** [2] - 111:25, 112:6
**cleanly** [1] - 94:14
**clear** [6] - 48:24, 96:4, 111:11, 112:2, 112:5, 112:7
**clerk's** [1] - 116:13
**client** [4] - 6:25, 8:23, 9:4, 110:11
**clients** [9] - 6:13, 6:14, 7:14, 8:22, 9:7, 10:14, 11:20, 87:24
**close** [8] - 23:13, 27:16, 54:1, 62:14, 87:9, 101:4, 103:7, 117:10
**closed** [4] - 36:16, 42:3, 78:14, 78:23
**closer** [1] - 113:17
**closest** [1] - 22:17
**closing** [1] - 101:1
**clothes** [1] - 40:2
**clothing** [1] - 39:4
**coast** [3] - 17:11, 27:17, 27:21
**codefendant** [2] - 35:2, 35:4
**codefendants** [13] - 7:25, 9:2, 12:16, 14:17, 14:25, 34:25, 35:22, 41:11, 44:12, 44:20, 58:6, 82:8, 82:25
**codes** [1] - 21:19
**coercion** [1] - 34:13
**collar** [3] - 4:19, 24:20, 35:19
**collateral** [1] - 115:7
**color** [1] - 39:2
**combines** [2] - 20:16, 27:10
**coming** [7] - 14:8, 74:16, 75:20, 76:20, 91:13, 93:17, 107:9
**comment** [3] - 64:16, 72:8, 77:19
**commented** [1] - 34:23
**comments** [2] - 34:20, 83:4
**commercial** [1] - 16:15
**commission** [1] - 13:23
**commit** [1] - 13:22
**committed** [1] - 24:20
**committing** [1] - 12:22
**common** [5] - 17:22, 22:9, 77:12, 77:14, 77:18
**communication** [3] - 53:14, 54:1, 57:6
**communications** [1] - 56:3
**community** [3] - 17:23, 103:8, 112:2
**commuter** [1] - 17:1
**companies** [5] - 7:17, 8:24, 58:25, 59:19, 62:20
**company** [56] - 6:7, 6:8, 7:8, 7:12, 8:10, 9:18, 10:15, 10:21, 11:1, 11:8, 13:9, 13:13, 14:4, 14:8, 14:18, 14:23, 14:24, 15:1, 16:23, 17:17, 17:21, 18:5, 18:6, 19:4, 22:23, 25:16, 26:1, 27:6, 30:4, 32:20, 33:5, 33:7, 34:13, 34:24, 37:8, 38:5, 40:13, 40:14, 58:17, 58:25, 61:16, 61:24, 62:11, 79:13, 88:7, 88:11, 92:3, 92:11, 95:10, 100:5, 100:8, 102:5, 102:10, 103:12, 106:23, 111:7
**company's** [1] - 84:17
**compare** [1] - 20:25
**competition** [1] - 60:17
**competitive** [1] - 59:21
**competitors** [1] - 59:22
**complain** [2] - 49:10
**complainants** [1] - 36:10
**complaint** [10] - 36:15, 49:13, 50:7, 61:6, 80:22, 81:1, 87:18, 88:1, 88:12, 111:4
**complaints** [6] - 35:23, 61:7, 78:12, 78:21, 79:7, 81:16
**complete** [2] - 109:9, 110:12
**completed** [1] - 115:2
**completely** [1] - 24:3
**conceal** [1] - 98:13
**concern** [24] - 18:9, 22:7, 26:22, 33:24, 34:8, 34:10, 35:16, 36:12, 41:13, 44:21, 63:6, 73:7, 77:2, 84:10, 84:15, 90:5, 91:1, 92:14, 92:16, 109:18, 110:1, 111:20, 113:5, 113:12
**concerned** [2] - 96:23, 96:24
**concerning** [9] - 24:9, 25:2, 40:7, 44:9, 44:17, 44:19, 44:20, 73:18, 75:12
**concerns** [8] - 50:15, 50:21, 50:22, 97:4, 98:16, 113:8, 114:1, 118:4
**concluded** [1] - 119:6
**condition** [9] - 113:9, 114:3, 114:6, 114:16, 115:15, 116:15, 116:18, 117:20, 117:25
**conditions** [12] - 103:15, 103:21, 104:9, 106:20, 106:25, 111:8, 111:18, 113:6, 113:7, 114:7, 115:18, 117:18
**conduct** [5] - 41:17, 80:17, 80:19, 81:1, 112:17
**conducting** [1] - 6:10
**confess** [1] - 114:18

**confirm** [1] - 100:4
**connected** [3] - 27:12, 105:12
**connection** [1] - 105:11
**connections** [4] - 16:23, 16:24, 16:25, 95:8
**Connolly** [1] - 56:16
**Conrad** [2] - 3:5, 119:2
**conservative** [2] - 31:2
**conservatively** [4] - 31:18, 31:20, 31:21, 70:4
**consider** [2] - 23:22, 99:9
**considerable** [1] - 109:24
**consideration** [11] - 27:1, 32:2, 32:15, 68:8, 69:12, 69:13, 69:24, 85:17, 89:23, 93:4, 102:15
**considered** [2] - 68:5, 104:12
**considering** [1] - 113:19
**considers** [3] - 15:24, 90:3, 90:8
**consistent** [1] - 36:2
**conspiracy** [6] - 6:16, 9:25, 10:20, 10:22, 36:7, 38:2
**Constitution** [1] - 72:19
**contact** [8] - 13:11, 45:11, 45:15, 45:16, 86:18, 103:19, 106:24, 106:25
**contacting** [2] - 49:11, 49:25
**contacts** [7] - 17:4, 17:22, 18:9, 23:19, 27:8, 27:13, 98:22
**contents** [1] - 86:21
**contested** [1] - 87:4
**context** [2] - 107:8, 111:4
**continue** [5] - 62:18, 94:6, 100:18, 103:13, 104:23
**continued** [4] - 62:4, 62:10, 62:13, 62:17
**continues** [3] - 62:7, 102:3, 102:4
**continuing** [2] - 13:20, 80:18
**contract** [1] - 101:16
**contracts** [2] - 11:8, 11:11
**contrary** [1] - 77:7
**contrast** [1] - 29:4
**convenience** [1] - 6:11
**conversation** [4] - 49:4, 53:24, 72:10, 75:3
**conversations** [5] - 51:22, 52:4, 52:8, 56:6, 82:24
**conversing** [1] - 44:5
**converting** [1] - 105:3
**convicted** [3] - 79:1, 79:10, 96:15
**convictions** [1] - 101:8
**convincing** [4] - 111:12, 112:2, 112:5, 112:7
**cooperate** [1] - 12:18
**cooperating** [1] - 83:4
**corner** [1] - 37:22
**Corporation** [1] - 6:7
**corporation** [2] - 38:6, 61:22
**CORRECT** [1] - 119:9
**correct** [105] - 4:23, 5:10, 9:15, 9:19, 10:7, 12:7, 12:9, 12:13, 13:15, 13:19, 16:9, 16:10, 18:2, 18:3, 19:3, 19:5, 21:10, 21:13, 23:15, 24:8, 25:17, 26:16, 26:20, 27:7, 28:11, 28:20, 28:24, 29:3, 29:10, 29:15, 29:19, 30:23, 37:10, 37:16, 37:24, 38:3, 38:7, 38:12, 38:23, 39:17, 40:6, 41:4, 41:6, 41:21, 41:23, 41:24, 42:7, 42:11, 42:20, 43:22, 45:3, 45:25, 50:11, 50:12, 53:10, 53:16, 54:4, 54:13, 56:1, 56:4, 57:18, 58:1, 58:13, 58:17, 58:24, 59:5, 59:15, 59:25, 62:17, 63:3, 63:8, 63:9, 63:11, 63:22, 64:19, 65:12, 65:15, 65:18, 65:22, 70:8, 77:25, 78:4, 79:14, 80:17, 80:20, 80:21, 81:17, 81:24, 82:4, 82:17, 82:18, 84:19, 86:13, 87:6, 89:13, 90:6, 90:16, 90:20, 90:24, 91:11, 91:17, 91:21, 92:13, 92:21, 92:24
**correspondence** [1] - 95:22
**corroborate** [1] - 91:6
**corroborated** [3] - 34:25, 42:5, 91:19
**corroborates** [1] - 92:1
**Cosby** [1] - 91:14
**cost** [1] - 9:9
**Costa** [1] - 24:22
**counsel** [16] - 49:15, 53:23, 55:23, 55:24, 56:6, 56:15, 57:10, 57:13, 58:8, 83:24, 83:25, 91:4, 91:8, 104:20, 108:12
**countries** [1] - 27:14
**country** [5] - 20:13, 24:23, 84:19, 85:7, 97:25
**County** [7] - 37:4, 76:13, 78:22, 79:18, 79:19, 86:17, 91:23
**couple** [2] - 64:19, 64:22
**course** [27] - 4:25, 5:6, 5:8, 5:18, 9:25, 13:21, 19:6, 20:8, 28:9, 34:19, 36:7, 37:11, 41:5, 46:25, 50:18, 81:19, 81:20, 85:4, 90:3, 98:12, 109:16, 112:12, 112:17, 112:18, 112:24, 117:7
**COURT** [71] - 3:4, 3:15, 3:18, 3:24, 4:2, 4:5, 5:16, 7:10, 19:19, 19:22, 33:17, 34:2, 36:21, 40:10, 46:14, 47:11, 47:16, 51:1, 56:11, 56:20, 57:1, 61:3, 73:5, 74:19, 75:24, 77:6, 79:3, 86:2, 87:8, 87:11, 88:23, 88:25, 89:3, 93:19, 93:21, 93:23, 93:25, 94:3, 94:9, 95:24, 96:6, 100:25, 107:22, 107:25, 108:2, 108:4, 109:5, 109:18, 110:7, 110:12, 111:22, 112:7, 112:15, 114:14, 115:4, 115:11, 115:17, 116:2, 116:9, 117:2, 117:4, 117:8, 117:25, 118:3, 118:12, 118:14, 118:20, 119:1, 119:5, 119:7, 120:8
**court** [6] - 3:11, 24:11, 26:23, 71:10, 87:12, 94:8
**Court** [70] - 3:20, 5:12, 8:9, 15:24, 16:7, 19:15, 20:4, 20:10, 36:19, 44:11, 46:25, 50:19, 50:23, 51:21, 56:9, 57:1, 61:8, 62:15, 66:9, 66:10, 66:19, 66:21, 68:7, 68:11, 70:6, 73:22, 80:6, 82:2, 84:15, 89:19, 90:3, 90:8, 94:20, 95:23, 96:21, 96:24, 97:16, 98:13, 99:3, 99:9, 99:12, 100:16, 101:24, 102:14, 102:24, 103:16, 103:20, 104:10, 106:22, 107:20, 108:9, 109:19, 109:25, 110:10, 111:8, 111:20, 112:24, 113:9, 114:3, 114:5, 115:3, 115:9, 115:14, 115:15, 116:4, 116:20, 117:20, 117:21, 118:9
**Court's** [6] - 18:10, 19:20, 36:23, 56:24, 66:10, 97:2
**courts** [1] - 19:23
**cover** [1] - 12:10
**covered** [3] - 27:2, 52:23, 62:22
**COVID** [1] - 24:4
**CPS** [3] - 45:12, 46:16, 46:18
**create** [1] - 47:13
**created** [1] - 111:14
**creates** [2] - 91:1, 106:8
**credit** [19] - 6:7, 6:8, 6:10, 6:15, 7:1, 7:3, 7:5, 7:17, 7:20, 8:24, 9:7, 9:10, 10:15, 26:1, 58:16, 60:6, 61:16, 62:1, 101:17
**crime** [14] - 4:19, 5:21, 13:16, 13:21, 13:22, 13:23, 35:19, 50:10, 78:21, 87:25, 88:6, 88:15, 101:10, 101:11
**crimes** [1] - 26:6
**criminal** [15] - 77:24, 78:10, 78:19, 79:5, 81:23, 81:25, 87:22, 91:9, 91:16, 93:8, 96:17, 101:7, 104:24, 107:11, 110:20
**criminally** [1] - 71:7
**criteria** [1] - 92:22
**cross** [3] - 51:1, 85:25, 95:16
**CROSS** [2] - 51:2, 120:4
**cross-examination** [2] - 51:1, 95:16
**CROSS-EXAMINATION** [2] - 51:2, 120:4
**cross-examine** [1] - 85:25
**crossed** [1] - 113:22
**CRR** [1] - 119:12
**crude** [1] - 39:10
**CTO** [1] - 34:23
**culmination** [1] - 33:4
**current** [2] - 27:15, 105:11
**customer** [1] - 7:4
**Customs** [1] - 64:3
**cut** [1] - 95:7

## D

**daily** [1] - 31:13
**Dallas** [1] - 4:18
**danger** [8] - 72:15, 72:21, 100:23, 103:25, 104:1, 112:2, 112:8, 113:4
**dangerous** [3] - 72:16, 73:16, 100:19
**dark** [1] - 74:15
**data** [1] - 23:21
**date** [1] - 78:6
**DATE** [1] - 119:8
**dated** [2] - 37:5
**dates** [2] - 79:15, 79:16
**days** [3] - 39:23, 83:24, 98:17
**de** [1] - 3:9
**deal** [2] - 23:11, 23:13

