UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS (SHERMAN DIVISION)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>EDWARD WALSH VAUGHAN, HADI AKKAD, and GINA ELLINGSEN,<br><br>Defendants. | Case No. 4:22-cr-00162-ALM-KPJ-1-2-6<br><br>Sherman, Texas<br>October 10, 2023<br>1:42 p.m. |

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | n/a |
| For the Defendant:<br>(Edward Vaughan) | Joseph D. Brown, Esq.<br>Joe Brown, Attorney<br>100 N. Travis St.<br>Suite 205<br>Sherman, TX 75090 |
| For the Defendant:<br>(Hadi Akkad) | David Gerger, Esq.<br>Gerger Hennessy & McFarlane, LLP<br>700 Louisiana Street<br>Ste 2300<br>Houston, TX 77002 |
| For the Defendant:<br>(Gina Ellingsen) | Marlo Cadeddu, Esq.<br>Law Office of Marlo P Cadeddu<br>2911 Turtle Creek Blvd<br>Suite 300-390<br>Dallas, TX 75219 |
| For the Movant:<br>(U.S. Bank, N.A., and Elavon, Inc.) | Daniel Wallmuth, Esq.<br>Michael S. Dry, Esq.<br>Vinson & Elkins LLP<br>2200 Pennsylvania Ave., NW<br>Suite 500 West<br>Washington, DC 20037 |
| Court Recorder: | mmc |

Transcription Service: Chris Hwang
Abba Reporting
PO Box 223282
Chantilly, Virginia 20153
(518) 302-6772

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**INDEX**


| | Page |
|---|---|
| Motion, granted | 5 |

(Call to order at 1:42 p.m.)

THE COURT: Court calls case number 4:22-CR-162, United States v. Edward Walsh Vaughan, et al.

MR. GERGER: Good morning, Your Honor, my name is David Gerger. I'm from Houston and I represent (indiscernible) Defendant Hadi Akkad (indiscernible).

THE COURT: All right, good afternoon.

MR. BROWN: Joseph Brown for the Defendant Edward Vaughan.

THE COURT: Good afternoon.

MS. CADEDDU: Marlo Cadeddu for Defendant Gina Ellingsen.

THE COURT: Good afternoon.

MR. WALLMUTH: Good afternoon, Your Honor, Daniel Wallmuth and Michael Dry for third-party U.S. Bank and Elavon, Inc.

THE COURT: All right, good afternoon.

All right, we're here today regarding Defendants' motion for issuance of subpoena duces tecum for pre-trial production of documents to U.S. Bank.

Objections were filed on the part of U.S. Bank. For purposes of the record, there's been a reply, an ex parte -- a reply filed by the Defendants, as well as the Defendants' ex parte statement in support of the motion for the subpoena.

And there's also a motion, it's Docket 165, to

provide supplemental authority regarding U.S. Bank's sur-reply.

The conference note in the motion states that U.S. Bank opposes the Defendants' subpoena. I'm assuming your position to the motion itself is not opposed?

MR. WALLMUTH: That's right, Your Honor.

THE COURT: Okay. So just for purposes of the record, that motion Docket 165 is granted and the Court has read that motion as well as the attachment.

I want to just start off by saying that -- a couple of things because I have read the briefing. And I have some thoughts in terms of particular issues that are raised here.

I want to give the parties an opportunity to talk to me and if -- but I also want go to ahead and tell you preliminarily where I am, so that maybe you can better address anything that you'd like to either in terms of where I am right now.

In particular, looking at Rule 17, it does not seem to me that the information that's requested falls within the definition of dignity and privacy for purposes of Rule 17.

The -- I don't believe U.S. Bank provided, and we researched on our own case law, and did not find any information that likened the type of information sought in this case to fall within the definition here under Rule 17.

I know that U.S. Bank asked the Court to adopt the scope in terms of including financial information of Graham

Luchbiole (phonetic).

I don't believe that that argument is correct because that specific -- that specific language is accepted when it's produced by subpoena.

So I -- that's just my original after looking at the case law and the rule itself, I don't believe the requested information falls within it.

And so, I don't believe a notice to the 7,000 customers whose financial data that they at one time provided to ETS would warrant any notice and objection period.

And I'll also note for the record just in purposes of my thinking is that, you know, some of that information that's requested by the Defendants has already been produced to the Government.

So, again, not saying that you can't address that initial issue when it's your turn to talk to me, but that's my initial thinking.

For purposes of the request, when I read the initial motion, the requests seemed broad to me. They seemed broad. They seemed like they could have been defined more specifically. And so, I thought Defendants' objections at least in part had merit.

When I read the ex parte statement that seemed to narrow at least in part some of the requests and the information that's actually sought, I thought the Defendants

did a better job in terms of stating with specificity what documents they wanted and why. And it does seem to me that they are -- most of them requested a relevant to the Defense.

And I tell you that because I don't know if there's been discussions since the briefing's been filed. And some of these, we need to talk about and just go through one by one because I think some of the information has been produced. Defendants believe it hasn't all been produced. And so, we need to talk about that.

But to the extent -- and I'm just posing this as a question for sort of a reasonable solution here that may or may not be possible. The Defendants filed the statement ex parte because the purported reason is that it discloses its defense and strategy.

I'm not sure that at least when I read this statement, that it really gives any more information into your strategy other than, you know, that would otherwise be unknown by not knowing what -- and by knowing what specific documents you're requesting.

And so, I'm not going to, you know, make you give that statement to the other side, but I would ask you to at least consider and would it be worthwhile narrowing down to at least the specific documents that you have in mind and disclosing that to U.S. Bank.

