# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | Case No. 4:22-cr-162 |
| § | Judge Mazzant |
| EDWARD WALSH VAUGHAN (1) § | |
| HADI AKKAD (2) § | |
| GINA ELLINGSEN (6) § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion for Mistrial Based on Constructive Amendment of the Superseding Indictment or, if a Mistrial is Denied, to Bar Further Evidence or Argument on Theory of Guilt Not Charged in Indictment (Dkt. #355). After reviewing the Motion, relevant pleadings, and applicable law, the Court finds that the Motion should be **DENIED**.

## BACKGROUND

### I.   Factual Background

Electronic Transactions Systems Corporation ("ETS") was a credit and debit card processing company incorporated and headquartered in Virginia (Dkt. #274 at ¶ 1). Between 2012 and 2019, ETS had over twenty-five employees and provided card processing services for approximately 7,000 customers, including government municipalities, charitable organizations, and private businesses (Dkt. #274 at ¶ 1). Edward Vaughan, ETS's President, and Hadi Akkad, ETS's Executive Vice President, were the executives in charge of day-to-day operations (Dkt. #274 at ¶ 3). Other leadership positions were held by Jill Hall Mandichak, the Nation Sales Manager; Sean Lynch, the Sales Manager; Katherine Nguyen, the Director of National Accounts; and Gina Ellingsen, the Payment Industry Expert (Dkt. #274 at ¶ 3). As a credit and debit card processing company, ETS served as a middleman, communicating card transaction information

between the bank that issued a customer's debit or credit card and the business or entity accepting the card for payment (Dkt. #274 at ¶ 4). As part of its business, ETS charged a fixed fee set by the card brand associations (e.g., Visa, Mastercard, American Express, etc.), as well as an additional Interchange fee for providing the card processing service (Dkt. #274 at ¶¶ 6–7).

On July 13, 2022, the Grand Jury indicted Vaughan, Akkad, Mandichak, Lynch, Nguyen, and Ellingsen for conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and indicted Vaughan and Akkad for conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (*See* Dkt. #1). According to the Original Indictment, Defendants used ETS's position as a middleman in card-payment transactions to include hidden fees in transactions with their clients, which allowed ETS to obtain millions of dollars through the fraudulent concealment of those fees (Dkt. #1 at ¶¶ 8–15). Further, because of the hidden-fee scheme, ETS was valued at approximately $170 million and sold its assets to Elavon, Inc. and U.S. Bank National Association as part of an acquisition (Dkt. #229 at p. 1; Dkt. #274 at ¶ 24). As a result of the acquisition, Vaughan received approximately $107 million, and Akkad received approximately $33 million (Dkt. #274 at ¶ 24). On December 15, 2022, Hall Mandichak, Lynch, and Nguyen all pleaded guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (*See* Dkt. #123; Dkt. #128; Dkt. #133).

II.     **First Superseding Indictment**

On March 5, 2025, the Government filed the First Superseding Indictment (the "Indictment"), which cleaned up the language in Count 1 for conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (*Compare* Dkt. #1, *with* Dkt. #274). The Indictment charges Defendants with conspiracy to commit wire fraud in general terms but also provides a non-exhaustive list of examples (*See* Dkt. #274 at ¶¶ 10–24). For clarity, the Court will highlight the general allegations first, then provide the examples listed in the Indictment:

10. From April 2012 and through the spring of 2019, the defendants, at the direction of ETS president Edward Vaughan and Executive Vice President Hadi Akkad, defrauded ETS' merchant client by deliberately disguising a portion of their processing fees for thousands of clients. The defendants falsely represented to ETS merchant clients that ETS utilized a transparent pricing structure called Interchange-Plus pricing, wherein the merchant clients would be charged the Interchange fees plus an ETS-specific markup fee. In reality, knowing that the Interchange fees would not be questioned or challenged, the defendants embedded an additional markup within the Interchange fees. Such markup was not disclosed to the merchant clients beforehand and was concealed on the merchants account and billing statements.