**dealing** [2] - 98:10, 99:7
**deals** [1] - 116:13
**debated** [1] - 102:6
**debit** [2] - 6:9, 7:1
**debt** [3] - 108:13, 108:15, 109:22
**decided** [1] - 67:16
**decision** [4] - 5:7, 47:4, 49:24, 50:1
**declaration** [1] - 3:1
**deduct** [5] - 67:10, 67:13, 67:20, 68:1, 71:10
**deducted** [14] - 67:17, 68:13, 68:19, 68:25, 69:8, 69:10, 69:11, 70:15, 70:18, 70:19, 70:24, 70:25, 71:2, 71:5
**deeds** [1] - 91:16
**default** [1] - 103:3
**defendant** [58] - 4:25, 5:3, 5:22, 7:7, 7:25, 8:8, 10:25, 11:3, 12:19, 15:15, 18:4, 19:8, 20:10, 20:21, 21:11, 21:23, 35:2, 36:13, 38:1, 38:10, 38:21, 40:13, 41:14, 44:14, 46:11, 46:22, 47:7, 47:18, 47:23, 48:2, 48:9, 50:15, 50:22, 55:15, 89:19, 90:13, 92:3, 92:7, 92:15, 92:18, 93:1, 93:13, 94:8, 94:14, 94:22, 95:20, 98:8, 99:4, 99:9, 99:13, 100:15, 101:5, 102:16, 102:17, 110:16, 113:10
**Defendant** [3] - 5:1, 12:4, 13:20
**Defendant's** [2] - 120:22, 120:23
**defendant's** [10] - 5:7, 7:12, 21:1, 21:7, 30:13, 47:2, 47:3, 47:21, 47:25, 99:7
**defendants** [12] - 4:25, 9:12, 18:1, 18:18, 18:25, 24:23, 24:24, 57:25, 58:3, 97:3, 97:7, 118:24
**defendants'** [1] - 97:5
**defended** [1] - 62:16
**defense** [9] - 3:20, 57:3, 91:4, 93:25, 94:19, 97:16, 98:16, 101:1, 118:14
**defensibility** [2] - 61:8, 102:1
**defensible** [2] - 101:23, 102:14
**definitely** [2] - 76:23, 90:11
**delivery** [1] - 76:14
**denied** [1] - 45:16
**Department** [5] - 20:22, 22:21, 23:11, 23:17, 29:17
**department** [1] - 35:24
**departure** [1] - 22:3
**depict** [1] - 66:18
**deposit** [2] - 26:3, 29:15
**deposited** [1] - 98:5
**describe** [5] - 38:20, 40:4, 43:3, 48:11, 49:17
**described** [3] - 37:8, 38:8, 41:1
**describes** [4] - 37:14, 37:22, 40:12, 42:18
**design** [3] - 11:11, 82:9, 82:10
**designed** [1] - 11:8
**desk** [3] - 77:11, 77:17, 77:21
**despite** [3] - 51:18, 57:12, 101:9
**destroying** [1] - 88:14
**detail** [4] - 12:11, 38:20, 68:11, 106:8
**detailed** [1] - 38:18
**details** [7] - 49:4, 51:11, 59:3, 81:8, 85:24, 112:21, 113:25
**detain** [2] - 96:21, 99:3
**detained** [5] - 64:7, 97:3, 100:24, 105:25, 114:21
**detention** [14] - 3:21, 5:8, 15:14, 15:25, 46:8, 94:12, 97:1, 101:2, 102:25, 109:12, 112:9, 112:19, 115:21, 118:5
**determine** [2] - 66:24, 67:11
**determining** [2] - 47:4, 93:5
**difference** [2] - 28:12, 29:6
**different** [5] - 26:15, 36:3, 46:23, 80:10, 116:12
**differently** [1] - 58:12
**difficult** [1] - 21:19
**digital** [1] - 11:13
**diligence** [2] - 102:11, 102:12
**DIRECT** [2] - 4:7, 120:3
**direct** [7] - 4:24, 19:6, 36:23, 65:10, 69:21, 70:12, 83:7
**directed** [2] - 13:5, 13:6
**directing** [1] - 15:11
**direction** [4] - 35:1, 82:8, 82:15, 83:2
**directly** [5] - 7:6, 8:12, 8:13, 9:3, 104:19
**directs** [1] - 116:4
**discipline** [1] - 47:12
**disclose** [8] - 23:5, 23:10, 23:16, 60:9, 65:23, 65:24, 66:1, 66:2
**disclosed** [8] - 19:9, 61:13, 65:25, 67:6, 70:6, 90:7, 110:7, 117:15
**disclosing** [1] - 23:21
**disclosure** [9] - 59:5, 59:6, 61:7, 90:13, 102:6, 102:7, 102:9, 102:13
**disclosures** [9] - 58:15, 60:3, 62:11, 62:13, 63:14, 97:5, 98:6, 98:17, 101:16
**discuss** [2] - 48:8, 48:10
**discussed** [8] - 68:4, 70:1, 70:22, 71:1, 71:4, 71:8, 71:13, 71:14
**discussion** [1] - 92:18
**disgusted** [1] - 39:11
**dishonest** [1] - 16:7
**dishonesty** [1] - 33:23
**disposition** [1] - 93:8
**district** [8] - 49:19, 49:20, 49:23, 76:12, 96:14, 114:19, 116:12, 118:24
**District** [5] - 49:19, 55:25, 56:17, 96:3, 96:11
**Division** [1] - 4:18
**docket** [3] - 48:1, 59:10, 119:2
**document** [3] - 40:22, 56:18, 70:5
**documented** [1] - 14:11
**documents** [1] - 59:10
**dollars** [3] - 33:2, 71:18, 108:20
**domineering** [1] - 44:15
**Don** [1] - 111:16
**done** [25] - 3:21, 30:7, 41:18, 63:1, 66:23, 71:24, 85:8, 85:13, 89:11, 102:11, 108:21, 109:9, 109:11, 113:18, 114:4, 116:4, 116:5, 116:9, 117:1, 117:6, 117:24, 118:19, 118:21, 119:3
**door** [25] - 43:6, 43:8, 43:23, 44:1, 44:2, 44:3, 44:16, 44:17, 74:6, 74:9, 74:10, 74:12, 74:13, 74:17, 74:21, 74:22, 74:24, 75:8, 75:20, 76:3, 76:6, 76:14, 91:13
**doors** [2] - 74:8, 76:22
**doubt** [1] - 57:11
**dovetail** [1] - 33:24
**dovetails** [1] - 90:12
**down** [11] - 6:22, 23:11, 24:6, 63:20, 75:6, 76:13, 93:21, 100:1, 107:23, 108:4, 108:7
**downstream** [1] - 10:17
**dozen** [2] - 64:19, 66:7
**draw** [1] - 27:11
**dress** [1] - 40:15
**drew** [1] - 71:20
**drug** [1] - 103:9
**due** [5] - 27:15, 43:12, 93:11, 102:11, 102:12
**during** [32] - 6:16, 9:2, 9:25, 11:16, 13:16, 14:2, 14:4, 15:2, 24:4, 28:5, 30:19, 32:25, 34:9, 34:19, 34:21, 35:10, 35:19, 36:6, 36:7, 38:1, 52:5, 54:19, 57:24, 71:6, 73:14, 74:2, 76:25, 81:20, 83:6, 85:3, 95:16

## E

**early** [2] - 57:22, 93:3
**Eastern** [4] - 55:25, 56:17, 96:3, 96:11
**Ed** [6] - 38:15, 92:7, 94:16, 95:17, 99:20, 100:17
**Edward** [7] - 5:2, 5:19, 7:7, 8:9, 10:25, 12:19, 38:15
**effect** [2] - 67:7, 92:20
**effectively** [1] - 85:25
**effort** [2] - 67:5, 102:25
**eight** [4] - 24:1, 35:20, 41:9, 81:9
**either** [7] - 23:22, 43:15, 54:13, 67:3, 114:20, 114:21, 117:5
**Elavon** [5] - 61:22, 61:25, 62:7, 62:10, 62:13
**electronic** [1] - 116:16
**Electronic** [2] - 6:6, 38:15
**email** [1] - 11:22
**emails** [1] - 82:7
**emergency** [1] - 47:22
**employed** [3] - 37:9, 38:1, 38:4
**employee** [12] - 34:23, 48:13, 48:17, 53:4, 53:7, 53:11, 53:15, 53:16, 53:19, 84:6, 91:24, 92:11
**employees** [26] - 11:22, 12:14, 12:15, 13:2, 13:5, 13:7, 13:8, 13:13, 14:10, 14:12, 34:8, 34:13, 34:21, 34:24, 35:21, 36:2, 41:3, 41:5, 41:11, 42:12, 44:8, 48:19, 78:9, 83:22, 100:4, 100:8
**employment** [5] - 20:13, 20:17, 27:11, 27:12, 34:22

**empowered** [1] - 100:18
**end** [6] - 31:4, 33:3, 36:15, 79:9, 105:25, 115:21
**Endangerment** [1] - 45:1
**endangerment** [1] - 45:4
**ended** [1] - 45:23
**enforcement** [16] - 34:19, 36:17, 41:23, 42:1, 42:23, 57:20, 73:25, 74:25, 76:8, 77:17, 77:18, 83:2, 83:5, 83:6, 83:8, 99:15
**engage** [2] - 41:14, 53:24
**engaged** [2] - 56:6, 115:3
**engagement** [3] - 56:18, 58:7, 104:25
**engages** [3] - 55:24, 83:24, 104:20
**engaging** [2] - 83:25, 102:18
**enrich** [1] - 8:1
**enrichment** [1] - 9:12
**entered** [2] - 36:9, 117:23
**entitled** [3] - 44:25, 101:25, 105:16
**entry** [1] - 119:2
**environment** [2] - 110:18, 110:25
**erection** [1] - 39:5
**escaping** [1] - 52:10
**escort** [1] - 43:16
**especially** [2] - 24:4, 24:24
**essentially** [10] - 6:2, 6:8, 7:3, 7:21, 14:16, 21:20, 31:15, 33:5, 48:19, 82:11
**establish** [1] - 92:9
**established** [2] - 7:22, 33:19
**establishment** [1] - 7:21
**estate** [1] - 68:2
**estimate** [4] - 30:15, 31:2, 70:13, 90:1
**estimates** [1] - 30:24
**ETS** [27] - 6:19, 7:1, 8:11, 10:18, 11:6, 11:21, 14:3, 14:17, 14:21, 22:23, 22:25, 25:25, 34:16, 34:22, 38:16, 48:4, 49:7, 49:24, 50:6, 50:7, 58:17, 58:19, 61:24, 61:25, 62:6, 83:22, 91:25
**Europe** [1] - 19:10
**evaluate** [1] - 47:3
**evaluated** [1] - 93:5
**event** [1] - 40:23
**events** [1] - 35:13
**evidence** [36] - 3:8, 3:10, 3:14, 3:19, 5:4, 5:9, 10:24, 11:2, 11:13, 12:1, 12:4, 12:8, 13:18, 13:20, 13:24, 47:15, 50:14, 55:2, 94:1, 94:13, 95:24, 96:7, 98:20, 101:20, 103:25, 105:2, 106:14, 110:2, 111:2, 111:12, 111:16, 112:1, 112:4, 112:5, 112:11, 112:20
**ex** [2] - 70:19, 70:24
**ex-wife** [2] - 70:19, 70:24
**exact** [3] - 68:3, 69:1, 89:25
**exactly** [5] - 60:23, 82:5, 97:8, 106:10, 115:23
**exaggerated** [1] - 103:22
**exaggerates** [1] - 103:24
**examination** [2] - 51:1, 95:16
**EXAMINATION** [6] - 4:7, 51:2, 89:5, 120:3, 120:4, 120:4
**examine** [1] - 85:25
**example** [1] - 7:4
**examples** [3] - 34:12, 91:13, 91:15
**excess** [2] - 16:20, 29:16
**exchanged** [2] - 56:3, 56:5
**excuse** [1] - 45:22
**executive** [2] - 35:21, 97:18
**executives** [1] - 41:11
**exerting** [1] - 46:22
**Exhibit** [17] - 3:1, 19:17, 19:25, 25:14, 29:13, 36:24, 37:3, 37:12, 37:21, 91:22, 91:25, 120:14, 120:15, 120:16, 120:17, 120:19, 120:22
**exhibit** [1] - 19:13
**exhibited** [1] - 41:2
**EXHIBITS** [1] - 120:12
**Exhibits** [5] - 56:14, 56:23, 120:18, 120:23
**exhibits** [9] - 3:16, 19:14, 36:20, 56:11, 56:13, 56:22, 57:2, 57:3, 57:9
**exist** [1] - 81:7
**exorbitant** [1] - 35:1
**Expansive** [1] - 6:3
**expansive** [1] - 8:3
**expect** [1] - 97:16
**expected** [1] - 12:18
**expecting** [1] - 31:4
**expenditures** [1] - 85:18
**expense** [1] - 31:12
**expenses** [4] - 31:13, 69:14, 109:23
**experience** [1] - 89:11
**explain** [6] - 5:12, 6:24, 37:2, 43:9, 62:15, 98:21
**explained** [2] - 34:16, 105:9
**explains** [1] - 47:23
**explanation** [1] - 54:13
**expletive** [8] - 38:25, 39:2, 40:4, 40:23, 40:24, 40:25, 92:4, 92:5
**express** [1] - 36:12
**extensive** [6] - 16:13, 16:17, 42:15, 55:14, 63:4, 95:2
**extent** [1] - 118:18
**extradition** [2] - 24:23, 65:15
**extremely** [2] - 38:24, 101:23

## F

**face** [4] - 32:13, 32:24, 63:24
**face-to-face** [1] - 63:24
**faced** [2] - 97:23, 105:15
**faces** [1] - 96:16
**fact** [18] - 12:11, 16:3, 22:19, 26:11, 27:3, 33:13, 41:17, 51:18, 72:25, 73:19, 75:7, 91:22, 92:2, 92:25, 98:25, 102:13, 110:3, 110:4
**factor** [3] - 24:13, 45:4, 116:22
**factored** [1] - 67:16
**factors** [7] - 15:24, 47:1, 93:4, 93:11, 93:12, 94:15, 103:5
**facts** [4] - 33:19, 94:23, 96:23, 96:25
**failed** [2] - 23:3, 94:23
**fails** [1] - 30:21
**fair** [6] - 10:6, 49:8, 53:11, 56:5, 60:4, 90:1
**fake** [1] - 26:8
**fall** [3] - 23:13, 26:19, 30:8
**familiar** [3] - 5:3, 105:15, 115:16
**family** [6] - 20:20, 47:2, 100:20, 100:23, 103:8, 108:17
**far** [8] - 17:8, 27:23, 84:18, 87:4, 96:15, 103:22, 106:23, 107:5
**father** [1] - 45:24
**favor** [2] - 15:24, 103:5
**favorably** [1] - 103:5
**FBI** [52] - 4:14, 4:21, 17:25, 22:5, 26:5, 30:9, 30:24, 35:21, 36:11, 41:10, 41:20, 48:7, 48:9, 48:13, 48:16, 48:18, 48:21, 48:25, 49:2, 49:6, 49:11, 49:25, 50:9, 53:3, 53:9, 53:23, 53:24, 54:7, 55:21, 55:24, 56:16, 66:23, 71:9, 83:10, 83:20, 83:22, 84:9, 84:24, 85:8, 89:15, 89:23, 92:19, 93:4, 93:12, 93:14, 95:21, 99:21, 99:22, 104:12, 104:18
**FBI's** [3] - 30:7, 33:24, 79:16
**fear** [8] - 36:12, 36:16, 43:12, 74:14, 74:16, 76:20, 76:24, 107:9
**feared** [2] - 34:18
**February** [1] - 45:20
**federal** [3] - 48:3, 75:19, 76:2
**Federal** [1] - 4:16
**fee** [25] - 7:16, 7:21, 7:23, 8:14, 8:22, 8:24, 9:11, 10:2, 10:16, 33:4, 59:6, 59:12, 59:15, 59:18, 60:2, 60:13, 61:8, 61:11, 61:12, 61:13, 61:17, 62:4, 62:8, 102:3
**fees** [5] - 8:14, 8:15, 8:16, 8:17, 58:18
**felt** [2] - 53:7, 53:11
**female** [7] - 36:2, 43:3, 43:7, 75:9, 99:16, 99:25, 100:7
**fence** [1] - 43:24
**Ferraris** [1] - 15:5
**few** [5] - 39:23, 43:15, 63:13, 64:20, 65:3
**fight** [5] - 104:21, 104:22, 104:24, 105:1
**fighting** [1] - 56:19
**figure** [8] - 68:5, 70:7, 71:14, 113:21, 113:23, 113:25, 115:12, 117:13
**file** [3] - 3:4, 15:11, 88:12
**filed** [16] - 35:23, 36:15, 48:1, 49:14, 50:7, 59:10, 77:23, 78:3, 78:9, 78:11, 78:19, 79:5, 80:22, 81:10, 91:10, 117:6
**files** [2] - 70:5, 80:25
**filing** [1] - 70:9
**finances** [7] - 25:4, 28:7, 33:25, 67:5, 85:2, 98:9, 109:1
**financial** [22] - 13:21, 16:19, 17:1, 18:11, 18:24, 24:10, 24:14, 24:24, 25:1, 26:25, 38:4, 55:18, 67:4, 94:21, 95:6,