I think they would have a harder time at least for

some of these objecting if the request was specifically narrowed like it was in your ex parte statement.

And that may be too broad of a statement and we can talk about it one by one, but I just wanted to make those initial remarks.

Because it's the Defendants' motion, whoever would like to argue first on -- for Defendants may proceed.

MR. GERGER: Thank you, Your Honor, David Gerger for Mr. Akkad.

And to hopefully make our requests even clearer and also to reveal more of our reasoning, we, this morning, we gave the Court and U.S. Bank a little two-page summary. I don't know if the Court received it.

THE COURT: I have not seen that. I've been in hearings since this morning, so.

MR. GERGER: I have an extra if I can hand it up?

THE COURT: That would be great. So has U.S. Bank seen the ex parte document --

MR. GERGER: No.

THE COURT: -- that was filed? Okay.

MR. GERGER: No, but they --

THE COURT: But they have seen the summary?

MR. GERGER: They have seen this, which you know, really does go I think pretty far in explaining exactly why these are relevant in our view.

THE COURT: Let's just take these one by one since I'm just now looking at this. The Request Number 1, the ETS E-Money portal.

MR. GERGER: Right.

THE COURT: The Defendants are specifically -- is there a specific document or is it simply initial communications with each of the alleged companies that are included in the Government's case when the debt, when the additional 30 percent debt was added, or are you requesting something broader than that?

MR. GERGER: Well, as we understand this E-Money, this was literally a -- it includes direct communications between ETS and the customers about pricing.

I'm sure it includes discussions about other things, too, but we're not -- so we're not able to say that on this exact date we want this exact page out of E-Money because we no longer are in possession of this database although we once were, so our clients know what it is. And it does contain direct communications about pricing.

And the thing that we think really would reveal Defense strategy are the cited pages to our ex parte statement, where it shows exactly one example of why this E-Money portal is so important to us. It's a place where clients could go to get information about pricing that was being charged.

So we've asked for the entire E-Money database, which

once was in our possession, so that we can search for the things in there that are specific and admissible and relevant about pricing.

I don't know another way to narrow it down than that. The E-Money portal is not in the Government's discovery. I say that. We have spent a lot of time looking at the Government's discovery. We do not see the E-Money portal at all in the discovery.

THE COURT: It seems to me that e -- all documents contained within the e-portal is overly broad. I just I don't think that's permitted under the rule. I think you have to be more specific in a particular type or subset of documents that you're searching.

MR. GERGER: Well, our reason for asking it that way is, frankly, the other way to do it would be to say to U.S. Bank, our opponent in civil litigation, will you search the E-Money portal and give us the correspondence about pricing, we think it would be less intrusive if we search the database for the pricing, but that is what we're after.

THE COURT: Okay. And if you had to narrow that request, what specific documents -- I mean, if these documents were at one time your client's, I would assume they have a pretty good idea of what types of documents are contained in this portal. What specifically are you looking for?

MR. GERGER: Well, I'd want to confer with my team,

but certainly communications about debit pricing would be one. That would be one for sure. And I probably can confer and get some others if we had to.

THE COURT: All debit pricing or the 30 percent increase that's at issue in this case? It seems to me what is relevant here is the 30 percent increase for this case. And if you're seeking something broader than that, I need you to tell me the relevancy?

MR. GERGER: If I can have a minute at the end of our discussion and get back to you with that --

THE COURT: Yes.

MR. GERGER: -- answer, Your Honor, I will.

THE COURT: Okay.

MR. GERGER: Because we want to make this practical.

THE COURT: So do I.

MR. GERGER: Yeah.

THE COURT: Okay. Go ahead.

MR. GERGER: You know, I had wished I had put Request Number 5 first, because it really sets the stage for all the others, Your Honor.

You know, we have looked at the discovery and we know from the discovery that there were contracts between ETS and its customers that defined what can be charged.

We find only about 300 out of the 7,000. That's what our search has found. We do not find the 7,000 contracts.

THE COURT: Okay, and I think your briefing said 400.

MR. GERGER: Maybe it's 400.

THE COURT: Approximately 400.

MR. GERGER: 3- to 400. So we are -- we're asking for all of the contracts with the customers to show that they were not misled about what was to be charged.

THE COURT: The 400 contracts that you have, are they different? I mean, do they vary in that regard in terms of any sort of notification for this debt pricing that's at issue?

MR. GERGER: There are a couple of different versions, but we think that they support the Defense's case.

THE COURT: Okay, can you give me any additional information in terms of why that is? If you have 400 already that don't show what you think some others may show --

MR. GERGER: I think the others are going to show that, too. I think that we're going to be able to show that the 7,000 merchants were not misled. And so, we need their contracts to show that.

THE COURT: Okay.

MR. GERGER: And we set out in the ex parte statement why we think the contracts support the Defense and rebut the claim of fraud. I would rather keep that in an ex parte conversation or I can point you to the pages that we're referring to in that.

THE COURT: No, I know what you're talking --

MR. GERGER: Yeah.

THE COURT: I mean, I know what the purported reason is. It's just offering terms, when you're talking about, you know, specific types of data where you have the same contract with just a different person, sampling is often used what -- and so, I'm -- I guess what I'm still not understanding is why do we need all 7,000 if the contracts and what you're trying to show in that contract are essentially the same?

MR. GERGER: Well, because that's what the indictment alleges. We're trying to meet -- for sure, we're not going to go through 7,000 contracts in a jury trial, but we do not know what witnesses the Government is going to call.

We have asked the Government are you (indiscernible)? Can you narrow down the 7,000? We have been told no. And so, if the Government comes with a witness, customer number 5022, we need his file.