11. The fraudulent overcharging affected approximately 7,000 merchant clients and spanned nearly 87 million card transactions. . . .

12. It was the general purpose of the conspiracy for the defendants to unfairly, unjustly, and unlawfully enrich themselves and ETS by overcharging merchant clients by means of materially false and fraudulent pretenses, representations, and promises.

13. The manner and means by which the defendants sought to accomplish the conspiracy included, among others, the following:

. . .

    b. The defendants misled merchant clients, using contracts, sales pitches, calls, and emails, into believing that ETS utilized a transparent pricing structure with no hidden fees.

    c. The defendants embedded hidden markups into the Interchange fees and other program fees paid by merchant clients, concealing the markups in the contracts and the account statements provided to the merchant clients.

    d. The defendants altered the Interchange and program fees to include hidden markups by accessing billing tables and software located on computer systems belonging to a third-party company. ETS employees referred to this as accessing the "backend computer system."

. . .

    f. The defendants, when explaining ETS rates to merchant clients, did not disclose the true nature of

> their pricing model and used the rate disclosures in the merchant client agreements to confuse, conceal, and coverup their actual billing practices.
>
> . . .
>
> *Vaughan and Akkad's Concealment of the Scheme and Sale of the Company*
>
> . . .
>
> 24. The defendants' concealment of the hidden markups also inflated the valuation of ETS, enabling Vaughan and Akkad to profit from the sale of ETS in 2018. . . . Vaughan, Akkad, and Ellingsen stayed with ETS after the ETS acquisition and continued to coverup the fraudulent overcharging. However, once the hidden fees were revealed, the acquiring entity corrected the billing practice, offered refunds, and contacted all affected merchant clients. During the course of the scheme, ETS fraudulently overcharged on approximately 87 million card transactions, affecting approximately 7,000 merchant client accounts.

(Dkt. #274 at ¶¶ 10–13, 24) (emphasis in original).

In addition to the general charges, the Indictment also provides a non-exhaustive list of examples:

> **Acts in Furtherance of the Conspiracy**
>
> In furtherance of the conspiracy, the defendants committed the following acts, among others, in the Eastern District of Texas and elsewhere.
>
> *Merchant Client—Sherman, Texas*
>
> . . .
>
> 15. Although ETS represented that the Interchange fees were simply a passthrough cost of what the card brands charged, ETS actually embedded markups within the Interchange fees. Specifically, ETS included an additional 0.30% markup on Visa and MasterCard debit and prepaid card Interchange fees. This markup was never discussed in the contract, never disclosed by an ETS employee to the city of Sherman, and never shown or displayed on the account statements sent to the city of Sherman.
>
> 16. For example, in or around January 2018, ETS sent the city of Sherman an account statement showing what the city of Sherman owed ETS for the month of December 2017. On this account statement, ETS included a separate section called Interchange Fees/American Express Program Fees which totaled $3,075.31.

4

However, based on the publicly available Interchange rate schedule, the total should have been $2,682.63, approximately $392 less than the billed amount. Similar discrepancies and markups were found on various other account statements.

17. . . . ETS employee E.F. . . . falsely confirmed that ETS did not retain any of the Interchange fees and instead passed those payments on to the card brands.

. . .

*Examples of the Defendant's Execution of the Fraud*

19. The defendants took steps to actively embed and conceal the hidden markups in the Interchange fees. For instance:

> a. At the beginning of the scheme, Vaughan eld a "merchant statement design meeting" where Vaughan chose to format the merchant statements to hide the 0.30% markup fee.

> b. On May 30, 2014, Vaughan logged in to the backend computer system and made changes to the debit card interchange rates in the "Billing Element Tables." On June 25 and 27, 2014, Vaughan again logged into the backend system to correct errors made to the rates. On January 30, 2018, Vaughan logged in to correct an error made to the American Express Interchange rates.

> c. On several occasions between April 2016 and December 2017, Akkad, at the direction of Vaughan, accompanied and instructed ETS employee J.D. to verify and ensure the hidden markup was applied to all the debit card Interchange rates on the backend computer system.