95:8, 97:7, 97:10, 97:11, 97:18, 101:10, 117:1
**financially** [1] - 14:2
**fine** [4] - 3:4, 51:6, 57:1, 119:1
**fingers** [2] - 40:17, 40:18
**finish** [3] - 73:5, 79:9, 108:2
**fire** [1] - 101:21
**firearm** [12] - 43:2, 43:8, 43:11, 43:13, 44:4, 44:5, 72:22, 73:12, 73:14, 74:2, 76:25, 99:25
**firearms** [5] - 42:14, 42:16, 42:18, 42:22, 44:8
**first** [11] - 3:23, 5:18, 8:7, 8:19, 19:7, 20:3, 52:10, 65:7, 74:22, 80:15, 94:10
**fits** [1] - 94:14
**five** [6] - 19:10, 20:15, 40:18, 94:5, 98:17, 110:18
**five-minute** [1] - 94:5
**flags** [5] - 95:1, 95:13, 104:2, 105:5
**fled** [2] - 48:5, 95:18
**flee** [21] - 18:10, 24:10, 26:24, 32:9, 32:10, 54:3, 54:8, 54:11, 54:15, 54:18, 55:2, 55:16, 55:17, 55:19, 63:3, 90:5, 96:19, 104:6, 105:2, 110:4, 110:6
**fleeing** [4] - 24:13, 26:23, 54:20, 56:19
**fleshed** [1] - 16:4
**flies** [1] - 18:22
**flight** [31] - 15:16, 16:2, 16:11, 16:12, 18:23, 19:1, 19:7, 23:19, 27:25, 50:16, 90:3, 91:2, 94:16, 94:18, 94:21, 95:1, 95:13, 96:20, 98:11, 100:21, 103:4, 103:24, 104:3, 104:4, 104:22, 105:8, 111:12, 112:1, 112:3, 112:12, 113:4
**floor** [2] - 92:5, 92:6
**focus** [4] - 11:2, 27:25, 34:12, 61:7
**focusing** [4] - 5:8, 19:16, 32:18, 47:24
**follow** [1] - 45:14
**follow-up** [1] - 45:14
**followed** [2] - 38:19, 45:12
**follows** [1] - 104:19
**forcibly** [1] - 40:16
**FOREGOING** [1] - 119:9
**foreign** [2] - 95:8, 116:10
**forensic** [3] - 67:3, 89:15, 109:9
**forget** [1] - 99:20
**forgetfulness** [1] - 106:13
**forgets** [1] - 66:6
**forgetting** [2] - 64:22, 106:19
**forgot** [6] - 24:1, 65:3, 65:5, 65:9, 65:11, 65:20
**formal** [1] - 36:15
**former** [3] - 34:16, 35:21, 41:10
**forth** [2] - 75:3, 105:11
**forthcoming** [1] - 113:12
**forward** [4] - 33:22, 41:22, 80:8, 91:18
**fought** [1] - 104:23
**four** [6] - 39:22, 42:24, 66:6, 80:20, 97:12, 97:14
**fourth** [1] - 39:23
**France** [2] - 16:16, 20:15
**fraud** [22] - 4:19, 5:22, 6:1, 8:3, 8:10, 9:14, 9:18, 12:5, 12:15, 12:22, 13:6, 15:9, 15:10, 22:6, 24:20, 25:3, 32:21, 89:12, 94:13, 94:14, 96:25, 101:13
**Fraud** [1] - 6:3
**fraudulent** [1] - 26:9
**free** [1] - 96:4
**Friday** [4] - 71:23, 72:4, 94:20, 107:15
**friends** [4] - 17:1, 17:13, 18:19
**Frisco** [1] - 4:17
**FROM** [1] - 119:9
**front** [13] - 43:6, 43:23, 44:1, 44:2, 57:17, 74:7, 75:8, 75:20, 76:3, 76:14, 76:21, 102:20
**full** [1] - 104:21
**funded** [1] - 14:6
**funds** [1] - 7:25

## G

**gamesmanship** [1] - 106:2
**general** [12] - 7:17, 16:15, 16:24, 17:12, 17:13, 18:12, 18:21, 22:8, 22:9, 22:10, 27:22, 47:17
**generally** [2] - 85:23, 109:7
**genitals** [2] - 39:3, 39:9
**gentleman** [1] - 112:16
**Germany** [1] - 20:16
**gifts** [1] - 14:14
**given** [8] - 58:16, 71:3, 81:16, 81:18, 85:12, 94:1, 100:16
**glad** [1] - 110:11
**goods** [2] - 60:8, 60:9
**government** [32] - 3:8, 15:11, 20:23, 36:19, 56:12, 57:13, 58:7, 70:5, 71:24, 72:4, 72:14, 73:21, 93:23, 94:10, 94:23, 96:10, 96:23, 99:11, 102:18, 103:24, 105:1, 107:2, 107:15, 109:7, 114:10, 114:25, 115:4, 115:5, 116:6, 116:25, 117:8, 118:12
**GOVERNMENT** [2] - 4:8, 120:5
**Government's** [18] - 19:17, 19:25, 25:13, 29:13, 36:24, 37:2, 37:12, 37:21, 56:23, 91:22, 91:24, 94:20, 120:14, 120:15, 120:16, 120:17, 120:18, 120:19
**government's** [8] - 3:12, 36:20, 57:2, 61:6, 72:20, 98:16, 109:6, 109:7
**grab** [1] - 92:8
**grabbed** [1] - 39:19
**grabs** [1] - 40:14
**granted** [2] - 94:20, 99:18
**granting** [1] - 47:23
**great** [1] - 40:20
**greater** [1] - 96:19
**greatly** [1] - 90:1
**Greece** [2] - 20:13, 55:9
**groping** [1] - 36:4
**guess** [5] - 77:7, 83:13, 112:24, 113:6, 116:2
**guilty** [1] - 53:7
**guise** [1] - 106:9
**gun** [13] - 34:17, 44:3, 44:17, 72:16, 74:13, 74:21, 75:5, 75:12, 77:10, 77:21, 107:3
**gunned** [1] - 76:13
**guns** [15] - 42:23, 44:18, 72:13, 72:18, 73:1, 73:2, 73:7, 73:8, 73:9, 73:17, 74:12, 77:3, 77:8, 77:17, 93:7
**guy** [5] - 84:5, 106:9, 110:16, 111:14

## H

**hair** [1] - 101:21
**half** [4] - 32:25, 33:2, 71:18, 95:19
**hand** [4] - 4:2, 40:16, 75:12, 109:16
**handgun** [1] - 100:2
**handle** [1] - 74:2
**handled** [2] - 6:16, 6:17
**handling** [1] - 76:25
**hands** [10] - 11:7, 12:6, 12:23, 13:1, 13:5, 13:16, 40:1, 40:3, 40:15
**hands-on** [7] - 11:7, 12:6, 12:23, 13:1, 13:5, 13:16
**happy** [1] - 14:15
**harassed** [2] - 38:10, 100:7
**harassment** [4] - 36:5, 38:18, 78:8, 79:7
**Harvey** [1] - 91:14
**hatched** [1] - 14:16
**head** [1] - 100:10
**heads** [1] - 93:16
**heads-up** [1] - 93:16
**health** [1] - 103:9
**hear** [5] - 3:19, 22:4, 72:13, 101:25, 105:6
**heard** [7] - 35:8, 35:9, 46:11, 75:21, 77:7, 94:13, 95:15
**hearing** [19] - 5:6, 11:25, 12:11, 94:12, 98:18, 109:12, 112:9, 112:19, 114:17, 115:10, 115:11, 115:13, 115:16, 115:20, 115:21, 115:22, 116:4, 117:10
**hearings** [3] - 3:21, 66:15, 116:9
**heart** [2] - 98:9, 98:10
**height** [1] - 37:22
**held** [4] - 11:15, 97:2, 106:3, 107:6
**help** [1] - 21:15
**helped** [1] - 76:15
**helpful** [1] - 86:25
**HEREBY** [1] - 119:8
**hidden** [5] - 8:18, 8:19, 9:20, 85:6, 90:3
**hide** [3] - 65:19, 65:21, 106:17
**hiding** [3] - 10:14, 82:11, 82:13
**high** [4] - 26:14, 33:7, 67:5
**high-level** [1] - 67:5
**higher** [2] - 14:13, 93:11
**highlighted** [1] - 25:18
**highlighting** [1] - 33:23
**highlights** [1] - 35:12
**himself** [2] - 14:5, 14:9

**hip** [1] - 92:8
**hire** [1] - 71:6
**hired** [1] - 38:17
**hires** [1] - 55:23
**history** [15] - 16:13, 16:18, 19:7, 33:23, 47:2, 55:16, 63:17, 63:22, 64:5, 93:8, 99:8, 101:7, 106:1, 107:8, 107:11
**hit** [2] - 86:9, 100:9
**hits** [2] - 101:19, 104:2
**hitting** [1] - 45:24
**hold** [4] - 73:22, 90:2, 104:14, 114:11
**holding** [1] - 43:8
**hole** [7] - 35:4, 35:6, 86:4, 86:6, 86:7, 86:8, 86:11
**holes** [1] - 86:15
**home** [4] - 57:15, 57:19, 57:24, 101:7
**homes** [2] - 96:15, 108:7
**Honor** [53] - 3:13, 3:22, 3:25, 4:6, 5:14, 19:13, 20:5, 33:15, 33:20, 36:18, 46:7, 47:6, 50:25, 56:9, 56:13, 56:21, 57:4, 73:3, 75:23, 87:9, 93:18, 93:22, 93:24, 94:11, 94:25, 95:14, 95:19, 96:2, 96:10, 96:20, 97:8, 97:22, 98:5, 98:7, 98:15, 99:6, 99:18, 100:11, 100:20, 100:24, 101:2, 101:9, 102:16, 109:17, 111:25, 112:14, 114:12, 115:8, 115:25, 116:24, 118:13, 118:17, 119:4
**honor** [1] - 116:8
**hop** [1] - 43:24
**hostile** [2] - 110:17, 110:24
**hotel** [3] - 17:5, 23:12, 65:25
**hour** [3] - 10:9, 10:11, 10:12
**hours** [1] - 43:15
**house** [10] - 17:10, 27:19, 32:11, 73:9, 74:12, 75:8, 76:20, 107:9, 114:9, 115:6
**household** [1] - 93:7
**houses** [6] - 15:6, 67:19, 67:21, 68:12, 68:13
**huge** [1] - 109:19