THE COURT: Okay, I understand that.

MR. GERGER: So that's 5. And I think that sets the stage well for the rest.

Now, Your Honor, Number 2, that is a very difficult and broad request. We recognize that, because Request Number 1 we thought was specific. We will get with you and get it more specific, but Request Number 1 was E-Money. We know we can identify E-Money as a specific portal that we think could be produced.

In addition to E-Money, we know from the discovery that we have some examples of other communications like emails with customers where we are telling the customers exactly what's being charged accurately without any fraud, without any deception.

THE COURT: But I thought that's the information that was contained in the E-Money portal.

MR. GERGER: We know there's -- the E-Money portal is -- there are at least three sources of communications. E-Money is one.

We've also seen just emails between an employee and ETS and an employee at a customer. I don't know if that email is in E-Money, but I don't think it -- I think it might not be.

I think there was another they were communicating with employees -- employee of ETS, an employee of a customer by direct email, not through the E-Money portal if that makes sense.

And we've identified in the ex parte submission a couple of examples of where through email, not through E-Money, we're communicating accurate information to customers.

I say this is a hard one, because this would require a very broad search of our old records. We recognize that.

And as I'm standing here, I don't have a way to do that other than to ask U.S. Bank to produce the communications that we have with our customers.

We would be searching all of that, but for the fact that the company was sold and we no longer have our records. But if we still had these records, we would find the emails between our employees and our customers explaining how the pricing works.

So we have, I think, a strong case to get that kind of information. They have an argument that that's a very big project for them to try to undertake.

If they gave us all those communications, we would do the work. And we're not asking them for anything that we didn't once have ourselves.

THE COURT: Couldn't there be an agreed-upon search terms that -- to narrow let's say all communications within an extended time period to the specific information that you're looking? I'm assuming that's what you would do once you got all of the communications?

MR. GERGER: I would like to confer with my team, but I would be -- I think that's a very good suggestion, Your Honor, to do.

THE COURT: All right, so and to make sure I understand before we move on from Number 2, I believe this also was one where the Defendants represented that some of this information has been produced, but you believe not all communications, correct?

MR. GERGER: That's correct.

THE COURT: Okay. And then, that's the same for the Request Number 3 as well that's this internal database?

MR. GERGER: That's correct. We find like excerpts or snippets of this Number 3, this internal database, but again, we only find communications with 300 to 400 of our customers, not all of them.

And we have the same problem that we don't know who's coming at trial and what we're going to be held accountable for. So that's called the MANI, M-A-N-I, database.

THE COURT: And the specific -- I don't know -- I'm not sure this is clear in the way that the request is worded, the three parts or the three specific types of documents that are, I think, more clearly identified in the ex parte document, have those three specific records requests been identified for U.S. Bank? It's on page 5 and 6 of the ex parte statement, Numbers 1, 2, and 3.

MR. GERGER: We have not, Your Honor, but I'm happy to do that. I think that would be fair to them.

THE COURT: Well --

MR. GERGER: Yeah.

THE COURT: -- do you mind if I just read it on the record right now?

MR. GERGER: Please. Thank you.

THE COURT: Okay. So for primarily U.S. Bank's benefit, the specific type of information being sought by the

Defendants in Request Number 3 is number 1, a record of documents and communications related to merchant clients, including each of their merchant agreements.

Number 2, a log account maintenance performed by ETS, i.e. changing the merchants' rates.

And number 3, a log of oral communications between ETS and a merchant client.

This is, I think, a good example of what I was talking about in terms of when I look at the request as stated in the subpoena, it is -- appears to be broad. These three categories of documents that are specifically identified, they are more specific.

MR. GERGER: Yes, Your Honor.

THE COURT: So.

MR. GERGER: Thank you. Now the fourth request is actually related conceptually to the ninth request, but I'll start with the fourth request.

So the indictment claims that we defrauded our customers and -- from 2012 to 2018. And then, we sold our company to U.S. Bank in 2018. And the indictment says that we defrauded U.S. Bank by not telling them that we were defrauding our customers.

So, obviously, whatever U.S. Bank knew about our -- the way we charged customers is relevant to them being a victim. If they knew what we were doing, we don't think that

they are --

THE COURT: Right.

MR. GERGER: -- the victim.

THE COURT: However, and this is one thing I did not have time to do before the hearing, which is look at the actual charges, tell me how is it relevant to the criminal conduct that's alleged and charged in the indictment whether U.S. Bank was a victim or not?

MR. GERGER: They aren't planned as a victim.

THE COURT: I understand that, but for your client to be convicted of the charges that are alleged, is it relevant or is it necessary that the Government prove that U.S. Bank was in fact a victim?

MR. GERGER: Well, I --

THE COURT: Because I don't think so. And I say this without going back and looking at the indictment, which I intend to do.

So if you know, you know, there is a specific element here, it seems to me that if the Government proves that your client defrauded one of its customers, then that's what's required to be found guilty. So why it would be relevant if U.S. Bank knew or didn't know is unclear to me.

MR. GERGER: Well, I suppose it is true that if we defeated 6,999 victims, and there was still 1 victim we defrauded, in theory, we could be convicted. That is true.

And of course, the key to that is going to be what were the merchants told, right? So that's how we get need these communications with the different merchants.

I suppose the jury could believe we did not defraud U.S. Bank and convict us for defrauding one of our merchants, the city of Sherman, but we have to meet all of these charges.

And I expect at trial that someone from U.S. Bank will present itself as a victim. That is actually pled in the indictment that they -- well, they bought this company, and they are a victim. The Government's loss calculation relies heavily on this idea that U.S. Bank overcharged for our company.