20. In order to attract new business, the defendants performed detailed cost comparisons for prospective merchant clients, in which ETS compared the client's existing bill with what ETS would offer. In these cost comparisons, the defendants pitched the Interchange-Plus pricing model without any mention of the hidden markups to the Interchange fees. For example:

> a. On or about February 1, 2016, Hall Mandichak sent a cost comparison to an employee at company L.F., a prospective merchant client. In the cost comparison table, Hall Mandichak included two rows for "Interchange Clearing Fee" and "Interchange Fees." The "ETS % cells were "0" and left blank,

5

respectively, indicating there was no ETS revenue generated from the Interchange fees. In April 2016, the email chain was forwarded to Akkad and Lynch. Based on the representations made, company L.F. entered into a contract with ETS for card processing services.

b. On or about October 2, 2013, Hall Mandichak sent a cost comparison to an employee at company L.V. In the cost comparison table, Hall Mandichak left blank the cells for "ETS Markup" as it pertained to Interchange fees. In the email, Hall Mandichak also stated that "ETS does not charge miscellaneous fees" and stated that ETS solutions "are comprehensive, innovative, and transparent." Based on the representations made, company L.V. entered into a contract with ETS for card processing services.

c. On or about February 4, 2014, Hall Mandichak pitched an employee at company J.J. about the cost savings of switching to ETS. Hall Mandichak stated that "ETS would offer you Cost Plus [Interchange-Plus] .20% (20 basis points) over cost on credit cards with a $. 10 markup per item." Hall Mandichak never disclosed the markup in the Interchange fees.

21. The defendants were confronted by merchant clients regarding the hidden markup within the Interchange fees. In response to these inquiries, the defendants reiterated the transparency of ETS' "Interchange-Plus" model and gave varying explanations about the markup on the Interchange fees. For example:

a. On January 3, 2019, an employee from government entity P.W.V., an ETS merchant client, called Ellingsen regarding the 0.30% markup. Ellingsen gave various inconsistent explanations for the markup. For example, early in the conversation, Ellingsen acknowledged the confusion in the merchant client contract, apologizing because it "wasn't really made clear at the time of the initial signing of the contract." Later in the conversation, Ellingsen claimed that the pricing schedules were indeed transparent. Ellingsen argued that "this table is laid out for the scheduling of the pricing on your account, we feel is a clear indication of how it should, how you should be priced." When pressed further, Ellingsen stated computer and technical limitations prevented ETS

6

from overtly displaying the 0.30% hidden markup on the merchant account statement. In reality, there was no such limitation.

b. On June 14, 2018, an undercover law enforcement officer ("UCE") acting as a contractor for government entity N.P., an ETS merchant client, met with Nguyen at the ETS office in Virginia. When asked about the 0.30% ETS fee markup, Nguyen acknowledged the fraud: "[A]nd and you are 100% correct in saying that the .30 essentially should be up here [Plan Summary section of the merchant statement ending in 3831] for reflecting what is paid to ETS." On or about August 28, 2018, the UCE asked Nguyen over the phone whether government entity N.P. was the first ETS client to bring the 0.30% markup to ETS' attention. Nguyen responded, "That is correct," despite being alerted to the hidden markup via email nearly two years prior. In that email, sent on or about October 4, 2016, an employee from merchant client I.E. emailed Nguyen, ". . . I see that this account in particular is already competitively priced, however there is a surcharge of 0.30% being applied to all debit transactions above interchange cost. . . ."

22. The defendants internally discussed the fraud, the markup, and how to conceal the fraud from their merchant clients. For instance:

a. On or about June 28, 2016, in an email message that was sent to Akkad and then forwarded to Vaughan, a customer complained: "[Merchant client] is currently being charged a .30% markup on top of all debit volume. The most discourteous measure is that the markup is hidden within the interchange transactions, not labeled with a rate, and sometimes not labeled with the correct description. . . ."

b. On or about October 21, 2016, in an email thread discussing cost comparisons with a competitor, Lynch emailed Akkad: "I think we are charging an additional .20% for all DB tiers. Looks like we are charging .20% under the Plan Summary section and then adding the .30% to all DB tiers under the Interchange Fees section."