**I**

**ID** [1] - 11:15
**idea** [7] - 67:6, 69:7, 85:20, 86:15, 105:14, 106:7, 116:21
**identification** [1] - 25:11
**identified** [2] - 39:13, 50:3
**identify** [1] - 94:23
**illegal** [13] - 22:14, 22:15, 48:18, 59:13, 59:16, 59:18, 60:3, 60:14, 60:19, 61:14, 61:19, 73:18, 77:10
**imagine** [1] - 109:24
**immediately** [1] - 49:3
**impact** [1] - 72:21
**important** [4] - 10:2, 14:22, 46:15, 46:21
**impose** [1] - 114:15
**improper** [4] - 47:13, 64:21, 104:17, 106:18
**inanimate** [1] - 86:9
**inappropriately** [1] - 34:21
**incentive** [1] - 96:19
**incident** [2] - 47:10, 107:7
**incidents** [1] - 111:3
**include** [3] - 13:24, 47:2, 114:8
**included** [2] - 21:9, 35:21
**including** [3] - 41:10, 71:19, 98:2
**incorrect** [2] - 21:13, 21:14
**increase** [2] - 18:25, 90:2
**increased** [4] - 14:24, 14:25, 33:6
**incurred** [1] - 7:2
**independent** [1] - 58:21
**INDEX** [2] - 120:1, 120:12
**indicate** [2] - 23:18, 82:10
**indicated** [5] - 25:10, 81:10, 83:6, 108:11, 114:17
**indicating** [3] - 48:18, 108:13, 109:16
**indication** [4] - 48:12, 49:21, 78:23, 79:10
**indications** [4] - 14:12, 81:21, 83:7
**indicative** [1] - 86:5
**indicted** [1] - 55:3
**Indictment** [12] - 34:9, 51:24, 54:19, 55:14, 96:2, 96:14, 101:13, 101:24, 102:17, 110:23, 118:19
**individual** [3] - 6:10, 31:11, 34:17
**individuals** [4] - 42:13, 44:13, 79:16, 98:4
**industry** [3] - 16:24, 24:25, 97:19
**inference** [3] - 46:22, 48:20, 96:1
**information** [20] - 34:4, 42:5, 45:2, 46:20, 46:24, 48:25, 54:10, 56:25, 63:16, 66:11, 66:15, 66:17, 72:9, 81:18, 85:24, 91:20, 92:16, 99:19, 100:16, 101:24
**inherently** [1] - 72:15
**initials** [3] - 79:20, 80:11, 80:12
**innocence** [2] - 103:1, 103:2
**innocent** [1] - 75:21
**inquire** [1] - 116:25
**inserted** [1] - 40:17
**inside** [2] - 40:15, 40:17
**instance** [5] - 73:11, 73:12, 76:24, 90:22, 103:6
**instances** [1] - 13:10
**instead** [2] - 48:7, 104:16
**instinct** [1] - 99:22
**intended** [1] - 106:14
**intending** [1] - 110:6
**intends** [1] - 54:21
**intent** [2] - 104:21, 105:1
**intention** [4] - 54:3, 54:8, 54:15, 54:17
**intentionally** [1] - 106:15
**interaction** [2] - 34:7, 57:12
**interactions** [1] - 64:3
**interchange** [5] - 7:16, 7:21, 7:23, 8:14, 8:17
**interest** [3] - 49:1, 80:4, 84:19
**interested** [3] - 49:5, 49:6, 83:21
**interfered** [1] - 48:6
**international** [26] - 16:3, 17:4, 17:12, 23:4, 23:5, 23:17, 24:2, 27:8, 27:12, 28:6, 66:2, 90:22, 95:2, 95:4, 95:8, 95:12, 97:6, 97:9, 97:23, 98:1, 98:21, 98:22, 105:9, 113:15, 113:21
**internationally** [8] - 20:23, 21:12, 21:17, 23:18, 33:14, 63:7, 63:11, 90:14
**intervenes** [1] - 7:7
**interview** [8] - 28:5, 47:9, 63:18, 63:23, 63:24, 105:16, 106:19, 113:14
**interviewed** [9] - 16:7, 20:21, 33:12, 36:11, 41:5, 46:17, 63:20, 64:10, 64:23
**interviews** [3] - 41:10, 41:20, 100:4
**intimate** [1] - 25:4
**intimidate** [2] - 41:15, 92:15
**intimidated** [3] - 47:14, 53:15, 100:4
**intimidating** [1] - 86:12
**intimidation** [2] - 13:8, 34:12
**intrusion** [1] - 104:13
**investigate** [3] - 4:16, 4:19, 17:25
**investigated** [3] - 35:18, 54:7, 83:17
**investigating** [1] - 83:10
**investigation** [44] - 6:19, 8:12, 8:21, 9:17, 11:7, 11:10, 11:17, 12:24, 12:25, 13:10, 13:17, 14:6, 29:7, 29:25, 32:22, 34:20, 35:19, 36:8, 41:12, 41:25, 42:3, 48:3, 48:6, 58:22, 60:21, 76:15, 77:24, 79:17, 81:20, 82:7, 82:17, 82:18, 82:22, 85:1, 85:4, 85:22, 89:24, 95:18, 95:20, 96:8, 99:22, 104:11, 104:24
**investigative** [1] - 80:4
**investigator** [1] - 89:10
**investment** [1] - 65:25
**investments** [3] - 17:5, 95:9, 98:23
**involved** [13] - 6:1, 7:12, 8:12, 8:13, 9:3, 9:5, 11:10, 11:11, 51:19, 66:12, 67:4, 82:10, 85:21
**involvement** [1] - 56:18
**involves** [2] - 101:15
**Ireland** [13] - 16:16, 16:17, 20:14, 20:20, 21:24, 23:9, 23:10, 23:12, 27:15, 55:9, 65:24, 66:1, 84:18
**Irish** [1] - 84:18
**irrelevant** [2] - 46:7, 46:12
**IRS** [9] - 22:16, 22:18, 30:2, 31:24, 31:25, 32:2, 70:1, 70:2
**IS** [1] - 119:9
**issue** [15] - 44:21, 46:13, 69:24, 102:13, 109:8, 110:14, 112:9, 113:4, 113:5, 113:11, 114:9, 114:18, 115:21, 116:19, 118:3
**issued** [4] - 15:10, 17:18, 115:25, 116:22
**issuer** [1] - 6:9
**issues** [9] - 5:8, 15:14, 16:9, 46:8, 96:22, 101:12, 103:8, 103:9, 112:16
**Ita** [1] - 97:4
**items** [2] - 68:4, 82:16
**itself** [5] - 59:12, 60:2, 60:13, 61:8, 61:14

## J

jail [5] - 32:14, 63:20, 64:23, 68:10, 96:16
jailhouse [1] - 106:19
January [2] - 37:6, 48:4
JASON [4] - 4:7, 51:2, 89:5, 120:3
Jason [2] - 4:1, 4:12
jet [1] - 17:14
jets [1] - 17:15
jetting [1] - 105:11
Johnson [1] - 15:10
judge [1] - 117:23
Judge [29] - 5:6, 11:25, 15:10, 30:15, 45:8, 47:22, 47:24, 48:11, 49:17, 78:8, 85:9, 85:23, 105:15, 107:14, 111:17, 113:7, 113:10, 114:8, 114:16, 114:17, 114:20, 115:11, 115:18, 115:20, 116:3, 116:14, 116:20, 117:9, 117:19
judge's [2] - 75:19, 76:2
judges [1] - 35:10
judgment [1] - 110:20
JULY [1] - 119:8
jurisdiction [3] - 18:10, 48:6, 54:22
justice [16] - 12:12, 13:1, 15:21, 16:6, 28:1, 34:8, 35:16, 41:15, 44:11, 50:23, 82:22, 90:9, 98:11, 98:14, 99:3, 100:22
juxtaposing [1] - 83:18

## K

Kaufman [1] - 76:13
keep [8] - 14:14, 14:15, 50:10, 77:16, 77:20, 111:9, 111:18
keeping [1] - 68:10
kept [3] - 34:17, 100:2, 102:12
KH [9] - 37:18, 37:21, 79:21, 79:22, 80:13, 80:14, 86:17, 91:18, 92:9
kids [1] - 102:20
killed [3] - 75:19, 76:2, 76:13
kind [47] - 10:17, 15:3, 27:20, 47:8, 47:13, 51:16, 63:2, 65:20, 66:5, 72:20, 75:14, 78:21, 79:5, 79:6, 80:22, 80:23, 85:8, 85:12, 101:14, 101:18, 101:19, 102:8, 102:25, 104:10, 105:8, 105:16, 106:1, 106:3, 106:7, 106:8, 106:11, 106:16, 107:7, 107:10, 107:12, 107:16, 107:17, 108:17, 109:3, 110:20, 110:25, 111:15, 114:20, 116:13, 116:19
Kingsley [1] - 97:4
knock [3] - 74:12, 74:24, 76:6
knocked [2] - 44:2, 74:10
knocking [2] - 74:23, 75:8
knowing [1] - 22:18
knowledge [10] - 22:10, 24:24, 25:4, 59:9, 62:17, 81:3, 82:1, 83:1, 87:7, 88:18
known [9] - 13:6, 15:1, 36:17, 42:14, 54:6, 95:17, 98:16, 104:11
knows [1] - 100:17

## L

lack [4] - 90:12, 98:7, 98:17, 114:1
lady [2] - 37:25, 79:20
laid [1] - 94:15
land [1] - 17:9
language [1] - 19:17
large [9] - 5:22, 10:19, 24:14, 30:1, 30:5, 85:7, 85:19, 89:20, 89:24
large-scale [2] - 5:22, 10:19
largely [1] - 97:4
last [23] - 19:9, 19:10, 20:12, 20:22, 21:11, 24:2, 24:5, 29:18, 51:13, 51:14, 51:20, 52:9, 52:15, 57:16, 63:10, 63:13, 66:2, 87:10, 97:25, 99:1, 113:16
late [2] - 26:18, 107:9
latter [1] - 99:6
lavish [1] - 97:20
law [20] - 34:19, 35:9, 36:17, 41:23, 42:1, 42:23, 57:20, 60:16, 73:25, 74:25, 76:8, 77:17, 77:18, 83:2, 83:5, 83:6, 83:8, 99:15, 100:19, 114:24
Lawrence [1] - 52:9
laws [2] - 4:16, 61:18
lawsuit [1] - 91:9
lawsuits [2] - 81:23, 81:25
lawyer [4] - 3:2, 48:17, 64:9, 105:18
lawyers [4] - 49:10, 71:5, 87:17, 116:5
lead [3] - 49:14, 89:10, 89:15
leader [3] - 8:9, 9:18, 11:7
leadership [1] - 8:7
leading [1] - 7:9
learned [4] - 31:10, 48:3, 48:5, 58:22
learning [3] - 48:15, 49:24, 66:13
least [15] - 14:7, 16:14, 16:20, 26:2, 27:4, 27:14, 33:8, 35:20, 35:23, 41:9, 73:11, 74:1, 91:19, 97:9, 98:1
leave [2] - 40:25, 54:21
left [5] - 24:6, 27:20, 33:12, 97:25, 118:7
legacy [1] - 48:3
legal [11] - 35:10, 50:9, 54:25, 55:23, 55:24, 59:14, 59:15, 72:16, 72:18, 99:16
legally [4] - 72:18, 77:3, 77:8, 107:5
leisure [2] - 20:16, 27:10
length [3] - 10:20, 62:22, 78:7
lengths [2] - 43:9
lengthy [1] - 32:14
less [9] - 10:2, 28:22, 29:18, 30:10, 59:22, 97:12, 97:15, 103:25
letter [2] - 88:9, 88:18
letters [5] - 56:3, 56:15, 57:9, 88:17, 104:25
level [4] - 18:8, 67:5, 68:10, 93:11
levels [1] - 44:19
lewd [1] - 34:20
liability [1] - 96:18
liar [1] - 106:9
lie [4] - 83:2, 98:8, 98:13, 105:15
lied [2] - 33:12, 98:25
lies [4] - 12:22, 97:8, 97:9, 97:23
life [4] - 25:12, 74:16, 75:14, 76:18
lifestyle [4] - 30:4, 31:13, 69:12, 97:20
lightly [1] - 46:3
likely [1] - 65:19
line [4] - 26:12, 26:16, 50:13
lines [1] - 26:15
linked [1] - 15:9
liquid [2] - 31:17, 110:9
lis [2] - 15:12, 114:11
Lisa [1] - 20:18
list [2] - 64:22, 106:15
listed [1] - 37:11
litigated [3] - 102:2, 102:3, 110:19
litigation [11] - 58:24, 59:1, 59:8, 59:9, 62:19, 62:23, 71:6, 81:10, 81:13, 102:2, 104:23
litigations [1] - 59:4
live [1] - 74:11
lives [2] - 17:6
living [1] - 109:23
loans [1] - 67:24
local [5] - 6:22, 18:14, 21:21, 35:24, 43:16
located [1] - 38:16
location [1] - 116:17
locations [1] - 23:8
log [2] - 11:15, 11:16
log-in [1] - 11:15
log-ins [1] - 11:16
logged [2] - 11:14, 11:15
logistical [1] - 118:18
long-term [2] - 5:21, 10:19
look [12] - 5:25, 18:17, 20:2, 37:21, 38:13, 46:25, 76:7, 91:22, 100:12, 112:8, 113:6, 116:1
looked [3] - 31:23, 62:19
looking [5] - 9:22, 37:11, 39:22, 42:2, 84:9
looks [3] - 37:5, 108:19, 112:24
Los [1] - 74:7
loss [1] - 7:2
losses [1] - 6:20
Loudoun [6] - 37:4, 78:22, 79:18, 79:19, 86:17, 91:23
luxury [1] - 15:5
lying [4] - 9:14, 10:20, 12:5, 83:8

## M

mad [3] - 104:12, 104:13, 104:16
Mafia [1] - 111:15
Magistrate [14] - 101:3, 103:7, 113:7, 113:10, 114:8, 114:16, 114:19, 115:18, 116:3, 116:14, 116:20, 117:9, 117:19
major [1] - 85:18