And so, it seems to be able to meet that charge. We should be able to show two things. The first is that during this period of 2012 to '18, and this is really Request Number 9, U.S. Bank was working with ETS in the processing business.

And this is a little confusing to me anyway. They were something that's called an acquiring bank. That's not to say the bank that purchased our business, but as in the lingo of credit card processing, U.S. Bank was something called the acquiring bank for ETS.

And what that means is that ETS, and U.S. Bank, and a customer, the three of them have a contract together. And when the fees are sent and the statements are sent, the acquiring bank has the ability to review those, audit those, and ensure

they are in compliance with the law and industry standards.

In fact, the merchant, actually when we do processing, the merchant doesn't pay us. It pays U.S. Bank. And U.S. Bank distributes money to send other parties to the transaction. So, from that relationship, we say U.S. Bank was involved in our business and knew what we were doing.

That to me is relevant not only to show that U.S. Bank is not a victim, but indeed would be relevant to whether the customers are victims.

And there is a -- an agreement with each customer ETS and U.S. Bank that sets out this relationship. And as far as we can tell, that agreement is not in the discovery.

THE COURT: And that's the ISO agreements. And it's your position that you haven't received any ISO agreement?

MR. GERGER: I'm going to look over -- we have not found any ISO agreements involving U.S. Bank.

THE COURT: Okay.

MR. GERGER: In addition, we know that -- I don't know that we can say that U.S. Bank audited us. I don't know that we have the evidence of that, but if they also audited our work, which they have -- we think they would have the right to do under this contract, we would want their audits of us. So that's Number 9.

And Number 4 then jumps forward in time to when U.S. Bank is actually going to buy our business. We know there was

a data room that was set up. U.S. Bank sent in representatives and scoured our records. And, again, we're asking for what did they look at in the data room that would show them what our pricing was.

THE COURT: And wasn't that specific data room something that would have been set up by your clients?

MR. GERGER: We don't -- I don't believe we have any record of what it was.

THE COURT: I understand you probably don't, but do you not -- can you not be more specific? And I guess my question is instead of requesting anything that you may have looked at in the due diligence room, I'm not necessarily sure why they would be able to recollect that unless there's a specific list of documents that were provided. Is that not something that, you know, your client also has?

MR. GERGER: I don't believe my client has that. I don't think the others have that. And I'm not asking U.S. Bank to sit down and answer an interrogatory here. I'm just asking if they have a record of what was in the data room, that would certainly be a good start.

THE COURT: So you're not specifically asking for them to produce all of the information that they looked at? You're rather asking them just to produce a list of information if such list exists of what was provided in the data room?

MR. GERGER: I've written that down as a question for

my team --

THE COURT: Okay.

MR. GERGER: -- to see if we can jointly agree to narrow it to that, Your Honor. So 5 and 6 on our list are really the same, the contracts with each merchant.

7 has the following background. We call this the responses by our customers to the, quote, the welcome to Elavon letter, all right.

So here, we believe that after U.S. Bank bought our company, they continued to charge this same 30 cents that we had been charging, that we're accused of charging fraudulently.

But we believe that Elavon sent a letter to the customers that -- I put this in quotes on the summary. This is not an exact quote, but it basically says we're going to charge you this same fee, but in the past, we don't think it was disclosed up to our high standards.

We don't know what the customers responded, but if customers responded and said fine with us, we knew about that charge, that would be relevant.

If a customer said, oh, my goodness, I'm shocked about this, I really feel defrauded, that might be relevant for the Government to use, but I -- we haven't seen that. And so, I'm assuming that those letters aren't there because I assume U.S. Bank would have given those to the Government. They're working cooperatively with each other.

So I suppose we could narrow this to find, you know, we would come up with formulations that would be favorable to us, but we thought it easier just to ask for all of these responses by merchants. This would be the very victims responding to whether they thought they were victims.

THE COURT: But wouldn't the type of information, not just in this request, but in others, be exculpatory, and therefore, the Government would be required to produce it to you?

MR. GERGER: I don't know that the Government has these.

THE COURT: Okay.

MR. GERGER: Now I wish I were ending on 9, because that's a really good one, but I already did 9. So we're going to end on one that's not as good as Number 9.

THE COURT: You chose that one to start with. You don't get to end (indiscernible).

MR. GERGER: Yeah, we should start strong and end strong. You're supposed to start end good.

Well, Number 8 is this. We know that this is called communications between U.S. Bank and DOJ, including pitches to indict the Defendants.

We do know that this happened. We do know that U.S. Bank went to one U.S. Attorney's Office on the East Coast that declined to indict the case. We don't know why.

We don't know how the case came to Sherman, but we do know because there is an email in discovery where U.S. Bank is telling the Department of Justice or the FBI we're disappointed in the first decision, let us come help you. We'll make a presentations to assist in your investigation and prosecution of these Defendants.

So we're -- we think we are entitled to show that the Government did not do a good, thorough investigation of this case.

And I don't have the cases at the top of my head that say that, but I know in the 5th Circuit that that's a valid affirmative area of Defense evidence.

And so, we think that these presentations that they've relied on U.S. Bank, we think this is relevant and admissible for us to get and is potentially admissible.

THE COURT: Well, then, how do you make the leap between the email communication that you've seen where it was pitched to one U.S. Attorney's Office, they declined to prosecute, but another office went forward with prosecution to we want this information to show that the Government didn't do a thorough investigation?

MR. GERGER: Well --

THE COURT: I mean, that happens. That -- as you know, that happens and there are various reasons for it. So I don't think that one particular reason, particularly if it's

i.e. the Government didn't do a thorough job, number one, that's highly not -- I mean, highly likely to not be admissible at trial.