7

> c. On or about October 11, 2018, in an email thread titled "Confidential: Debit Markup," Ellingsen and Vaughan discussed a merchant client s concern regarding markup. Ellingsen stated: "The issue they have is that on the pricing scheduled we only mention the 30 bps markup for Debit, we do not separate out the Discount for that. So we are actually collecting Discount and the markup of Interchange for every signature debit transaction." Vaughan confirmed the effective rate and stated "Okay. Got it."

(Dkt. #274 ¶¶ 15–22) (emphasis in original).

### III.   Procedural History

On March 24, 2025, the Government filed its Motion in Limine seeking, in part, to prohibit Defendants from introducing their own statements because such statements are hearsay when offered by Defendants (Dkt. #312 at p. 7). Defendants filed their response on March 26, 2025, arguing that certain statements were not hearsay because they merely gave notice of the fees and would not be offered for their truth (Dkt. #318 at pp. 6-9). The Court took the matter under advisement at the Pretrial Conference held on March 28, 2025 (*See* Dkt. #325; Dkt. #327). On March 29, 2025, Defendants filed a Supplemental Brief containing examples of the notices and disclosures they contended were not hearsay (Dkt. #333). The Government filed its Reply on March 29, 2025, noting that one of the examples contains an explanation of the fee that shows Defendants did not actually disclose the full fee, as the notice only disclosed a .3% markup while the actual markup charged was .45% (Dkt. #336 at pp. 2-3).

On March 30, 2025, Defendants filed a Reply to the Government's Reply and an Objection to Constructive Amendment of Indictment claiming the Government's statement that the disclosure of the .3% fee but not the full fee in the .45% was evidence that the Government intended to offer evidence that would constructively amend the Indictment (Dkt. #340). On March 30,

8

2025, the Government responded that it was not constructively amending the Indictment (*See* Dkt. #341). The Court denied the Government's Motion in Limine and Defendants' Motion to bar evidence related to the alleged constructive amendment in its Memorandum Opinion and Order dated March 31, 2025 (Dkt. #343) ("the Court is not convinced based on one comment that the Government has constructively amended the Superseding Indictment. Second, even though the Superseding Indictment specifically references to the .3% fee, it also broadly addresses hidden fees and overcharging").

During trial, Defendants objected to the Government's evidence of the fees charged beyond the .3% fee, arguing that the Government was constructively amending the Indictment. The Court overruled that objection, referencing its prior Order (Dkt. #343). On April 5, 2025, Defendants filed a Motion for Mistrial, again arguing that the Government had constructively amended the Indictment (Dkt. #355). In the alternative, Defendants asked the Court to bar all evidence or argument that any fees other than the .3% fee were part of the charged offense in Count 1 (Dkt. #355). The Government filed its Response on March 6, 2025, arguing no constructive amendment had occurred (Dkt. #356).

## LEGAL STANDARD

The Fifth Amendment "guarantees that a criminal defendant will be tried only on charges alleged in a grand jury indictment." *U.S. v. Threadgill*, 172 F.3d 357, 370 (5th Cir. 1999). The two primary functions of an indictment are that it (1) provides notice of the crime for which the defendant has been charged, allowing him the opportunity to prepare a defense, and (2) interposes the public into the charging decision so that the defendant is not subject to double jeopardy for the same offense. *U.S. v. Diaz*, 941 F.3d 729, 736 (5th Cir. 2019). After an indictment has been

returned, its charges may not be broadened through amendment except by the grand jury. *U.S. v. McMillan*, 600 F.3d 434, 436 (5th Cir. 2010). A constructive amendment occurs when the government changes its theory during trial so as to urge the jury to convict on a basis broader than that charged in the indictment, or when the government is allowed to prove an essential element of the crime on an alternative basis permitted by the statute but not charged in the indictment. *U.S. v. Girod*, 646 F.3d 304, 316 (5th Cir. 2011). However, a constructive amendment does not occur when the elements of the offense that sustain conviction are fully and clearly set out in the indictment, that is, "the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." *U.S. v. Quintanilla*, 114 F.4th 453, 466 (5th Cir. 2024).