**male** [3] - 43:15, 52:11, 91:24
**Malibu** [3] - 15:7, 17:8, 18:15
**man** [5] - 97:17, 99:24, 100:2, 100:6, 100:9
**manipulate** [1] - 13:17
**manipulated** [3] - 7:24, 8:25, 11:18
**manipulated/added** [1] - 9:12
**manipulation** [4] - 8:12, 8:13, 9:3, 9:6
**manner** [1] - 92:9
**map** [1] - 27:20
**March** [2] - 45:19
**mark** [1] - 10:8
**marked** [3] - 8:14, 19:13, 60:24
**markup** [23] - 7:18, 8:14, 8:18, 8:21, 8:24, 9:3, 9:11, 9:21, 10:2, 10:5, 10:13, 11:14, 11:18, 11:21, 14:7, 14:23, 33:4, 58:18, 58:22, 59:15, 82:10, 82:14, 82:18
**markups** [1] - 11:9
**Marshals** [1] - 57:16
**marshals** [1] - 63:20
**Martin** [4] - 16:16, 22:11, 55:10
**massage** [1] - 39:6
**MasterCard** [1] - 6:9
**mastermind** [1] - 5:23
**math** [1] - 30:11
**matter** [5] - 48:8, 48:10, 52:25, 62:22, 101:20
**Mazzant** [8] - 11:25, 30:15, 45:8, 47:22, 47:24, 48:11, 49:17, 85:23
**Mazzant's** [1] - 5:7
**mean** [25] - 8:20, 13:4, 33:18, 36:19, 47:17, 47:19, 53:25, 54:20, 69:23, 72:22, 77:15, 78:1, 82:5, 83:13, 84:8, 85:1, 96:7, 102:24, 107:23, 109:1, 109:18, 110:4, 110:6, 115:12, 116:7
**meaningful** [1] - 101:7
**means** [15] - 16:19, 17:2, 17:14, 18:11, 18:19, 18:24, 24:10, 24:14, 25:1, 26:24, 32:15, 54:20, 95:6, 104:5
**meat** [1] - 112:20
**meet** [4] - 48:8, 48:10, 48:23, 48:24
**meeting** [2] - 34:19, 49:5
**mental** [1] - 103:9
**mention** [1] - 23:2
**mentioned** [6] - 15:14, 17:16, 24:12, 27:17, 42:8, 42:25
**Mercedes** [1] - 15:5
**merchant** [2] - 61:15, 61:16
**merchants** [4] - 13:6, 58:17, 58:19, 82:11
**Mexico** [1] - 113:22
**middle** [1] - 93:15
**might** [9] - 18:7, 24:2, 55:11, 63:2, 65:21, 70:22, 75:14, 86:11, 88:11
**million** [92] - 6:18, 6:20, 9:1, 14:9, 14:19, 14:21, 14:23, 15:3, 16:21, 22:22, 22:25, 25:23, 25:24, 26:4, 26:12, 26:16, 26:19, 26:21, 27:5, 28:23, 29:14, 29:16, 29:18, 29:21, 30:8, 30:9, 30:10, 30:18, 30:20, 30:25, 31:2, 31:3, 31:8, 31:20, 31:25, 32:3, 32:6, 32:7, 32:18, 33:2, 33:8, 66:22, 66:24, 67:10, 67:11, 67:17, 67:22, 68:15, 68:16, 68:17, 68:18, 68:19, 68:22, 68:23, 69:6, 69:21, 69:22, 69:23, 69:25, 70:3, 70:6, 70:16, 71:11, 71:16, 71:18, 71:25, 72:5, 84:25, 85:5, 85:10, 85:23, 95:7, 97:13, 97:19, 97:21, 107:13, 107:17, 107:19, 108:5, 108:8, 108:14, 108:16, 108:20, 108:23, 109:22, 110:8, 118:7
**million-plus** [1] - 25:23
**millions** [2] - 89:8, 89:9
**mind** [1] - 97:17
**minute** [4] - 12:3, 16:4, 69:23, 94:5
**minutes** [1] - 100:1
**misconduct** [4] - 35:11, 36:23, 42:12, 91:15
**misrepresent** [4] - 13:7, 82:3, 82:16, 82:21
**misrepresentations** [2] - 97:6, 97:10
**missing** [9] - 30:6, 67:17, 71:11, 71:25, 72:6, 90:12, 90:25, 108:24, 109:14
**mob** [1] - 101:18
**money** [61] - 7:18, 9:9, 15:10, 22:6, 22:13, 22:17, 22:23, 24:15, 25:7, 25:10, 26:9, 27:5, 28:7, 28:13, 28:14, 28:17, 29:1, 29:2, 29:8, 30:6, 30:9, 30:12, 30:15, 31:7, 31:8, 67:6, 68:6, 69:17, 85:19, 89:7, 89:19, 89:20, 89:24, 90:4, 90:6, 90:9, 90:12, 90:25, 98:20, 104:4, 104:5, 104:6, 105:3, 105:7, 108:10, 109:3, 109:8, 109:14, 109:19, 109:23, 110:3, 110:5, 110:14, 114:2, 114:4, 116:21, 117:14
**monitoring** [3] - 103:17, 116:16, 116:17
**monster** [1] - 107:12
**month** [1] - 9:7
**monthly** [2] - 11:11, 58:20
**months** [2] - 102:10, 105:25
**morning** [4] - 5:1, 57:22, 93:3, 93:14
**most** [6] - 23:25, 64:25, 65:5, 65:9, 77:20, 79:13
**motion** [7] - 47:22, 47:23, 72:20, 73:21, 83:19, 94:19, 94:23
**motivation** [1] - 88:16
**motivations** [2] - 75:18, 86:9
**motive** [1] - 13:22
**mouth** [1] - 40:19
**move** [2] - 33:17, 34:3
**moved** [1] - 85:5
**MR** [69] - 3:13, 3:16, 3:22, 7:9, 33:15, 34:1, 40:9, 46:7, 47:6, 47:12, 51:3, 56:9, 56:12, 57:5, 60:25, 61:2, 61:5, 73:20, 75:10, 75:23, 76:1, 77:9, 78:16, 78:18, 78:25, 79:2, 79:4, 86:3, 87:9, 87:13, 87:15, 88:24, 93:20, 93:24, 94:2, 94:11, 96:1, 96:9, 101:2, 107:24, 108:1, 108:3, 108:11, 109:17, 109:21, 110:10, 110:15, 111:24, 112:14, 114:12, 114:24, 115:8, 115:14, 115:23, 116:8, 116:24, 117:3, 117:7, 117:23, 118:2, 118:11, 118:13, 118:17, 118:21, 118:23, 119:4, 120:4, 120:6, 120:7
**MS** [41] - 3:23, 3:25, 4:6, 4:9, 5:14, 5:17, 7:11, 19:12, 19:21, 19:24, 20:7, 21:4, 21:6, 33:20, 33:21, 34:5, 36:18, 36:22, 37:1, 37:17, 37:19, 40:11, 41:7, 41:8, 46:15, 47:20, 50:25, 56:21, 57:4, 73:3, 74:18, 75:22, 77:4, 86:1, 88:21, 89:2, 89:4, 89:6, 93:18, 120:3, 120:4
**muddy** [3] - 46:10, 101:10, 110:15
**multiple** [17] - 4:25, 11:20, 13:6, 13:10, 15:4, 18:21, 19:10, 21:20, 27:14, 36:10, 42:24, 51:22, 52:5, 97:3, 100:3, 100:7
**multiplier** [1] - 10:4
**municipal** [1] - 6:13
**municipalities** [2] - 6:21, 33:11
**municipality** [3] - 6:23, 6:25, 8:5

## N

**name** [10] - 4:10, 4:11, 36:16, 37:11, 38:14, 52:9, 52:10, 52:12, 84:17
**narrative** [1] - 37:14
**nature** [8] - 4:20, 6:12, 8:19, 35:25, 36:3, 43:25, 98:22, 102:8
**near** [3] - 18:15, 49:7, 83:22
**Nebbia** [1] - 115:10
**necessarily** [3] - 113:23, 116:3, 117:11
**necessary** [1] - 109:11
**need** [4] - 87:11, 105:7, 106:3
**needed** [2] - 17:3, 40:21
**needs** [2] - 93:10, 115:9
**nefarious** [2] - 64:21, 65:2
**negative** [1] - 72:21
**neglected** [1] - 90:23
**neighborhood** [4] - 74:7, 74:11, 74:24, 76:21
**net** [2] - 32:4, 90:2
**neutral** [1] - 92:10
**never** [10] - 26:13, 77:24, 78:10, 78:20, 81:10, 87:5, 90:18, 114:20, 116:9, 116:13
**new** [4] - 12:3, 25:11, 25:12, 112:20
**next** [8] - 8:2, 19:8, 27:2, 27:25, 35:12, 40:7, 42:17, 43:15
**night** [4] - 74:4, 74:23, 76:20, 107:9
**nobody's** [1] - 28:25
**non** [1] - 24:23
**non-extradition** [1] - 24:23
**nonconsensual** [1] - 36:4
**nondisclosure** [1] - 81:22
**nondisclosures** [1] - 81:6
**none** [6] - 10:12, 49:5, 49:6, 53:17, 58:11, 105:5
**nonpresumption** [2] - 112:25, 113:1
**nonresponsive** [2] - 78:16, 79:2
**normally** [2] - 76:21, 112:25
**northern** [1] - 83:23
**Northern** [1] - 49:19

**note** [2] - 46:15, 117:16
**noted** [1] - 86:16
**notes** [1] - 63:21
**nothing** [19] - 59:15, 61:14, 64:21, 72:15, 73:18, 77:10, 82:20, 83:9, 83:11, 84:3, 84:4, 86:19, 93:20, 96:5, 104:17, 106:18, 107:14, 108:21, 112:23
**notice** [1] - 88:5
**noticed** [1] - 80:14
**notices** [2] - 87:24, 88:13
**notifications** [1] - 11:22
**notified** [4] - 11:21, 48:13, 87:19, 88:3
**notify** [3] - 22:15, 22:16, 50:10
**notifying** [1] - 50:1
**November** [1] - 27:16
**novo** [1] - 3:9
**Number** [8] - 5:1, 21:9, 25:14, 36:24, 37:3, 37:12, 91:23, 102:17
**number** [7] - 9:22, 10:8, 20:19, 48:1, 69:16, 69:19, 70:10
**numbers** [1] - 90:2
**numerous** [1] - 91:15

## O

**oath** [1] - 4:4
**object** [9] - 33:15, 56:21, 73:3, 74:18, 75:22, 77:4, 86:1, 86:9, 88:21
**objected** [1] - 46:11
**objection** [9] - 7:9, 40:9, 47:17, 56:20, 60:25, 78:16, 78:25, 116:6, 117:3
**obligation** [4] - 50:9, 66:3, 66:10, 111:11
**obstruct** [8] - 34:8, 35:16, 44:11, 46:9, 82:22, 84:5, 90:9, 100:22
**obstructing** [6] - 12:12, 13:1, 15:20, 50:23, 98:11, 98:14
**obstruction** [23] - 16:6, 28:1, 34:7, 41:15, 44:22, 46:12, 82:13, 90:8, 92:14, 94:16, 96:22, 96:24, 96:25, 99:3, 103:5, 103:23, 104:1, 106:23, 111:13, 111:21, 112:3, 112:9, 113:5
**obtained** [2] - 81:19, 86:19
**obviously** [7] - 43:9, 45:12, 45:16, 81:7, 83:6, 96:13, 111:5
**occasion** [2] - 39:20, 74:1
**occasions** [2] - 19:11, 81:9
**occurred** [7] - 45:14, 47:10, 62:6, 63:23, 79:12, 80:17, 111:3
**occurring** [1] - 81:1
**ocean** [1] - 17:9
**odd** [2] - 64:24, 75:1
**OF** [6] - 4:7, 4:8, 51:2, 89:5, 119:10, 120:12
**off-site** [1] - 105:4
**offended** [1] - 48:20
**offense** [1] - 50:5
**offer** [7] - 19:14, 19:19, 48:22, 53:22, 56:22, 56:24, 81:3
**offered** [4] - 48:7, 48:10, 83:20, 98:19
**offering** [1] - 25:13
**Office** [12] - 37:5, 38:8, 43:16, 49:22, 50:2, 55:25, 56:17, 57:8, 57:10, 87:23, 88:4, 88:12
**office** [10] - 34:17, 35:5, 35:7, 39:8, 39:20, 42:10, 56:7, 80:2, 100:3, 116:13
**officer** [35] - 16:8, 20:9, 21:2, 21:13, 21:17, 28:5, 28:6, 28:9, 28:13, 28:16, 30:22, 33:13, 34:16, 38:4, 40:14, 42:9, 57:23, 63:15, 63:21, 64:4, 64:11, 66:5, 89:22, 90:14, 90:23, 93:17, 105:19, 105:20, 106:5, 106:6, 106:10, 107:15, 117:15, 117:16, 118:6
**offshore** [4] - 22:13, 22:17, 85:5, 109:3
**often** [2] - 18:22, 74:8
**oftentimes** [1] - 98:5
**old** [3] - 43:21, 101:5, 107:7
**omitted** [3] - 11:9, 24:3, 64:25
**omitting** [1] - 23:23
**ON** [2] - 4:8, 119:8
**once** [1] - 75:4
**one** [46] - 6:23, 8:5, 12:10, 15:7, 19:2, 23:7, 23:9, 25:23, 26:8, 26:12, 26:16, 27:14, 29:15, 34:6, 35:1, 35:23, 36:14, 37:7, 39:7, 39:14, 39:20, 39:22, 40:1, 41:22, 43:1, 46:4, 48:12, 73:11, 73:12, 74:1, 79:18, 79:19, 81:16, 87:4, 87:13, 90:21, 90:22, 97:13, 111:24, 113:8, 116:9, 117:19, 118:17
**ones** [3] - 65:6, 65:8, 113:17
**ongoing** [3] - 32:22, 58:20, 103:13
**Open** [1] - 94:8
**opened** [2] - 35:18, 78:22
**operates** [1] - 27:6
**operating** [2] - 50:2, 57:21
**opinion** [2] - 19:1, 83:10
**opportunities** [1] - 103:20
**opportunity** [4] - 73:4, 84:24, 102:19, 116:25
**opposite** [1] - 77:14
**option** [1] - 3:12
**options** [2] - 32:12, 32:13
**order** [2] - 58:8, 70:15
**ordered** [1] - 116:17
**ordinary** [1] - 76:23
**originally** [2] - 70:1, 70:5
**otherwise** [3] - 78:20, 110:15, 114:7
**outcry** [1] - 45:10
**outline** [1] - 85:13
**outraged** [1] - 88:19
**outright** [1] - 67:23
**outside** [3] - 27:23, 39:3, 101:12
**overall** [3] - 44:18, 50:13, 93:8
**overcome** [1] - 114:23
**overheard** [1] - 92:2
**overpaid** [1] - 34:25
**overrule** [1] - 47:16
**overruled** [3] - 40:10, 74:19, 75:24
**overseas** [3] - 17:5, 24:16, 24:25
**oversight** [1] - 90:21
**overvalued** [1] - 33:5
**overview** [10] - 5:20, 5:25, 6:4, 11:4, 16:12, 27:24, 34:14, 35:15, 42:21, 45:8
**own** [6] - 100:9, 100:20, 100:23, 103:12, 106:23, 107:5
**owned** [6] - 6:6, 18:5, 18:6, 72:18, 77:3, 77:8
**owner** [1] - 101:6
**ownership** [5] - 44:17, 72:16, 73:17, 92:9, 107:3
**owning** [1] - 73:1
**owns** [3] - 16:3, 16:22, 73:2

## P

**p.m** [3] - 94:7, 119:6
**page** [14] - 5:15, 5:25, 6:2, 19:17, 20:1, 20:2, 37:12, 37:21, 47:24, 86:24, 87:1, 91:23, 91:24, 91:25
**PAGE** [2] - 120:2, 120:13
**paid** [9] - 10:12, 14:5, 14:9, 32:25, 67:23, 67:25, 70:18, 108:12, 108:16
**paint** [2] - 91:1, 99:19
**pants** [1] - 40:15
**papers** [3] - 43:12, 43:14, 85:14
**paperwork** [1] - 44:16
**paragraph** [4] - 20:3, 38:13, 39:23, 40:7
**parental** [1] - 47:12
**parents** [1] - 45:16
**park** [2] - 22:12, 22:17
**part** [11] - 10:5, 14:7, 19:7, 19:20, 22:16, 42:17, 99:5, 99:6, 101:13, 110:24, 116:16
**particular** [1] - 76:5
**particularly** [1] - 60:13
**parts** [1] - 39:1
**party** [1] - 7:6
**pass** [4] - 8:16, 50:25, 88:24, 93:18
**pass-through** [1] - 8:16
**passport** [3] - 20:3, 20:11, 103:18
**passports** [1] - 32:10
**past** [2] - 3:21, 40:22
**Patrol** [1] - 64:3
**pattern** [5] - 33:10, 36:1, 41:17, 44:15, 44:19
**pay** [6] - 10:11, 14:13, 14:14, 68:21, 90:9, 96:18
**payment** [2] - 68:20, 108:17
**payments** [8] - 30:2, 31:24, 32:1, 33:2, 70:2, 70:23, 71:19
**payroll** [1] - 10:11
**peaceful** [1] - 107:10
**Pebble** [1] - 15:7
**pendency** [1] - 34:9
**pendens** [2] - 15:12, 114:11
**pending** [2] - 27:14, 100:24
**penetration** [1] - 36:4
**penny** [1] - 85:3