And so, for this one, if you've got specific case law, I'd like to see it. I don't recall any particular case law that was cited and supported this. This seems like a stretch to me.

MR. GERGER: Understood. And I'll get that to you. I think it deals -- there are a lot of cases where, you know, the Government focuses on a theory and they don't look at other theories. They focus on one suspect. They don't -- they ignore exculpatory evidence. They ignore evidence of other suspects.

And I believe that that evidence has been held to be admissible. So, but certainly, I'm not prepared to cite those now.

THE COURT: Okay.

MR. GERGER: And I'd like to repeat my argument about Number 9. It's a such a good argument.

THE COURT: I don't -- I know --

MR. GERGER: I would be able to do that.

THE COURT: -- you really want to end on Number 9, but I don't need to hear.

MR. GERGER: I'm -- all right.

THE COURT: I'd actually like to hear from the -- are

any of the other Defendants' counsel or do you want to make additional arguments before I move to U.S. Bank or? Okay.

MR. GERGER: May I have a moment, Your Honor?

THE COURT: Yes.

MS. CADEDDU: May I just clarify one point? When you're talking about 30 percent?

THE COURT: I'm -- 30 cents.

MS. CADEDDU: It's not actually.

THE COURT: Oh, it's 30 percent?

MS. CADEDDU: 30 basis points.

THE COURT: Okay.

MS. CADEDDU: So it's .030 of a percent.

THE COURT: It's 30 basis points. And there's a particular debt mark-up that that applies to. And what is that called? Isn't --

MS. CADEDDU: (Indiscernible.)

THE COURT: Online debit?

MS. CADEDDU: Offline.

THE COURT: Offline debit.

MS. CADEDDU: Offline debit. So it's a 30 basis point, 3-0 of 1 percent on a offline debit (indiscernible).

THE COURT: Okay. All right, thank you. And my understanding of the underlying facts of this case is there was essentially a one-time that this mark-up happened for each one of the customers that the 30 point mark-up was imposed.

And so, it seems to me that those particular documents, at least the contracts, are relevant. I don't know that that's disputed seeing that you already have 400'ish of those contracts.

The other point that's a little bit concerning to me, and U.S. Bank's going to have to address this, is like I said a minute ago, much of the information that's requested at least refined just a little bit as we've sort of talked through today would be considered exculpatory evidence of the charges and allegations against your client.

So the question is does the Government have this information? And if the Government doesn't have this information, then aren't the Defendants entitled to it?

And so, that's really the question that I have for U.S. Bank, because I think you're the one that's a position to know what has of the requested information, what has and has not been produced to the Government. And then, we can go from there.

MR. GERGER: Your Honor, Ms. Peterson passed me a note to clarify the difference between E-Money and emails.

THE COURT: Okay.

MR. GERGER: I was confused. E-Money as I understand it now, that's a Request Number 1, is like a portal where customers who go to view information. It's not emails between the client and the company.

THE COURT: Okay.

MR. GERGER: That's a separate set of documents.

THE COURT: So it could go to this e-portal to review information. What kind of information?

MR. GERGER: Pricing information and the information that's in our ex parte filing.

THE COURT: And so, what's requested is for number one communications related to debt mark-ups, but there are no communications in that portal, correct?

MR. GERGER: I would say that ETS is communicating to the customers through that portal, where they go -- the customers go and see news or information that's relevant to their account.

And I don't know a way to narrow that other than let us look at the portal, but there are -- there are I call them communications. The customer logs in and reads communications from ETS, reads --

THE COURT: Regarding certain changes --

MR. GERGER: Exactly.

THE COURT: -- to I guess various mark-ups, is that?

MR. GERGER: Could be, yes.

THE COURT: So you don't know if this information is fluid or if it's essentially this is the information and then a client can look at it?

MR. GERGER: I think the clients can look at it.

THE COURT: Right, I know that. But the question is the first part. Is it -- is the information fluid? Is it changing?

MR. GERGER: Well, it's my understanding that if something appears today in E-Money, the client can see it today and they can see it tomorrow.

There might be additional messages tomorrow. I may be misdescribing it, but that is my understanding and why based on what's in the ex parte filing, it's very important to see what customers saw when they looked in E-Money.

THE COURT: Right, but I think this is a good example of a weakness in some of the requests. It seems to me that you don't even really know what you're looking for here.

And I don't think that's permitted under the rule. I think there has to be specific information that is requested. And it's my understanding at least as framed, Request Number 1 was communications that are contained in this portal, I mean, maybe if the request is information that your clients put up on this e-portal to be viewed by their customers related to the 30 basis points debit mark-up, that would make sense to me.

MR. GERGER: That's really what we're after. And as I said, we're going to confer, but that is really what we're after.

THE COURT: Okay. Okay.

MS. CADEDDU: May I just add, Your Honor, I do

believe if you look at the request itself, that it's framed that way.

So produce all documents of ETS' E-Money customers to documents of ETS' E-Money customer portal from online 2012 to 12/31/2018, related to debit pricing and rates for clients related and clients referenced in Attachment B. So we are specifically looking for communications or documents that would have been put out there to clients giving notice of debit rates and fees.

THE COURT: Okay, but it's not really communications. It's just information provided by ETS regarding this issue?

MS. CADEDDU: I mean, I suppose you could call it communication because it's information you're putting out for your clients to access. I mean, it's a notification really (indiscernible).

THE COURT: Right. And would that notification be -- again, this is a question that I asked earlier. It seems to me that the initial notification when that change was made is really what's at issue here.