      Not all factual variations rise to the level of a constructive amendment. *U.S. v. Hanson*, 161 F.3d 896, 903 (5th Cir. 1998). Moreover, a constructive amendment cannot occur where the indictment completely and accurately describes the conduct of the defendant. *Id.* (citing *U.S. v. Mikolajczyk*, 137 F.3d 237, 243 (5th Cir. 1998)). Additionally, "no constructive amendment arises where the evidence proves facts different from those alleged in the indictment but does not modify an essential element of the charged offense." *U.S. v. Petersen*, 383 F. App'x 458, 461 (5th Cir. 2010). When an indictment charges a violation of a statute in general terms, a constructive amendment will not occur because the government elicits proof of acts of the kind described, although those acts are not specifically mentioned in the indictment. *U.S. v. Malatesta*, 583 F.2d 748, 756 (5th Cir. 1978) (citing *U.S. v. Hyde*, 448 F.2d 815, 838 (5th Cir. 1971)).

## ANALYSIS

Defendants argue in their Motion for Mistrial that the Government has constructively amended the Indictment in violation of their Fifth Amendment Rights (Dkt. #355 at p. 2). Specifically, Defendants argue that the Indictment charges the Defendants with conspiracy to commit wire fraud by including an undisclosed .3% fee on all Interchange fees (Dkt. #355 at pp. 2–6). To support their argument, Defendants highlighted examples where the Indictment mentions the .3% fee (Dkt. #355 at pp. 2–6). Defendants contend that the eleven specific references to the .3% fee, all of which arise when discussing examples of the Interchange fee, shows that the Indictment specifically charges Defendants with the alleged fraud that only arose through the use of the .3% fee. (*See* Dkt. #355 at pp. 2–6). At trial, the Government has pursued the theory that Defendants failed to disclose the .3% fee in conjunction with other fees of .15%–.2% (*See* Dkt. #355 at p. 5). According to Defendants, the Government's focus on the additional undisclosed fee of .15%–.2% (when the .3% fee was disclosed) represents a shift in theory to double-billing—something the Indictment does not explicitly charge (Dkt. #355 at p. 5). Thus, since the Indictment is silent on the use of other undisclosed fees or on double-billing, Defendants contend a constructive amendment occurred and the Court should declare a mistrial (Dkt. #355).

The Government responds by arguing that a constructive amendment has not occurred for two reasons (Dkt. #356). First, the Indictment broadly charges Defendants with a conspiracy to overcharge merchant clients by using hidden fees (Dkt. #356). Second, references to the .3% fee were only one of the examples of the charged conspiracy, but they were not meant to narrow the charge to focus only on the use of the .3% fee (Dkt. #356). In short, the Government argues that the

11

Indictment broadly charges the Defendants with the use of hidden markups and that any specific references were merely provided as examples of how Defendants violated the law (Dkt. #356).

The Court agrees with the Government that a constructive amendment of the Indictment has not occurred. On a plain reading of the Indictment, it is clear that the Government did not limit the charge of conspiracy only to the examples it provided (*See* Dkt. #274). Instead, the Indictment broadly accuses Defendants of using hidden fees and markups to fraudulently overcharge its clients (Dkt. #274 at ¶¶ 8–24). Further, even the examples provided were not wholly limited to the .3% fee, instead alleging Defendants used that hidden fee, as well as other hidden fees, to achieve the conspiracy's objectives (Dkt. #274 at ¶¶ 10–24). Because of Defendants repeated objections regarding the scope of the Indictment, the Court finds it necessary to provide a review of Count 1 of the Indictment and to explain why the Indictment is not limited to Defendants' narrow reading.