**people** [31] - 14:13, 14:14, 18:7, 18:16, 18:21, 22:12, 24:4, 24:13, 44:23, 48:25, 55:8, 55:9, 60:16, 63:13, 74:7, 74:11, 76:6, 76:7, 76:21, 77:1, 77:16, 77:20, 82:16, 83:5, 88:5, 88:14, 91:13, 91:19, 93:16, 113:25
**per** [3] - 60:19, 61:17, 61:18
**percent** [14] - 8:18, 8:25, 9:11, 9:20, 9:21, 10:1, 10:5, 11:21, 32:5, 97:15, 108:12, 108:13, 108:15, 109:22
**percentage** [5] - 7:23, 11:15, 59:23, 60:7, 60:22
**period** [7] - 30:19, 38:10, 41:2, 57:8, 75:5, 79:14
**permission** [1] - 56:24
**person** [8] - 24:19, 43:20, 76:14, 79:23, 80:7, 80:11, 99:21, 113:2
**personal** [8] - 16:22, 17:17, 18:4, 24:16, 27:3, 27:4, 95:10, 99:8
**personally** [3] - 11:17, 18:5, 48:7
**phone** [1] - 53:9
**physical** [3] - 45:11, 45:15, 45:16
**physically** [2] - 39:6, 52:14
**picks** [1] - 53:9
**picture** [7] - 27:19, 44:7, 44:9, 50:13, 91:1, 99:20
**pistols** [1] - 42:24
**place** [10] - 18:17, 22:8, 22:17, 57:21, 103:16, 103:17, 104:10, 106:21, 111:9, 111:19
**placed** [5] - 44:23, 112:21, 113:6, 113:10, 114:11
**places** [3] - 22:12, 55:12, 65:19
**placing** [1] - 46:23
**plane** [5] - 17:2, 18:16, 18:19, 19:2, 105:3
**planes** [16] - 16:3, 16:14, 17:1, 17:19, 18:12, 18:13, 18:20, 19:2, 19:4, 27:5, 31:12, 69:15, 84:16, 104:8, 117:13
**plenty** [4] - 3:21, 84:24, 103:20, 110:3
**plus** [4] - 25:23, 25:24, 33:2, 108:16
**point** [17] - 13:4, 33:15, 43:1, 49:13, 53:23, 54:3, 56:13, 59:14, 60:2, 61:9, 65:1, 75:15, 86:24, 87:16, 102:23, 110:2
**pointed** [2] - 15:18, 65:10
**police** [2] - 35:24, 81:19
**portion** [1] - 25:19
**portrayed** [2] - 69:5, 83:19
**position** [5] - 38:5, 38:19, 59:4, 59:7, 102:7
**possession** [4] - 30:13, 42:18, 72:16, 73:14
**possibility** [1] - 90:11
**possible** [4] - 17:13, 76:23, 80:25, 81:7
**pot** [1] - 33:3
**potential** [6] - 13:13, 32:14, 44:22, 99:7, 100:22, 103:22
**potentially** [2] - 6:20, 100:19
**pounds** [1] - 37:23
**PowerPoint** [12] - 3:17, 5:11, 5:15, 6:2, 8:17, 19:8, 21:5, 21:9, 25:9, 34:14, 35:12, 42:17
**PR** [1] - 114:22
**practices** [3] - 13:7, 101:15, 116:11
**preparation** [3] - 52:6, 105:2, 105:8
**prepare** [1] - 98:19
**prepared** [2] - 5:11, 51:15
**preparing** [1] - 105:6
**preponderance** [4] - 112:1, 112:4, 112:11, 112:12
**prerogative** [1] - 84:8
**present** [7] - 3:10, 3:19, 48:17, 93:12, 94:8, 110:1, 111:11
**presentation** [4] - 3:17, 21:5, 42:18, 99:6
**presented** [5] - 3:11, 12:3, 66:21, 100:16, 117:21
**president** [2] - 8:11, 11:6
**pressure** [4] - 44:23, 46:23, 47:8
**presume** [1] - 115:5
**presumption** [2] - 113:1, 113:2
**pretending** [2] - 75:20, 76:14
**pretends** [1] - 76:3
**Pretrial** [11] - 63:25, 66:12, 66:18, 90:18, 97:5, 97:14, 97:24, 98:25, 105:17, 110:8, 117:17
**pretrial** [11] - 19:22, 63:15, 63:21, 64:10, 66:4, 66:19, 95:5, 105:19, 106:5, 106:10, 118:6
**pretty** [5] - 22:9, 24:13, 31:16, 93:15, 100:11
**prevent** [3] - 103:21, 106:25, 111:20
**previous** [1] - 33:1
**previously** [1] - 46:24
**primarily** [3] - 4:18, 7:15, 14:6
**primary** [1] - 17:7
**private** [18] - 15:7, 16:14, 17:14, 17:15, 18:19, 18:20, 24:17, 27:21, 39:1, 39:9, 39:10, 40:2, 40:4, 40:5, 40:17, 40:19, 92:4, 95:10
**probability** [1] - 44:10
**Probation** [14] - 17:7, 20:22, 22:20, 23:1, 23:3, 23:6, 23:11, 23:17, 23:21, 24:3, 29:2, 29:17, 31:4, 114:5
**probation** [17] - 16:8, 20:9, 21:2, 21:13, 21:17, 28:5, 28:6, 28:13, 28:16, 30:22, 33:13, 64:4, 89:21, 90:13, 90:23, 117:15, 117:16
**problem** [4] - 86:5, 103:10, 116:2, 117:4
**procedure** [2] - 50:3, 57:21
**procedures** [1] - 116:11
**proceed** [4] - 3:3, 4:5, 7:10, 47:19
**Proceedings** [1] - 119:6
**proceedings** [1] - 35:10
**PROCEEDINGS** [1] - 119:10
**proceeds** [1] - 25:25
**process** [22] - 7:1, 7:13, 9:24, 43:5, 43:7, 43:8, 43:11, 43:15, 43:18, 43:20, 44:6, 72:22, 73:13, 74:5, 74:9, 75:4, 75:5, 77:23, 84:12, 99:17, 99:25, 115:2
**processed** [4] - 6:19, 7:8, 9:1, 9:9
**processing** [7] - 6:7, 6:15, 7:4, 10:15, 14:4, 61:16, 62:1
**processor** [4] - 9:7, 10:16, 10:18, 60:6
**product** [1] - 33:8
**proffered** [1] - 57:9
**profit** [2] - 14:25, 33:7
**propensity** [2] - 55:19, 74:2
**proper** [1] - 88:21
**properties** [7] - 15:11, 29:20, 29:23, 31:5, 71:14, 97:21, 109:23
**property** [3] - 23:18, 31:12, 114:10
**prosecutor's** [1] - 56:7
**protection** [1] - 103:1
**Protective** [1] - 45:5
**prove** [2] - 103:4, 108:18
**proven** [1] - 44:15
**provide** [5] - 46:23, 66:15, 68:11, 111:19, 114:3
**provided** [9] - 46:24, 56:9, 56:12, 58:21, 66:18, 67:8, 67:9, 69:16, 117:8
**provides** [1] - 66:11
**proximity** [7] - 17:11, 27:17, 27:21, 27:22, 95:12
**publish** [3] - 5:14, 19:18, 19:25
**pull** [2] - 66:8, 113:20
**pulled** [2] - 25:18, 63:19
**pulling** [1] - 20:4
**punched** [7] - 35:4, 35:6, 35:7, 86:4, 86:6, 86:7, 86:11
**punching** [1] - 86:15
**punish** [2] - 102:25, 106:13
**purchase** [9] - 17:2, 25:11, 27:5, 30:3, 32:10, 32:11, 62:6, 62:18, 67:18
**purchased** [14] - 15:1, 15:4, 15:5, 15:6, 15:10, 29:20, 29:23, 31:5, 61:24, 67:21, 68:2, 68:12, 69:8, 69:14
**purchases** [10] - 15:2, 15:7, 17:5, 29:21, 30:2, 31:9, 31:11, 31:19, 61:25, 69:1
**purchasing** [1] - 23:18
**purely** [1] - 96:9
**purpose** [1] - 88:17
**purposes** [3] - 20:13, 37:17, 115:1
**pursuant** [1] - 29:25
**pursued** [1] - 49:22
**push** [1] - 64:2
**pushed** [1] - 39:20
**put** [17] - 26:16, 40:1, 40:15, 66:3, 66:22, 72:20, 75:6, 86:8, 98:20, 100:1, 101:19, 101:23, 103:16, 104:10, 106:21, 111:9
**puts** [1] - 73:21
**putting** [6] - 46:3, 47:8, 85:20, 105:6, 106:18, 109:3

## Q

**questioning** [1] - 95:16
**questions** [4] - 89:1, 110:13, 118:12, 118:14
**quickly** [2] - 46:16, 46:19
**quiet** [1] - 14:14
**quite** [2] - 30:8, 64:20
**quote** [1] - 94:22

## R

**R-E-N-N-I-E** [1] - 4:12
**rainbow** [1] - 33:3
**raise** [1] - 4:2
**raised** [6] - 36:6, 109:8, 109:12, 110:14, 115:20, 115:21
**ran** [2] - 10:23, 13:9
**range** [2] - 42:25, 69:16
**rare** [2] - 99:12, 100:14
**rate** [1] - 60:17
**rather** [1] - 45:20
**Rattan** [8] - 33:17, 34:2, 46:14, 52:22, 78:7, 81:9, 87:16, 88:25
**RATTAN** [41] - 3:23, 3:25, 4:6, 4:9, 5:14, 5:17, 7:11, 19:12, 19:21, 19:24, 20:7, 21:4, 21:6, 33:20, 33:21, 34:5, 36:18, 36:22, 37:1, 37:17, 37:19, 40:11, 41:7, 41:8, 46:15, 47:20, 50:25, 56:21, 57:4, 73:3, 74:18, 75:22, 77:4, 86:1, 88:21, 89:2, 89:4, 89:6, 93:18, 120:3, 120:4
**RDR** [1] - 119:12
**reached** [1] - 48:15
**read** [3] - 3:7, 86:23, 112:18
**real** [2] - 26:8, 68:2
**reality** [2] - 28:2, 28:13
**realized** [1] - 75:4
**really** [7] - 3:12, 10:17, 22:17, 83:18, 97:16, 112:22, 113:2
**reap** [1] - 7:25
**reason** [12] - 57:11, 57:22, 63:2, 72:3, 72:6, 73:22, 74:14, 76:24, 86:5, 104:3, 107:10, 118:20
**reasonable** [6] - 27:13, 32:16, 46:22, 63:6, 76:19, 107:8
**reasons** [3] - 23:24, 74:20, 86:11
**received** [5] - 14:20, 22:22, 80:16, 80:23, 84:25
**receiving** [2] - 34:25, 35:2
**recent** [8] - 23:25, 45:18, 64:25, 65:5, 65:9, 90:14, 90:17, 90:22
**recently** [3] - 51:12, 51:13, 97:2
**Recess** [1] - 94:7
**recess** [1] - 118:15
**recommended** [2] - 117:17, 117:18
**record** [2] - 19:20, 37:18
**RECORD** [1] - 119:9
**recorded** [1] - 28:9
**recording** [2] - 53:12, 53:13
**records** [10] - 20:24, 20:25, 21:7, 21:8, 85:15, 113:20, 113:24
**red** [5] - 95:1, 95:13, 104:2, 105:5
**REDIRECT** [2] - 89:5, 120:4
**refer** [1] - 36:1
**reference** [1] - 19:14
**referenced** [2] - 35:12, 114:25
**referred** [1] - 88:6
**referring** [3] - 39:1, 87:3, 92:4
**reflects** [1] - 80:1
**regard** [6] - 58:16, 82:12, 82:13, 82:21, 106:21, 115:3
**regarding** [2] - 101:11, 114:1
**relate** [2] - 33:24, 96:25
**related** [12] - 17:5, 20:25, 45:11, 48:3, 49:25, 50:8, 53:14, 69:15, 81:7, 82:7, 82:16, 110:17
**relates** [4] - 35:16, 37:7, 44:22, 45:1
**relating** [1] - 96:23
**relation** [3] - 36:22, 44:20, 82:6
**relationships** [1] - 18:21
**relayed** [1] - 17:7
**release** [8] - 5:7, 44:11, 50:23, 103:3, 103:6, 117:17, 117:18, 117:24
**released** [8] - 99:14, 100:18, 114:6, 114:21, 116:23, 117:22, 118:1, 118:9
**relevance** [1] - 75:22
**relevant** [2] - 46:14, 75:23
**relinquish** [1] - 43:11
**relying** [2] - 89:14, 89:18
**remember** [10] - 24:4, 64:11, 65:6, 66:3, 87:20, 105:21, 106:1, 106:17, 113:17, 113:24
**RENNIE** [4] - 4:7, 51:2, 89:5, 120:3
**Rennie** [13] - 4:1, 4:12, 37:2, 51:4, 60:2, 60:11, 61:9, 72:17, 85:20, 95:17, 98:3, 108:4, 112:21
**rent** [3] - 17:2, 18:19, 24:17
**repeat** [1] - 78:17
**repeated** [1] - 36:4
**repeatedly** [2] - 38:9, 41:2
**repeating** [1] - 106:7
**repetitive** [3] - 33:16, 34:1, 34:3
**report** [27] - 19:12, 19:13, 19:15, 20:8, 20:19, 28:10, 28:16, 28:21, 29:12, 30:21, 39:18, 40:1, 47:9, 54:9, 66:19, 80:1, 80:14, 80:15, 80:16, 81:19, 86:16, 86:23, 89:20, 90:17, 91:23, 100:12, 111:2
**Report** [1] - 37:4
**reported** [18] - 21:16, 29:1, 29:4, 29:8, 30:11, 39:8, 40:21, 41:20, 42:15, 45:5, 46:1, 68:6, 69:17, 73:24, 85:19, 89:20, 91:20, 95:4
**reporter** [1] - 87:12
**REPORTER'S** [2] - 119:7, 120:8
**reporting** [3] - 41:13, 80:16, 80:19
**reports** [8] - 19:22, 28:22, 29:17, 51:15, 51:23, 86:22, 92:2, 100:3
**representation** [1] - 28:2
**representations** [1] - 28:4
**represented** [1] - 28:18
**request** [1] - 42:3
**requested** [2] - 36:16, 42:2
**require** [1] - 103:21
**requirement** [1] - 106:4
**residence** [3] - 17:7, 20:11, 103:17
**resident** [1] - 4:17
**resort** [1] - 43:17
**resource** [1] - 66:5
**respond** [1] - 73:4
**responded** [2] - 39:14, 46:16
**response** [7] - 47:21, 47:25, 48:2, 48:5, 83:19, 94:19, 95:15
**responses** [1] - 28:10
**responsive** [1] - 61:2
**rest** [3] - 93:23, 108:10, 108:18
**restrict** [1] - 104:10
**restriction** [2] - 59:20, 114:22
**restrictions** [2] - 63:5, 103:19
**rests** [1] - 94:21
**RESTS** [1] - 120:5
**result** [4] - 7:2, 78:11, 81:11, 118:4
**resulted** [1] - 110:19
**resulting** [2] - 78:21, 79:6
**retaliated** [1] - 53:18
**retaliation** [2] - 34:18, 53:20
**retribution** [1] - 53:16
**reveal** [1] - 22:20
**revealed** [1] - 79:17
**revenue** [1] - 14:8
**revenues** [2] - 14:24, 33:6
**review** [7] - 3:9, 20:23, 50:14, 51:20, 67:5, 117:1
**reviewed** [9] - 3:10, 5:9, 12:1, 19:16, 20:5, 29:12, 51:23, 51:24
**Rica** [1] - 24:23
**rifles** [1] - 42:24
**rights** [1] - 103:2
**risk** [42] - 12:11, 13:1, 15:16, 15:20, 16:2, 16:11, 16:12, 18:23, 18:25, 19:7, 23:19, 27:25, 28:1, 32:17, 50:15, 50:22, 55:16, 91:2, 94:15, 94:16, 94:18, 94:21, 94:24, 95:1, 95:14, 96:20, 98:10, 98:14, 100:21, 100:22, 103:4, 103:5, 103:24, 104:4, 104:22, 107:4, 111:12, 111:13, 112:1, 112:3, 112:12, 113:3
**robbed** [1] - 76:7
**role** [1] - 51:7
**room** [1] - 77:20
**rough** [2] - 70:13, 85:13
**roughly** [1] - 110:8
**rub** [2] - 39:3, 39:9
**rubbed** [1] - 39:8
**rule** [1] - 60:15
**ruled** [1] - 97:2
**rules** [1] - 61:17
**run** [2] - 43:25, 101:20