It -- I mean, after the change was made, and the 30 point mark-up was imposed bill after bill after bill, I'm just -- I'm wondering if it could be narrowed?

MS. CADEDDU: Well, let me just -- and again, I'm not an expert on this on pricing, though I'm becoming one. My understanding is that twice a year, there are changes in fees

by credit card companies.

And so, and those fees go through the pass-through section essentially, which is where this 30 basis points is charged.

So in time -- and so, it would be important to see each, you know, every six month -- every twice a year, the pricing notifications for -- that were going through that pass-through account. So it's a little bit hard to narrow just to one transaction, because the pricing changed twice a year.

THE COURT: But isn't --

MS. CADEDDU: To carry on forward.

THE COURT: But isn't this the only pricing issue in this case? So what does it matter what other pricing issues?

MS. CADEDDU: Because there's -- well, because so the 30 basis point fee went -- the Government claims it was concealed because it was not put in the top part of the bills, put in the pass-through part of the bill.

And the pass-through part of the bill is where the fees are changed by Visa and MasterCard every six months. And so, the way to calculate or figure out where that 30 basis points is is by saying, oh, let's -- we can calculate the fee that Visa is charging. And that is 30 basis points less than the fee that we see on that section of the bill.

THE COURT: Okay, I see what you're saying. Okay, thank you.

MR. WALLMUTH: Good afternoon, Your Honor.

THE COURT: Hi.

MR. WALLMUTH: I'll start with your first question, you know, related to the exculpatory material that U.S. Bank or Elavon may have, that the Defendants are seeking.

You know, this is one the clearer fishing expedition, you know, requests. They're asking us to comb through thousands of documents to try to find information. They don't know whether it exists.

And we don't know whether it exists. They're just trying to ask us to go find it. So -- and that sort of request is just not permissible under Rule 17.

In addition, Defendants talk about how they don't have the documents they need in order to defend themselves, but they don't identify that U.S. Bank in earlier negotiations between the parties like the civil case provided Mr. Vaughan and Mr. Akkad their entire .pst email files and their entire network files.

They have all that information. If they want to search through it, look through it, and identify, you know, the communications they had which they think are exculpatory and, you know, are relevant to their defense.

THE COURT: Okay, hold on. What's a .pst file?

MR. WALLMUTH: It's an email file, Your Honor. All the emails that they would have had in their account at ETS, we

provide a .pst file to them.

THE COURT: From 2012 to 2018?

MR. WALLMUTH: We provided it in 2019. So whatever information would have been saved in 2019, we provided those files to Mr. Vaughan and Mr. Akkad.

THE COURT: Back through 2012?

MR. WALLMUTH: It would include anything that would have been back in 2012, correct, Your Honor.

THE COURT: And so --

MR. WALLMUTH: It wasn't modified and it wasn't, you know, date limited in any way.

THE COURT: So you're saying that all communicate -- all email communications between EST and its customers from 2012 up to 2019 has already been provided?

MR. WALLMUTH: Just the emails that would have been contained on Mr. Vaughan and Mr. Akkad's email accounts. So anything sent or received that they saved and they didn't delete from their .pst files, they have.

THE COURT: Okay.

MR. WALLMUTH: Your Honor, in addition, U.S. Bank provided over 200,000 documents in response to grand jury subpoenas here. So a number of the documents they say they don't have, we believe that do.

And to provide, you know, documents beyond the custody or the customers that we've already provided would

include hundreds of thousands of documents, actually, millions of documents that would cost, you know, substantial amount of money, substantial amount of time to provide, and included, you know, a number of business instructions in order to try to print that data, you know, back online.

THE COURT: I'm assuming this data is preserved, correct?

MR. WALLMUTH: Correct, Your Honor. It's -- most of the data is preserved in cold storage.

THE COURT: Okay.

MR. WALLMUTH: So we can walk through, you know, the individual requests --

THE COURT: Well --

MR. WALLMUTH: -- if it would be helpful.

THE COURT: Let me just tell you again. I don't think your broad just sort of conclusory objection for every single one of these requests, that it's a fishing expedition, that it's expensive, that it's going to take time is sufficient.

If you want to make a specific burdensome objection, you need to tell me, okay, what this request is asking for is X number of documents and this is going to be the cost in terms of manual labor for review and production and dollars and cents. And I don't have anything.

And you know, while I don't disagree that some of

these requests can and should be narrowed, I do disagree that they're not entitled to anything that they're requesting.

And so, I don't know to what extent the parties have tried to talk and narrow this amongst yourself. You know, I do this all the time in civil cases. And that's always the best result for both parties if the parties can do that.

If the parties tell me there's no way we can do that, we need you to just tell us, I'm happy to do that, but it would seem to me that there should at least be that initial attempt at least with what I've told you here today, okay, let's go try to be reasonable. Defendants be reasonable about this is -- these are the documents we have reason to believe they exist and that are relevant and admissible.

And, you know, if the bank has a specific objection in terms of burden, et cetera, I don't think the relevance objection but for the category of documents that I do have a real question about, which is U.S. Bank's motive. I don't, as I sit here, know why that would be relevant to the Defendants' guilt or innocence, as well as everything that's requested regarding Defendants' United States or United Bank's due diligence with the exception of if they were to agree to narrow it down to a list of documents that were in that data room if that exist, that would at least make sense for a starting point.

But do you understand my point? It just seems that

some of these, the parties could surely talk and figure this out.

MR. WALLMUTH: Understood, Your Honor. And we're prepared to talk through each one and what we understand the burden would be on U.S. Bank and Elavon.

THE COURT: Well, when are we set for trial in this case? What's the -- and is it a special setting or do we expect that date to move? What's -- do we know?