First, the Court will begin reading Count 1 of the Indictment at the "Overview of the Conspiracy" (Dkt. #274 at p. 4). To describe the conspiracy to commit wire fraud, the Indictment states that Defendants overcharged their merchant clients via an undisclosed, concealed "additional markup" (Dkt. #274 at ¶ 10). Next, the Indictment discusses how the "fraudulent overcharging" was "concealed" prior to ETS's acquisition in 2018 (Dkt. #274 at ¶ 11). The Indictment then charges Defendants with enriching themselves by "overcharging" merchant clients "by means of materially false and fraudulent pretenses, representations, and promises." (Dkt. #274 at p. 5).

The next section of Count 1 discussing the broad charges of conspiracy provides four relevant subparagraphs to the issue of overcharging and hidden fees (*See* Dkt. #274 at p. 5, ¶¶ 13b–13d, 13f). In those subparagraphs, the Indictment charges Defendants with embedding

12

"hidden markups" to overcharge the merchant clients (Dkt. #274 at ¶¶ 13b–13d, 13f). Specifically, the Indictment provides a broader charge of the offense than just focusing on the .3% fee: "[t]he [D]efendants altered the Interchange *and program fees* to include hidden markups" (Dkt. #274 at ¶ 13b) (emphasis added). Further, the broad charge also states, "[t]he [D]efendants, when explaining ETS rates to merchant clients, did not disclose the true nature of their *pricing model*" (Dkt. #274 at ¶ 13f) (emphasis added). The use of "program fees" and "pricing model" is clearly broader than just referencing one fee in the Interchange charges.

After outlining the contours of the charge for conspiracy to commit wire fraud, the Indictment turns to "Acts in Furtherance of the Conspiracy" (Dkt. 274 at p. 6). In this section, the Indictment outlines various examples of how Defendants committed the alleged crime, noting that "[D]efendants committed the following acts, *among others*" (Dkt. #274 at p. 6) (emphasis added). Notably, such use of "among others" denotes that not all of Defendants actions are listed in the following examples.

The first example in this subsection discusses how ETS overcharged the City of Sherman (Dkt. #274 at ¶¶ 14–18). The Indictment begins with another broad charge that "ETS actually embedded markups within the Interchange fees" (Dkt. #274 at ¶ 15). However, the next sentence presents the fork in the road for interpreting the Indictment, as it states "[s]pecifically, ETS included an additional 0.3% markup" (Dkt. #274 at ¶ 15). At this point, the Indictment could be read one of two ways. The first option, chosen by Defendants, is to read this as a narrowing of the charges to a single, specific method for hiding markups—using the .3% fee embedded in the Interchange fees (*See* Dkt. #355). The second and more correct option is that the Indictment refers

13

to how Defendants defrauded the City of Sherman specifically. To understand why this single example is not a narrowing of the broad charges, one need only read the Indictment further.

Turning to the next subsection, the Indictment states that Defendants took different steps to embed and conceal their hidden markups in the Interchange fees (Dkt. #274 at ¶ 19). It lists examples of the steps Defendants took, including those Vaughan and Akkad took to embed and conceal the hidden markup (Dkt. #274 at ¶ 19). The next set of examples turns to Defendants' omission of disclosing "miscellaneous fees" or "markup[s] in the Interchange fees" (Dkt. #274 at ¶ 20). The third set of examples turns to examine Defendants' responses when confronted about the markup on the Interchange fees (Dkt. #274 at ¶ 21). Here, the selected examples discuss instances where merchant clients requested more information about the .3% fee (Dkt. #274 at ¶ 21). Overall, these three sets of examples focus on the .3% markup, yet, all of them are couched in terminology of "examples" or "instance[s]." In the Court's reading, even though the Indictment's examples focus on the .3% markup, these examples were meant to show only *some* of the ways Defendants perpetrated their fraud, not the *only* way.