## S

**safety** [2] - 57:23, 93:17
**salary** [2] - 33:3, 71:20
**sale** [8] - 14:5, 14:21, 14:22, 22:23, 25:25, 30:3, 32:20, 79:12
**satisfied** [1] - 118:10
**saw** [7] - 35:4, 42:10, 69:2, 69:3, 92:11, 111:2, 114:24
**scale** [2] - 5:22, 10:19
**scheduling** [1] - 85:3
**scheme** [19] - 7:2, 7:23, 8:4, 8:10, 10:6, 10:13, 11:1, 11:23, 12:5, 12:15, 14:3, 14:4, 14:16, 14:23, 14:24, 15:2, 25:3, 32:21, 33:1
**Scheme** [1] - 6:3
**school** [4] - 45:23, 46:2, 46:4, 100:12
**scope** [2] - 6:16, 86:10
**Scotland** [3] - 16:16, 20:15, 55:9
**screamed** [1] - 40:22
**screen** [3] - 5:18, 12:14, 19:8
**scrutiny** [1] - 96:17
**se** [3] - 60:19, 61:17, 61:18
**seal** [5] - 19:15, 48:1, 56:24, 57:2, 117:6
**seated** [1] - 94:9
**second** [1] - 38:13
**secondhand** [1] - 108:15
**seconds** [1] - 40:18
**Section** [1] - 94:15
**securities** [1] - 4:19
**see** [10] - 53:5, 55:12, 61:8, 80:3, 92:4, 92:5, 117:4, 117:12, 118:8, 118:20
**seeking** [1] - 114:25
**seeks** [1] - 81:1
**seize** [3] - 15:11, 115:1, 115:5
**seized** [2] - 84:12, 117:13
**seizing** [1] - 84:11
**seizure** [4] - 17:18, 18:14, 51:24, 69:3
**self** [5] - 19:9, 57:14, 58:1, 58:9, 102:20
**self-disclosed** [1] - 19:9
**self-surrender** [4] - 57:14, 58:1, 58:9, 102:20
**sells** [1] - 22:25
**send** [1] - 88:16
**sending** [2] - 87:23, 88:13
**sense** [6] - 17:22, 44:22, 55:6, 99:13, 100:15
**sensitive** [1] - 56:25
**sent** [4] - 9:6, 84:6, 88:5, 104:12
**sentence** [1] - 79:9
**separate** [1] - 6:18
**September** [4] - 25:15, 26:2, 29:13, 32:19
**serious** [17] - 12:11, 15:15, 15:20, 23:19, 27:24, 28:1, 32:17, 50:15, 50:21, 50:22, 95:13, 98:14, 103:4, 111:12, 111:13, 113:3
**seriously** [1] - 23:23
**serve** [3] - 43:12, 43:17, 43:20
**served** [1] - 43:14
**server** [14] - 43:5, 43:7, 43:8, 43:11, 43:16, 44:6, 72:22, 73:13, 74:5, 74:9, 75:4, 75:5, 77:23, 99:25
**Service** [1] - 57:16
**service** [2] - 43:3, 118:6
**Services** [8] - 45:5, 97:5, 97:14, 97:24, 98:25, 105:17, 110:8, 117:17
**services** [11] - 6:15, 19:22, 63:15, 63:21, 64:10, 66:5, 95:5, 97:18, 105:19, 106:5, 106:10
**set** [8] - 3:6, 10:16, 11:1, 25:11, 60:17, 98:18, 114:7, 117:19
**setting** [1] - 115:15
**settlement** [4] - 80:23, 81:1, 81:3, 111:5
**settlements** [4] - 36:10, 81:5, 81:7, 87:5
**seven** [3] - 24:1, 32:24, 91:19
**several** [2] - 56:3, 100:1
**sexual** [17] - 13:11, 14:12, 35:11, 35:20, 36:23, 38:18, 41:9, 42:12, 44:13, 78:8, 79:7, 79:11, 86:18, 87:2, 91:6
**sexually** [4] - 38:9, 100:7
**shade** [1] - 98:12
**Shannon** [2] - 21:23, 21:25
**sheet** [1] - 29:11
**Sheriff's** [3] - 37:5, 38:8, 43:16
**Sherman** [5] - 6:23, 6:25, 8:4, 8:5
**shooting** [1] - 42:25
**short** [1] - 94:3
**shortly** [1] - 53:23
**shoulders** [2] - 39:7, 39:19
**show** [13] - 7:4, 11:13, 12:8, 44:16, 54:3, 84:5, 98:20, 101:24, 102:24, 104:25, 105:7, 108:23, 109:2
**showed** [2] - 14:6, 82:7
**shown** [16] - 6:19, 8:13, 8:21, 9:17, 11:7, 11:10, 11:17, 12:24, 12:25, 41:12, 54:8, 89:24, 104:21, 104:25, 105:2, 108:21
**shows** [7] - 9:8, 18:14, 44:16, 44:22, 60:21, 66:21, 109:1
**shut** [1] - 24:6
**side** [3] - 81:16, 102:1, 110:22
**sides** [1] - 81:15
**sign** [1] - 40:22
**signed** [1] - 8:22
**significant** [24] - 17:21, 18:2, 18:8, 22:22, 23:17, 24:9, 25:18, 26:22, 28:25, 29:1, 29:5, 29:8, 29:20, 30:12, 31:7, 31:16, 32:1, 37:20, 38:5, 70:2, 90:7, 96:16, 98:4, 113:18
**significantly** [1] - 13:23
**signs** [1] - 118:9
**silence** [2] - 96:4, 96:10
**similar** [4] - 7:19, 89:12, 91:12, 91:20
**simply** [1] - 46:10
**single** [1] - 107:7
**site** [1] - 105:4
**sits** [1] - 6:8
**sitting** [2] - 66:4, 97:13
**situation** [13] - 23:23, 54:17, 54:23, 55:18, 58:5, 58:6, 69:18, 69:20, 73:16, 76:8, 97:10, 97:11, 113:1
**situations** [1] - 97:7
**six** [3] - 19:10, 20:15, 24:1
**slapping** [1] - 34:21
**Slide** [2] - 21:5, 21:9
**slide** [16] - 8:2, 8:17, 19:8, 21:9, 21:15, 25:9, 27:3, 28:19, 33:1, 34:14, 35:12, 41:7, 41:9, 42:17, 44:25, 73:9
**slight** [1] - 49:1
**small** [6] - 7:18, 16:25, 18:15, 37:25, 111:24, 118:17
**SNN** [1] - 21:23
**sold** [8] - 14:3, 14:18, 14:19, 14:20, 25:16, 60:8, 62:11
**solely** [1] - 94:21
**someone** [3] - 46:23, 55:21, 90:9
**someplace** [1] - 65:21
**son** [2] - 75:19, 76:2
**soon** [1] - 117:13
**sophisticated** [5] - 5:22, 8:3, 11:1, 25:4, 97:17
**Sophisticated** [1] - 6:3
**sorry** [3] - 67:12, 108:3, 118:18
**sorts** [1] - 29:21
**sound** [1] - 9:21
**sounds** [1] - 78:6
**speaking** [4] - 23:10, 48:19, 49:2, 83:5
**speaks** [1] - 64:4
**special** [4] - 4:14, 4:22, 22:7, 83:7
**Special** [1] - 4:1
**specific** [4] - 3:16, 37:7, 79:16, 92:22
**specifically** [1] - 11:2
**speculating** [1] - 96:6
**speculation** [3] - 47:7, 74:18, 107:14
**spell** [1] - 4:10
**spent** [2] - 30:8, 85:3
**split** [1] - 26:15
**spoken** [2] - 48:17, 49:2
**spot** [1] - 65:12
**spreadsheets** [1] - 85:15
**squad** [1] - 93:10
**St** [4] - 16:16, 22:11, 55:10
**stable** [1] - 103:7
**stage** [2] - 99:12, 100:15
**stand** [1] - 85:21
**standard** [3] - 50:2, 57:21, 112:5
**standpoint** [2] - 31:17, 33:9
**stands** [1] - 102:24
**Starbucks** [1] - 48:24
**start** [6] - 5:15, 9:22, 10:21, 10:22, 94:18
**started** [2] - 11:25, 49:21
**starting** [1] - 11:23
**starts** [6] - 20:3, 38:13, 38:14, 39:23, 40:8, 99:19

**state** [4] - 4:10, 45:13, 60:16, 61:18
**statement** [10] - 9:8, 9:10, 9:13, 25:14, 25:15, 25:19, 26:7, 26:10, 29:12, 30:21
**statements** [7] - 9:6, 11:9, 11:12, 51:15, 58:20, 64:16, 82:9
**States** [16] - 3:25, 16:8, 20:9, 21:1, 21:13, 21:21, 22:20, 23:16, 24:18, 27:23, 28:4, 30:21, 49:22, 89:21, 90:13, 97:3
**States'** [1] - 47:22
**stating** [1] - 3:2
**status** [2] - 85:2, 88:3
**stay** [7] - 5:7, 32:13, 47:22, 47:23, 83:19, 94:19, 115:24
**stayed** [1] - 34:24
**stealing** [4] - 9:14, 10:20, 11:1, 12:22
**step** [1] - 93:21
**still** [4] - 30:5, 30:11, 49:25, 115:1
**stolen** [2] - 22:6, 27:5
**stomach** [1] - 39:14
**stood** [2] - 72:3, 105:18
**stop** [1] - 39:12
**store** [2] - 6:11, 10:10
**story** [3] - 45:1, 45:14, 111:6
**strength** [1] - 101:25
**stringent** [1] - 106:20
**stuck** [1] - 40:19
**stuff** [1] - 92:11
**subject** [4] - 58:23, 62:22, 102:4
**submit** [3] - 3:1, 99:11, 106:20
**subordinates** [1] - 36:2
**subsequent** [5] - 30:3, 49:24, 53:13, 64:6, 102:5
**subsequently** [1] - 78:23
**substantial** [1] - 95:6
**suffice** [1] - 89:8
**sufficient** [1] - 113:8
**suggest** [1] - 94:24
**suitable** [1] - 116:5
**sum** [3] - 30:6, 31:7, 85:19
**summary** [1] - 21:8
**summer** [1] - 56:16
**summons** [1] - 58:6
**sums** [2] - 24:14, 89:24
**Sunday** [2] - 74:4, 107:9
**supplement** [1] - 110:11
**support** [1] - 5:6
**supposed** [1] - 23:13
**suppressed** [1] - 36:6
**surely** [1] - 108:25
**surrender** [5] - 57:14, 58:1, 58:9, 102:20, 103:18
**sustained** [2] - 86:2, 88:23
**SWAT** [5] - 92:19, 92:21, 92:23, 92:25, 93:10
**Switzerland** [1] - 24:22
**sworn** [1] - 4:3
**system** [2] - 10:11, 11:14
**Systems** [2] - 6:6, 38:16