MR. GERGER: It's currently set April 1st of next year.

THE COURT: Is that really realistic?

MR. GERGER: I don't know.

THE COURT: Okay. If I gave you 14 days, is that enough time to get together, have reasonable discussions about this, and either tell me we need to issue -- we need you to issue an opinion or we've got it worked out? Or do you need 30 days?

MR. GERGER: I would move to ask to move it less than 30 days.

MR. WALLMUTH: One piece on U.S. Bank's side, Your Honor. A number of the requests relate to materials in cold storage.

And as we understand it, that's material that U.S. Bank would have to bring back online. And we've asked and we've heard that it would take anywhere between 14 to 21 days

and 7 to 10 people working on that.

It's not just a matter of turning a light switch on. You know, they have to identify where the data is, identify, you know, this is material from back in 2018, you know, what sort of server you'd have to host it on, what sort of, you know, supporting databases would be needed to be activated in order to support the data.

THE COURT: And do you have specific information? I'm assuming you do of what information currently is in cold storage?

MR. WALLMUTH: In broad categories, yes, Your Honor.

THE COURT: Okay.

MR. WALLMUTH: But even when we bring it back up, I think there's been questions about, you know, making sure all the data, you know, is brought back on the right server, making sure it's, you know, there's no issues when you bring it back up. You know, all those things would have to be worked through by the IT teams or that, you know, 14 days.

THE COURT: Okay, and I guess what I'm envisioning when I talk about this 14-day time period is not necessarily that you already have all that data brought up and -- but the parties just get in a room and they have a conversation together about Defendants, how can we narrow down to specifically what information we really think we need? And then, you know, whatever your position is. That's what I'm

talking about within 14 days.

MR. GERGER: We can do it in less than a week, I'm sure.

THE COURT: What are your thoughts?

MR. GERGER: (Indiscernible.)

MR. WALLMUTH: I think initially the concern is that unless we would have that -- spend the time to get that data back online, wouldn't necessarily know what for example in E-Money, you know, they identify that there's information that's described to customers.

We don't know if that data they're describing is, you know, cycled through and such that if there's a notice when a customer signs up, you know, welcome to Elavon, and then, the next thing it displays is, you know, your next statement will come in a month, I don't know unless we get that data back online whether each one of those messages is retained in the way that they're describing. And --

THE COURT: All right. Well, it's -- I'm going to order that some of this information be produced because I think it should be.

And so, you know, again, I think I've already signaled. I think it should be somewhat limited, but you can either go ahead and do that leg work.

I mean, I've tried to give strong indications of what documents I did think were relevant. You know, particularly

where you've got documents, where you've already produced some of those documents to the Government, but not all of them.

And frankly, maybe you can address that for me now. It's -- I think it's Requests 5 and 6 where you produced some of the merchant agreements, but at least from the Defendants' position not all of them.

MR. WALLMUTH: I believe that's correct, Your Honor. U.S. Bank received the grand jury subpoena that identified a little over 50 merchants. And those are the merchants that U.S. Bank responded to and focused on.

And even those, you know, merchants, you know, for 54 required over 2,000 documents just for the agreements themselves.

You're talking about initial agreement, an amendment, perhaps a change in signature page. And so, it's not as though you can sort of just copy, you know, one agreement over and satisfy that. There's almost 40, you know, 50 documents potentially per merchant.

THE COURT: And it would also seem to me, and again, maybe I'm just not completely understanding the issues of the case, but I don't -- it seems to me what's relevant here is that the underlying customer documents that deal with this specific mark-up, which is not every agreement with every customer, but that -- but maybe that's not accurate.

I do think that the Government could be helpful in

this in that they're not going to go forward on all 7,000 customers in narrowing that.

And I'm not suggesting that at this early time frame, when you've got a trial date of April that they should have to disclose their witness list, exhibits list, et cetera.

I don't think that's the case, but narrowing from 7,000 to a more reasonable number, where we're talking about a reasonable number of customer accounts for everyone to deal with, but certainly for U.S. Bank as well, you know, that -- I'm not sure that that couldn't be narrowed some.

And I know you're not the Government. And, you know, I know Ms. Rattan wasn't here. Mr. Varadarajan isn't here. And you know, it's a question that I have.

MR. WATTERS: Your Honor, very briefly?

THE COURT: Uh-huh.

MR. WATTERS: Judge, we appreciate the position the Court's in. We hope you'll appreciate the position we're in. We're a third-party subpoena recipient facing millions of dollars in costs to respond to this. We want to narrow.

We understand the Court's position that a subset of materials needs to be produced. And we're trying to figure out how to get there.

Our frustration is these are the Defendants' original documents. And we have no specificity on what they're actually looking for.

Then they file an ex parte. You're like, well, some of this makes sense to us. How do we even negotiate with them when we don't know what they're actually looking for and even in this hearing, they haven't been able to specify to the Court.

So from our vantage point, if the Court wants us to have, you know, good faith negotiation, I think what at a minimum we should get to ex parte to see what they're actually looking for and what you're actually thinking they're entitled to, because at this point, we don't know.

And then after that, we think the process should be, okay, let's get the Government and U.S. Bank and the Defendants in a room and let's have a real conversation and say, okay, this makes sense, this doesn't make sense.

That takes it off the Court's plate. And then, we're not in this where everybody's trying to like figure out what's important and what's reasonable. Because at the end of the day, that's what we want to do.

THE COURT: Okay, and let me make this clear if you have a different impression. I'm certainly not trying to punt this. I'm happy to just issue an opinion.

I don't have all of the information to make what I think would be the best decision as I sit here today. And that's why it seems to me that assuming everybody's reasonable here, that you're in a better position.