The fourth subsection of examples examines some of Defendants' internal discussion of the hidden markups (Dkt. #274 at ¶ 22). Here, the first discussion revolves around the hidden .3% fee (Dkt. #274 at ¶ 22a). However, the next example discusses a .2% fee: "I think we are charging an additional .20% fee for all DB tiers. Looks like we are charging .20% under the Plan Summary section and then adding the .30% to all DB tiers under the Interchange Fees section." (Dkt. #274 at ¶ 22b). Thus, the second example discusses the very evidence the Government elicited at trial—double-billing of debit charges where Defendants charged a .2% fee and a .3% for the same thing. The third and final example discusses the concealment of the .3% fee and how Defendants

14

collected it in addition to the markup of Interchange for every transaction (Dkt. #274 at ¶ 22c). These examples, specifically in paragraph 22b, show that the conspiracy was not only about the .3% fee, but also about the entire conspiracy and Defendants' actions in fraudulent overcharging their clients by using hidden markups.

Next, the Indictment returns to the broad language of "concealment of hidden markups" and "fraudulent overcharging" (Dkt. #274 at ¶24). While Defendants do not directly address the implications of the return to the broad language, it appears that they believe the language is constrained by the previous examples of the .3% fee (*See* Dkt. #355 at pp. 1–5). However, the Court is not persuaded that the provided examples constrain the broad language in the "Overview" section and "Concealment" subsection. Such a reading would render the use of noted examples as a complete constraint on the proof of essential elements that were broadly charged. In other words, Defendants read out the broad charges in the Indictment because the Government also provided them with some of the specific acts that they committed.

The Court finds that the more correct reading is to read the examples as just that—some examples of Defendants' conduct that may prove the charges, but not the only conduct that would prove an essential element of the charges as set out in the Indictment. *U.S. v. Miller*, 471 U.S. 130, 136 (1985) ("As long as the crime and the elements of the offense that sustain conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes *or other means* of committing the same crime") (emphasis added). Ultimately, the question is whether the evidence at trial proves an essential element of the charged offense but does not modify those elements. *U.S. v. Chavful*, 100 F. App'x 226, 230 (5th

Cir. 2004). The Court finds that the evidence adduced at trial has not broadened the essential elements beyond those charged in the Indictment, and thus there is no constructive amendment.

The Court's decision is consistent with Fifth Circuit precedent on the issue. *U.S. v. Earnest*, 2025 WL 957673, at *5–6 (5th Cir. Mar. 31, 2025) (holding no constructive amendment when the defendant was convicted of tax fraud on proof of fraudulently including education credits despite argument that the indictment only used the term "deductions" in the relevant paragraph, but also included a section for "education credits" in an included table outlining the fraudulently claimed deductions); *U.S. v. Davis*, 53 F.4th 833, 846–47 (5th Cir. 2022) (holding no constructive amendment occurred where the indictment charged more than necessary to prove the underlying offense); *Diaz*, 941 F.3d at 736 (holding no constructive amendment in a conspiracy to commit health care and wire fraud where evidence at trial showed the defendant made false statements and falsified records to cover up the scheme instead of falsifying only records as charged in the indictment); *U.S. v. Gates*, 624 F. App'x 893, 896–97 (5th Cir. 2015) (finding that although the Government presented evidence of a fraudulent misrepresentation different from that charged in the indictment, the indictment was not constructively amended because the evidence was "probative of the [defendants'] fraudulent scheme"); *Girod*, 646 F.3d at 316–17 (holding no constructive amendment occurred in a healthcare fraud conspiracy where the dates on which false statements were made differed between the indictment and evidence at trial); *McMillan*, 600 F.3d at 450–52 (holding no constructive amendment occurred where the indictment charged only that false statements were made to the state Department of Insurance, but proof at trial showed false statements were made to both the Department of Insurance and medical service providers); *Malatesta*, 583 F.2d at 754–56 (holding no constructive eviction occurred where the indictment

16

broadly charged an illegal scheme to engage in interstate activities, specifically charged some acts, and evidence was introduced of acts not listed in the specific examples because the convictions were not based on facts outside the indictment's scope).