## T

**takeaway** [1] - 73:13
**talks** [3] - 8:3, 44:25, 105:4
**tampering** [1] - 16:9
**Target** [1] - 6:11
**tasted** [1] - 40:20
**tax** [6] - 69:18, 69:20, 69:24, 108:13, 108:15, 109:22
**taxes** [9] - 68:20, 68:21, 68:23, 69:6, 70:11, 71:15, 97:20, 108:7, 108:12
**teacher** [2] - 46:17, 46:19
**team** [5] - 92:19, 92:21, 92:23, 92:25, 93:10
**TEC** [3] - 20:24, 54:9
**technology** [2] - 34:16, 42:9
**temper** [2] - 86:5, 107:4
**ten** [1] - 110:18
**tender** [1] - 56:13
**term** [4] - 5:21, 10:19, 38:2, 39:10
**terms** [24] - 5:20, 12:5, 12:21, 12:25, 13:17, 16:6, 18:9, 19:16, 24:10, 25:9, 26:22, 28:14, 34:7, 35:11, 44:7, 44:10, 89:7, 101:16, 112:17, 112:21, 116:17, 117:14, 118:4
**testified** [12] - 50:18, 51:12, 51:21, 67:1, 70:3, 70:12, 71:23, 72:7, 72:9, 72:11, 81:5, 112:22
**testifies** [1] - 107:15
**testify** [3] - 5:12, 51:21, 51:25
**testifying** [3] - 52:20, 70:10, 89:18
**testimony** [8] - 12:21, 34:6, 52:6, 55:13, 65:1, 66:9, 72:1, 89:14
**Teterboro** [1] - 18:15
**Texas** [2] - 6:23, 8:5
**THAT** [1] - 119:8
**THE** [73] - 3:4, 3:15, 3:18, 3:24, 4:2, 4:5, 4:8, 5:16, 7:10, 19:19, 19:22, 33:17, 34:2, 36:21, 40:10, 46:14, 47:11, 47:16, 51:1, 56:11, 56:20, 57:1, 61:3, 73:5, 74:19, 75:24, 77:6, 79:3, 86:2, 87:8, 87:11, 88:23, 88:25, 89:3, 93:19, 93:21, 93:22, 93:23, 93:25, 94:3, 94:9, 95:24, 96:6, 100:25, 107:22, 107:25, 108:2, 108:4, 109:5, 109:18, 110:7, 110:12, 111:22, 112:7, 112:15, 114:14, 115:4, 115:11, 115:17, 116:2, 116:9, 117:2, 117:4, 117:8, 117:25, 118:3, 118:12, 118:14, 118:20, 119:1, 119:5, 119:9
**themselves** [2] - 8:1, 8:24
**thereafter** [1] - 53:23
**therefore** [2] - 55:16, 107:4
**thereof** [2] - 98:7, 98:17
**they've** [4] - 46:24, 98:19, 103:16, 107:18
**thinking** [1] - 18:7
**thinks** [5] - 20:14, 99:14, 99:15, 99:16
**third** [2] - 7:6, 109:16
**third-hand** [1] - 109:16
**thirty** [1] - 46:4
**thirty-one** [1] - 46:4
**THIS** [1] - 119:8
**thousands** [2] - 9:16, 88:5
**threat** [2] - 75:14, 76:19
**three** [22] - 15:6, 16:14, 16:22, 17:16, 19:2, 19:4, 23:5, 24:7, 27:4, 29:23, 31:15, 33:14, 39:22, 59:14, 63:10, 66:2, 67:19, 68:12, 68:18, 98:1, 101:6, 113:16
**three-basis-point** [1] - 59:14
**thrilled** [1] - 73:15
**throw** [3] - 17:8, 17:9, 108:19
**ticked** [1] - 84:6
**tickets** [2] - 105:3, 105:6
**ties** [2] - 16:4, 103:8
**today** [14] - 3:3, 8:9, 39:2, 51:4, 51:12, 51:21, 52:1, 52:13, 86:16, 91:18, 101:12, 111:2, 115:3, 117:11
**took** [3] - 24:3, 40:18, 69:18
**tools** [1] - 107:19
**top** [5] - 10:1, 20:2, 28:19, 39:23, 97:22
**Toronto** [7] - 16:17, 22:3, 23:9, 65:11, 65:18, 90:19, 106:16
**total** [2] - 68:1, 107:14
**totaled** [1] - 14:9
**totaling** [1] - 28:21
**totally** [2] - 46:12, 47:6
**touch** [1] - 39:7
**touched** [6] - 8:8, 16:8, 34:6, 39:6, 39:13, 39:15
**touching** [2] - 39:15, 40:3
**toward** [3] - 41:3, 42:12, 44:8
**towards** [2] - 13:8, 83:5
**trace** [1] - 109:10
**track** [3] - 84:24, 107:19, 109:2
**tracked** [1] - 108:25
**tranche** [1] - 66:17
**Transaction** [2] - 6:6, 38:15
**transaction** [7] - 6:11, 7:19, 7:24, 9:1, 10:3, 21:22, 27:15
**transactions** [9] - 6:17, 6:18, 7:1, 9:1, 9:8, 9:25, 10:2, 25:23, 25:25
**TRANSCRIPT** [1] - 119:9
**transcript** [4] - 3:7, 12:1, 112:18
**transfers** [1] - 109:4
**transportation** [1] - 25:11
**travel** [76] - 16:2, 16:13, 16:14, 16:18, 19:7, 20:10, 20:17, 21:1, 21:7, 21:8, 21:20, 21:21, 22:19, 22:21, 23:17, 23:25, 24:1, 24:5, 25:1, 27:10, 27:12, 27:22, 28:7, 33:23, 54:9, 54:12, 54:14, 54:23, 54:25, 55:1, 55:7, 55:8, 55:12, 55:14, 55:16, 63:1, 63:4, 63:5, 63:12, 63:13, 63:17, 63:22, 64:5, 64:12, 69:14, 90:14, 90:17, 90:22, 90:25, 95:2, 95:3, 95:4, 97:7, 97:9, 97:24, 98:4, 98:9, 98:21, 103:18, 104:10, 105:9, 105:12, 105:15, 105:19, 105:22, 106:1, 106:12, 113:13, 113:15, 113:18, 113:21
**traveled** [17] - 16:16, 19:9, 20:12,

20:14, 20:20, 20:22, 21:11, 21:17, 22:4, 30:22, 33:13, 55:9, 63:7, 105:10, 106:17, 113:15
**traveling** [3] - 54:15, 63:11, 84:18
**travels** [1] - 22:25
**treated** [1] - 37:8
**treaty** [1] - 65:15
**trial** [2] - 3:11, 100:24
**tried** [2] - 85:6, 111:15
**trip** [6] - 23:3, 65:11, 65:24, 66:1, 106:15, 106:16
**trips** [22] - 23:4, 23:5, 24:2, 64:19, 64:20, 64:22, 64:24, 64:25, 65:2, 65:4, 65:5, 65:7, 65:8, 65:20, 66:2, 66:4, 66:7, 98:1, 106:1, 106:12, 106:14, 106:15
**true** [10] - 26:13, 64:18, 83:17, 86:20, 90:2, 94:25, 95:19, 99:13, 117:12, 118:6
**truthful** [2] - 66:11, 66:15
**try** [6] - 85:24, 106:17, 109:10, 113:14, 113:20, 113:25
**trying** [15] - 43:20, 54:25, 61:7, 66:8, 68:5, 79:9, 88:7, 102:22, 102:23, 107:12, 113:16, 113:22, 115:5, 115:12
**Turks** [3] - 16:17, 22:11, 55:10
**turn** [2] - 8:2, 101:17
**turns** [1] - 13:22
**twenty** [1] - 70:15
**twice** [1] - 108:12
**two** [12] - 15:6, 23:4, 23:7, 25:22, 25:24, 26:15, 39:22, 40:8, 57:17, 66:6, 98:7, 101:6
**type** [4] - 7:20, 41:1, 41:14
**types** [2] - 18:1, 26:6
**typical** [2] - 14:13, 93:15
**typically** [2] - 114:19, 114:21

## U

**U.S** [10] - 5:18, 22:15, 50:1, 55:25, 56:16, 57:7, 57:10, 87:23, 88:3, 88:12
**ultimately** [12] - 14:3, 41:25, 42:2, 42:3, 42:13, 43:14, 44:8, 53:7, 69:5, 69:16, 71:15, 80:7
**unaccounted** [6] - 30:12, 30:16, 30:18, 30:25, 89:7, 89:25
**unaware** [1] - 10:17
**unbeknownst** [3] - 8:23, 9:4, 61:1
**uncommon** [3] - 77:10, 77:13, 77:14
**uncovered** [4] - 11:20, 11:24, 13:10, 35:20
**uncovering** [1] - 66:14
**undeclared** [1] - 24:25
**under** [18] - 18:14, 19:14, 43:16, 47:1, 48:1, 50:9, 54:19, 56:24, 57:2, 63:4, 75:15, 96:14, 96:17, 99:9, 103:3, 111:25, 117:6
**undercover** [1] - 79:24
**underneath** [1] - 40:16
**underreported** [1] - 32:5
**understandable** [2] - 24:2, 113:13
**understood** [1] - 118:11
**underwear** [3] - 39:2, 39:19, 40:16
**undisclosed** [1] - 90:25
**unencumbered** [2] - 114:10, 115:6
**uneventful** [1] - 65:7
**unexcused** [1] - 46:4
**unfamiliar** [1] - 114:18
**unfortunately** [1] - 76:9
**unique** [1] - 112:15
**United** [17] - 3:25, 16:8, 20:9, 21:1, 21:12, 21:21, 22:20, 23:16, 24:18, 27:23, 28:4, 30:21, 47:21, 49:22, 89:21, 90:13, 97:3
**unjustifiably** [1] - 83:17
**unjustified** [1] - 104:13
**unjustly** [1] - 83:10
**unless** [4] - 103:4, 106:4, 113:3, 116:6
**unreasonable** [2] - 16:25, 65:3
**unrevealed** [1] - 22:21
**unseal** [1] - 118:19
**unsealed** [1] - 119:3
**unsophisticated** [1] - 31:11
**unsubstantiated** [1] - 110:17
**unsure** [1] - 20:11
**unwelcomed** [1] - 13:11
**up** [36] - 7:4, 8:14, 8:22, 9:23, 10:8, 11:2, 18:14, 20:4, 25:12, 26:15, 44:16, 45:12, 45:14, 48:24, 53:9, 54:6, 60:24, 72:4, 85:20, 85:22, 88:2, 93:16, 99:19, 101:10, 101:12, 103:10, 104:17, 104:19, 108:19, 109:1, 110:16, 110:19, 111:4, 112:8, 116:1
**upset** [4] - 74:3, 75:3, 77:1, 88:12
**user** [2] - 7:14, 11:15

## V

**vacation** [5] - 54:13, 54:16, 54:25, 63:1, 65:12
**vacations** [1] - 105:13
**vagaries** [1] - 101:16
**value** [2] - 10:3, 31:6
**Varadarajan** [1] - 105:4
**VARADARAJAN**[21] - 3:13, 3:16, 3:22, 93:24, 94:11, 96:1, 96:9, 111:24, 112:14, 114:12, 115:8, 115:14, 115:23, 116:8, 116:24, 117:7, 118:13, 118:17, 118:23, 119:4, 120:6
**various** [1] - 58:24
**Vaughan** [90] - 5:2, 5:19, 6:6, 7:8, 8:9, 10:25, 12:4, 12:19, 13:20, 14:2, 14:5, 14:13, 14:25, 16:23, 18:13, 20:18, 27:6, 34:17, 34:18, 34:20, 35:1, 35:3, 35:5, 35:8, 35:9, 36:1, 36:9, 38:15, 43:6, 43:7, 43:10, 44:2, 47:14, 47:15, 48:5, 48:13, 48:15, 49:1, 49:15, 50:6, 50:7, 52:25, 53:5, 53:8, 53:9, 53:14, 55:22, 56:4, 56:7, 57:7, 57:17, 58:4, 58:8, 59:2, 63:1, 63:10, 63:24, 71:17, 72:15, 73:12, 73:14, 73:22, 74:10, 75:3, 76:24, 76:25, 78:9, 78:11, 80:7, 82:2, 82:15, 82:20, 82:24, 84:21, 85:3, 86:8, 86:18, 87:17, 92:8, 94:17, 94:24, 95:17, 96:21, 99:20, 100:17, 108:11, 109:24, 111:8, 111:9
**Vaughan's** [14] - 33:9, 45:10, 56:14, 56:15, 56:18, 57:12, 58:17, 58:25, 59:4, 75:14, 80:2, 82:8, 97:13, 110:22
**vehicle** [1] - 35:2
**vehicles** [7] - 15:4, 15:5, 69:1, 69:2, 69:8, 69:14, 108:6
**verbal** [1] - 36:4
**verify** [1] - 20:18
**versed** [1] - 82:23
**versus** [4] - 5:18, 28:2, 97:3, 102:25
**veteran** [1] - 101:6
**victim** [10] - 6:20, 8:4, 36:15, 41:22, 42:4, 87:25, 88:6, 88:15, 91:18, 92:9
**victims** [23] - 6:24, 8:6, 9:16, 9:17, 11:22, 22:6, 33:11, 35:20, 36:3, 36:14, 37:7, 41:10, 42:6, 49:11, 49:25, 50:3, 50:10, 87:19, 88:2, 91:5, 91:6
**view** [1] - 116:14
**violations** [1] - 4:16
**violence** [1] - 101:14
**violent** [2] - 101:11, 102:9
**Virginia** [14] - 15:6, 20:12, 49:20, 56:1, 56:7, 56:17, 57:8, 83:7, 83:23, 87:23, 88:3, 96:3, 96:11
**Visa** [2] - 6:9, 7:6
**visited** [1] - 19:10
**volume** [1] - 10:1
**vulgar** [1] - 38:24

## W

**wages** [1] - 14:14
**waist** [1] - 40:15
**wait** [3] - 69:23, 93:15, 95:24
**waive** [1] - 3:2
**walk** [2] - 21:15, 25:19
**wall** [7] - 35:6, 35:7, 86:4, 86:6, 86:8, 86:12
**walls** [1] - 86:15
**Walsh** [7] - 5:2, 7:7, 8:9, 9:2, 10:25, 11:14, 11:23
**wants** [1] - 107:2
**warning** [1] - 106:11
**warrants** [3] - 15:10, 17:18, 104:9
**wash** [1] - 40:3
**watch** [1] - 39:11
**waters** [2] - 17:12, 95:12
**wealth** [3] - 18:2, 18:8, 98:4
**wealthy** [3] - 55:11, 55:15, 71:17
**weapons** [2] - 93:8, 107:5
**wear** [2] - 53:4, 80:2
**wearing** [4] - 39:3, 53:8, 55:22, 80:9
**Wednesday** [1] - 98:18
**week** [7] - 29:18, 40:8, 51:13, 51:14, 51:20, 57:16, 99:1

**weigh** [2] - 15:24, 103:5
**Weinstein** [1] - 91:14
**well-to-do** [1] - 32:23
**white** [4] - 4:19, 35:19, 97:23, 100:11
**white-collar** [2] - 4:19, 35:19
**whole** [2] - 44:7, 54:6
**wholly** [1] - 103:24
**wife** [9] - 20:18, 57:18, 70:19, 70:24, 101:7, 102:20, 108:16, 109:22
**Williams** [1] - 56:15
**willing** [2] - 103:15, 106:20
**willingness** [1] - 105:1
**wire** [11] - 53:4, 53:8, 53:16, 55:22, 79:23, 80:2, 80:9, 84:6, 86:17, 86:20, 86:21
**wires** [1] - 85:7
**wiser** [1] - 10:12
**within-the-United-States** [1] - 21:21
**WITNESS** [1] - 93:22
**witness** [12] - 3:23, 4:4, 16:9, 42:8, 50:25, 73:3, 86:17, 88:24, 92:10, 93:18, 98:21
**witnessed** [1] - 34:20
**witnesses** [25] - 12:16, 13:2, 13:13, 13:17, 36:11, 41:15, 42:13, 44:9, 44:23, 46:9, 82:2, 82:21, 92:15, 99:7, 99:15, 99:16, 100:20, 100:23, 101:19, 103:14, 103:19, 106:24, 107:1, 107:4, 111:7
**woman** [1] - 43:21
**women** [2] - 92:1, 92:3
**word** [5] - 20:3, 78:5, 84:1, 84:23, 88:10
**words** [1] - 87:22
**wore** [2] - 53:15, 86:17
**worker** [1] - 24:20
**workplace** [1] - 112:17
**world** [4] - 22:16, 23:20, 24:6, 107:19
**worry** [2] - 24:22, 26:25
**worst** [1] - 98:13
**worth** [8] - 6:17, 6:20, 9:24, 16:20, 32:4, 33:2, 71:19, 90:2
**writing** [1] - 67:7

## Y

**year** [5] - 45:19, 62:14, 100:13, 102:11, 102:12
**years** [24] - 4:21, 17:25, 19:10, 20:15, 24:1, 26:5, 31:16, 43:21, 63:10, 63:13, 80:20, 81:2, 91:15, 91:25, 97:12, 97:14, 101:5, 104:11, 106:1, 107:7, 107:11, 110:18, 113:16
**years'** [1] - 89:11
**yell** [1] - 99:22
**yelled** [1] - 95:21
**yelling** [1] - 49:8
**yesterday** [3] - 3:8, 45:20, 52:16
**you-all** [1] - 70:7
**Young** [1] - 72:11
**young** [2] - 43:20, 101:6