You having the documents, although I think what you have said is fair in that, yes, you're in possession of all these documents, but you don't even know necessarily what all of them are.

MR. WALLMUTH: And judge to be clear, when we looked at the subpoena and we're like, okay, let's see if we try to comply with this what that would look like, we couldn't even figure out what search terms we would run. And we would be in a position of saying, yeah, we complied, but we don't really know if we complied.

THE COURT: Right.

MR. WALLMUTH: Or just turning the entire database over, which we cannot do quite frankly because intermingled in that is new customer data that was post-acquisition. So there's no way that we can just in the blind turn these databases over.

THE COURT: What about the information that is in this cold storage room? Would there be any risk that the bank could anticipate in letting Defense counsel just have access to those documents since they were in fact ETS' documents?

MR. WALLMUTH: Judge, we spent a bunch of time since the subpoena talking to people at the bank, trying to figure out, you know, it's in cold storage, but what do we know about what's in cold storage?

Our understanding right now is that after the

acquisition, there was a transition process in which these systems were continuing to be used for new clients that were onboarded well after the Defendants left.

And so, that data, we can't just turn over to the Defendants and say like once we get it out of cold storage, here you go guys, go on your fishing expedition. We can't do it.

We've got to a fiduciary obligation to new clients. And that's data they were never entitled to. And so, we can't give it to them.

THE COURT: I don't disagree with that, but what I'm asking is could you not remove the new clients, and then, rather than you having the burden and the expense of sorting through, et cetera, letting them have access to what was their documents?

MR. WALLMUTH: I don't know enough to know at this point, Your Honor. I'll be perfectly blunt with you because we don't have a firm grasp on what is in cold storage and what it looks like once we bring it out.

And you know, quite frankly, the E-Money portal is not just a portal. It's basically data -- various databases that are kind of converged into one information system. And we're still trying to figure that out.

But from our vantage point, like if the Court says, okay, we are going to give them information, we understand

that. What we would like is not 7,000 clients. We don't understand quite frankly if they have 400 contracts why they need 660 more, but --

THE COURT: Well, because right now, I mean, I can answer that question. Because right now, the Government's alleged problems with 7,000 customers.

They don't know which -- the Government's obviously not going to use all 7,000 at trial, but the Government's not been willing up until this point to narrow that down at all.

And so, where they sit here today in reviewing documents and forming their defense, they're forced to have to consider all 7,000.

MR. WALLMUTH: But presumably, Your Honor, the Government is going to use the discovery it has in its possession.

And there's no way that at trial they would say, okay, we never gave you a contract for Merchant 6998, but now that merchant's going to hit the fan with his merchant agreement.

THE COURT: Right.

MR. WALLMUTH: That would never happen.

THE COURT: Right, but what if one of the contracts that is not in the Government's possession is beneficial to the Defendants? I mean, that's the issue.

MR. WALLMUTH: Your Honor, I don't respectfully as I

understand this case, and I'm definitely not the prosecutor and not the defense attorney, but after reading through the indictment, being involved in the investigation, my understanding of what this case really about isn't necessarily the merchant agreements.

It's basically they told merchants we give them a transparent pricing and all of your costs are in this one section of your statement.

And they were marketing that to the merchants through their salesforce.  And then, at the end, they had a hidden fee that was attached that was not disclosed and was hidden in the interchange section.

The merchant agreement is not going to be dispositive one way or the other.  It's whether people were charged and what they were told was going to be transparency.

THE COURT:  I understand that.  And what you're articulating is the Government's case.  And I'm -- I am familiar with this case because I saw the warrants prior to indictment on this case.

And so, I at least have a general understanding of the Government's case, but the Defendants are entitled to put on a defense.

And even if you think what they're arguing in their defense is ultimately not relevant, et cetera, they -- they're entitled to do that.  And --

MR. WALLMUTH: I'm just going to make one more pitch for us to get the ex parte because it's incredibly hard for us to argue about relevancy and admissibility when we don't know what the subcategories of documents are that they're looking for.

THE COURT: I think we need to go one step further because some of the categories even in the ex parte document, I believe, are still too broad.

And I think we've talked through those at least generally today. And so, I'm going to ask the Defendants to take a stab at narrowing the 10 requests.

And I'd like to see that. And then, that can be a starting point for discussions as opposed to the initial subpoena being a starting point.

MR. GERGER: We agree.

THE COURT: Okay.

MR. WALLMUTH: And Your Honor, can we set like a status conference maybe in three weeks?

THE COURT: Yes.

MR. WALLMUTH: And then, maybe encourage the Government to participate to the extent they're willing to prior to that status conference?

THE COURT: Yes. I'm -- I will issue an order from today. It's not going to be the detailed opinion that I will otherwise issue with -- I'm making rulings on this. I'm going

to issue a general order setting forth a schedule.

Defense counsel, is 7 days enough time to amend the categories of requests?

MR. GERGER: Yes.

THE COURT: Okay. I'm going to give you 7 days. I'm going to ask for the parties to confer, meaningfully confer. I'm going to give you 14 days to do that. I will ask the Government to the extent it can participate to do that. And then, I'll schedule a status conference to follow --

MR. WALLMUTH: Thank you.

THE COURT: -- the following week.

MR. WALLMUTH: Thank you very much.

THE COURT: Okay? Anything else?

MR. DRY: Nothing from U.S. Bank.

THE COURT: Okay, all right, we'll stand adjourned.

(Proceedings concluded at 2:50 p.m.)

**CERTIFICATE**

I, Chris Hwang, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

__________________ October 18, 2023

Chris Hwang Date

Court Reporter