Defendants cite three cases to support their contention that a constructive amendment has occurred, all of which are distinguishable. First, they cite *Sitrone v. U.S.*, 361 U.S. 212 (1960). There, the defendant was charged with unlawfully affecting interstate commerce by extortion of ready-mix concrete, which contained sand, for use in the construction of a steel processing plant. *Id.* at 213. At trial, the evidence showed that the defendant interfered with both the sand brought into the state and other steel shipments. *Id.* at 213–14. The Supreme Court held that a constructive amendment occurred because the indictment did not charge any interference with movement of steel, thus broadening the charges from those only related to sand. *Id.* at 217. Here, Defendants were charged with conspiracy to commit wire fraud by using hidden markups to overcharge their clients (Dkt. #274 at ¶¶ 8–24). In contrast to *Sitrone*, where the interference with steel shipments was not included in the indictment, the conduct in this case was charged in the Indictment. Even though the Indictment seems to focus on the .3% fee as the primary example of fraud, it also generally charges hidden markups (Dkt. #274 at ¶¶ 8–24) ("[t]he defendants altered the Interchange and program fees to include hidden markups").

Defendants next cite to the Fifth Circuit's opinion in *U.S. v. Hoover*, 467 F.3d 496 (5th Cir. 2006). There, the defendant was indicted with knowingly making false statements to an FBI agent in a specific manner. *Id.* at 497, 502. The Court's charge, however, allowed conviction on the false statement for any reason, not only the one charged in the indictment. *Id.* The Fifth Circuit held that "when the government chooses to specifically charge the manner in which the defendant's

17

statement is false, the government should be required to prove that it is untruthful for that reason." *Id.* Here, the difference comes down to the charged offenses. While *Hoover* focused on the charge of making false statements, the charge in this case deals with a conspiracy to commit wire fraud by fraudulently overcharging through hidden markups (Dkt. #274 at ¶¶ 8–24). Thus, while the Government's case has focused on the .3% fee, it need not be only confined to that fee when it shows the conspiracy to overcharge clients through using other similar hidden fees.

Finally, Defendants cite to *U.S. v. Chambers*, 408 F.3d 237 (5th Cir. 2005). There, the indictment charged the defendant as a felon in possession of ammunition transported in interstate commerce. *Id.* at 241. However, the evidence produced at trial only showed that the component parts were transported, not completed rounds of ammunition. *Id.* Here, the difference is evident—the Indictment charges a conspiracy to commit wire fraud by using hidden markups (Dkt. #274 at ¶¶ 8–24) ("[t]he defendants altered the Interchange and program fees to include hidden markups"). While the focus of the case has been on the .3% fee, all evidence related to the overcharging through hidden markups falls within the broad scope of the charged offense. None of the evidence adduced at trial has gone beyond proving the essential elements of Count 1 in a way uncharged in the Indictment.

In sum, the Court finds that the Government has not constructively amended the Indictment with the evidence it adduced at trial. The Indictment charges Defendants with overcharging merchant clients by including hidden markup fees (Dkt. #274 at ¶¶ 8–24). Much of the evidence has revolved around the .3% fee referenced in the Indictment. Yet, the evidence related to the .15%–.2% fee has not changed any essential element or theory of the Government's case, as it relates to how Defendants defrauded their merchant clients as charged by the Indictment

(Dkt. #274 at ¶¶ 8–24) ("[t]he defendants altered the Interchange and program fees to include hidden markups"). Ultimately, after a plain reading of the Indictment, all evidence adduced at trial relates to exactly what Defendants were indicted for in Count 1—a conspiracy to commit wire fraud by fraudulently overcharging merchant clients through the use of embedded hidden markups in their transactions (Dkt. #274 ¶¶ 8–24). *See Earnest*, 2025 WL 957673, at *6.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion for Mistrial Based on Constructive Amendment of the Superseding Indictment or, if a Mistrial is Denied, to Bar Further Evidence or Argument on Theory of Guilt Not Charged in Indictment (Dkt. #355) is hereby **DENIED**.

**IT IS SO ORDERED.**

SIGNED this 10th day of April, 2025.

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE