IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

MAR 0 5 2025

BY
DEPUTY_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | Case No. 4:22CR162 |
| | | Judge Mazzant |
| EDWARD WALSH VAUGHAN (1) | § | |
| HADI AKKAD (2) | § | |
| JILL HALL MANDICHAK (3) | § | |
| SEAN LYNCH (4) | § | |
| KATHERINE NGUYEN (5) | § § | |

### FIRST SUPERSEDING INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### General Allegations

At all times material to the facts set forth in this First Superseding Indictment:

1. Electronic Transactions Systems Corporation ("ETS") was a credit and debit card processing company incorporated and headquartered in the Commonwealth of Virginia. Between 2012 and 2019, ETS had over 25 employees and provided card processing services for at least 7,000 different entities, including government municipalities, charity organizations, and private businesses.

2. The city of Sherman was a municipality in the Eastern District of Texas.

3. The defendants all had different leadership roles at ETS. The executives responsible for the day-to-day operations of the company were **Edward Vaughan**, the President, and **Hadi Akkad**, the Executive Vice President. The sales and customer service

Case 4:22-cr-00162-ALM-BD   Document 486   Filed 05/22/25   Page 2 of 13 PageID #:
Case 4:22-cr-00162-ALM-BD   Document 475-1   Filed 03/05/2025   Page 2 of 20 PageID
#:18061

leadership included: **Jill Hall Mandichak**, the National Sales Manager; **Sean Lynch**, the Sales Manager; **Katherine Nguyen**, Director of National Accounts

### *Background on Card Processors*

4.  Credit and debit card processing companies like ETS provided equipment and services to facilitate card payment transactions. The companies acted as middlemen, communicating card transaction information between (1) the bank that issued a customer's debit or credit card and (2) the business or entity accepting the card for payment. Specifically, such companies gave merchant clients equipment and software to allow for the acceptance of credit and debit cards, captured card transactional data, and routed it to the card network and appropriate banks.

5.  Typically, credit card processing companies entered into contracts with the business or entity (also called "merchant clients") who wished to accept card payments. These contracts and agreements discussed, among other things, the fees the merchant clients agreed to pay the card processor.

6.  Card processing fees typically fell into several categories. One category was "Interchange" fees, which were calculated using standard, non-negotiable rates set by the card brand associations, such as Visa, Mastercard, and American Express. Because the Interchange rates were established by the card brand associations, Interchange fees assessed to a merchant client for a given transaction were the same regardless of the

processor utilized. Another category was processor-specific markup fees, which were negotiated and varied among the merchant clients and card processors.

7.  One pricing model adopted by many card processors, including ETS, was the "Interchange-Plus" model, also referred to as "Interchange pass through pricing" or "cost-plus pricing." Here, the card processor charged the merchant client the fixed Interchange fee plus a negotiated markup fee for providing the card processing service. Under this pricing model, the Interchange fee was a "pass-through" cost to the merchant client. Regardless of the pricing model, card processors typically provided merchant clients billing statements outlining the card transaction volume, number and type of card transactions, and the fees the merchant clients were charged for a given time period.

## COUNT 1

Violation: 18 U.S.C. § 1349
(Conspiracy to Commit Wire Fraud)

8.  The General Allegations section of this First Superseding Indictment is realleged and incorporated by reference as though fully set forth herein.

9.  From in or around April 2012 and continuing up through the spring of 2019, in the Eastern District of Texas and elsewhere, the defendants, **Edward Vaughan, Hadi Akkad, Jill Hall Mandichak, Sean Lynch, Katherine Nguyen,** and others known and unknown to the Grand Jury, conspired to commit wire fraud, which also affected a financial institution, a violation of Title 18 United States Code Section 1343,

and knowingly and willfully joined in the agreement with the intent to further its unlawful purpose.

## Overview of the Conspiracy

10. From April 2012 and through the spring of 2019, the defendants, at the direction of ETS president **Edward Vaughan** and Executive Vice President **Hadi Akkad**, defrauded ETS' merchant clients by deliberately disguising a portion of their processing fees for thousands of clients. The defendants falsely represented to ETS merchant clients that ETS utilized a transparent pricing structure called "Interchange-Plus" pricing, wherein the merchant clients would be charged the Interchange fees plus an ETS-specific markup fee. In reality, knowing that the Interchange fees would not be questioned or challenged, the defendants embedded an additional markup within the Interchange fees. Such markup was not disclosed to the merchant clients beforehand and was concealed on the merchants' account and billing statements.

11. The fraudulent overcharging affected approximately 7,000 merchant clients and spanned nearly 87 million card transactions. In addition, the fraud was concealed prior to ETS' acquisition in 2018, allowing the company to be valued and sold at approximately $170 million. Through the sale of the company, **Vaughan** received approximately $107 million, and **Akkad** received approximately $33 million. Over the course of the scheme, and through 2023, **Vaughan** and **Akkad** used the unfairly, unjustly, and unlawfully obtained funds to personally enrich themselves through bonuses, jewelry, luxury vehicles, private aircraft, and high-end real estate purchases.

Case 4:22-cr-00162-ALM-BD   Document 486   Filed 05/22/25   Page 5 of 13 PageID #:
Case 4:22-cr-00162-ALM-BD   Document 376   Filed 03/05/25   Page 5 of 20 PageID
#:18034

## Purpose of the Conspiracy

12.  It was the general purpose of the conspiracy for the defendants to unfairly, unjustly, and unlawfully enrich themselves and ETS by overcharging merchant clients by means of materially false and fraudulent pretenses, representations, and promises.

## Manner and Means of the Conspiracy

13.  The manner and means by which the defendants sought to accomplish the conspiracy included, among others, the following:

   a. The defendants caused ETS to enter into agreements with merchant clients.

   b. The defendants misled merchant clients, using contracts, sales pitches, calls, and emails, into believing that ETS utilized a transparent pricing structure with no "hidden" fees.

   c. The defendants embedded hidden markups into the Interchange fees and other program fees paid by merchant clients, concealing the markups in the contracts and the account statements provided to the merchant clients.

   d. The defendants altered the Interchange and program fees to include hidden markups by accessing billing tables and software located on computer systems belonging to a third-party company. ETS employees referred to this as accessing the "backend computer system."

   e. The defendants communicated with each other via phone, email, and in-person meetings, and used various monetary and non-monetary incentives to ensure participation in the scheme.

   f. The defendants, when explaining ETS rates to merchant clients, did not disclose the true nature of their pricing model and used the rate disclosures in the merchant client agreements to confuse, conceal, and coverup their actual billing practices.

   g. The defendants, when notified by merchant clients, third party affiliates, legal filings, and media publications about the hidden charges, denied wrongdoing and purported to offer "refunds."

h. The defendants participated in overt acts in the Eastern District of Texas, which enabled them to engage in financial transactions in excess of $10,000 with criminally-derived property.

i. The defendants engaged in financial transactions with the fraudulently obtained proceeds, including to reward themselves with large bonuses, jewelry, luxury vehicles, private aircraft, and high-end real estate, as well as to conceal the nature, location, source, ownership, and control of the proceeds.

j. The defendants, in communicating and transacting with merchant clients, caused wire transmissions that affected interstate commerce.

### Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, the defendants committed the following acts, among others, in the Eastern District of Texas and elsewhere.

#### *Merchant Client – Sherman, Texas*

14. On or about June 29, 2007, **Lynch** and **Akkad** executed an agreement with the city of Sherman to provide card processing services. The parties agreed to an Interchange-Plus pricing structure, under which ETS would charge the city of Sherman (1) the Interchange fees and (2) separate ETS-specific fees based on the volume of money and the number of transactions handled. ETS also agreed to provide periodic account statements to the city of Sherman breaking down the transactions and fees for the relevant billing period. The city of Sherman agreed to pay the fees and charges set forth in the agreement via Automated Clearing House ("ACH") debits of its bank account, which would cause interstate wire transmissions.

15. Although ETS represented that the Interchange fees were simply a pass-through cost of what the card brands charged, ETS actually embedded markups within the

Interchange fees. Specifically, ETS included an additional 0.30% markup on Visa and MasterCard debit and prepaid card Interchange fees. This markup was never discussed in the contract, never disclosed by an ETS employee to the city of Sherman, and never shown or displayed on the account statements sent to the city of Sherman.

16. For example, in or around January 2018, ETS sent the city of Sherman an account statement showing what the city of Sherman owed ETS for the month of December 2017. On this account statement, ETS included a separate section called "Interchange Fees / American Express Program Fees" which totaled $3,075.31. However, based on the publicly available Interchange rate schedule, the total should have been $2,682.63, approximately $392 less than the billed amount. Similar discrepancies and markups were found on various other account statements.

17. Between January and April 2018, an employee with Sherman, from a location in the Eastern District of Texas, placed multiple phone calls to ETS to discuss the billing concerns. In one call on January 22, 2018, the Sherman employee asked if the Interchange fees in the Interchange section of the merchant statement strictly went to Visa, MasterCard, and Discover. ETS employee E.F. answered, "Exactly," and falsely confirmed that ETS did not retain any of the Interchange fees and instead passed those payments on to the card brands.

18. On April 9, 2018, an employee with Sherman left a telephone message for **Akkad** regarding a requested audit but never received a return telephone call. On May 3,

2018, the employee followed up with an email to E.F. that was subsequently forwarded to Akkad. The email read in part:

> The audit request was prompted when a competitor provided an analysis of our monthly statements. The analysis showed a surcharge on the interchange category. From all of my discussions with ETS representatives, the interchange rate is a "passthrough" charge only. ETS does not add to the interchange rate/charge. Attached is a copy of an analysis reflecting a markup %...

The Sherman employee received email read-receipts from E.F. and from Akkad on May 3, 2018, but never received an email or telephone response. During the course of the fraudulent scheme, the city of Sherman was overcharged on at least 130,820 transactions and overpaid, via interstate wire transmissions, approximately $34,166 to ETS.

### *Examples of the Defendants' Execution of the Fraud*

19. The defendants took steps to actively embed and conceal the hidden markups in the Interchange fees. For instance:

   a. At the beginning of the scheme, **Vaughan** held a "merchant statement design meeting" where **Vaughan** chose to format the merchant statements to hide the 0.30% markup fee.

   b. On May 30, 2014, **Vaughan** logged in to the backend computer system and made changes to the debit card interchange rates in the "Billing Element Tables." On June 25 and 27, 2014, **Vaughan** again logged into the backend system to correct errors made to the rates. On January 30, 2018, **Vaughan** logged in to correct an error made to the American Express Interchange rates.

   c. On several occasions between April 2016 and December 2017, **Akkad**, at the direction of **Vaughan**, accompanied and instructed ETS employee J.D. to verify and ensure the hidden markup was applied to all the debit card Interchange rates on the backend computer system.

20. In order to attract new business, the defendants performed detailed cost comparisons for prospective merchant clients, in which ETS compared the client's existing bill with what ETS would offer. In these cost comparisons, the defendants pitched the Interchange-Plus pricing model without any mention of the hidden markups to the Interchange fees. For example:

   a. On or about February 1, 2016, **Hall Mandichak** sent a cost comparison to an employee at company L.F., a prospective merchant client. In the cost comparison table, **Hall Mandichak** included two rows for "Interchange Clearing Fee" and "Interchange Fees." The "ETS %" cells were "0" and left blank, respectively, indicating there was no ETS revenue generated from the Interchange fees. In April 2016, the email chain was forwarded to **Akkad** and **Lynch**. Based on the representations made, company L.F. entered into a contract with ETS for card processing services.

   b. On or about October 2, 2013, **Hall Mandichak** sent a cost comparison to an employee at company L.V. In the cost comparison table, **Hall Mandichak** left blank the cells for "ETS Markup" as it pertained to Interchange fees. In the email, **Hall Mandichak** also stated that "ETS does not charge miscellaneous fees" and stated that ETS solutions "are comprehensive, innovative, and transparent." Based on the representations made, company L.V. entered into a contract with ETS for card processing services.

   c. On or about February 4, 2014, **Hall Mandichak** pitched an employee at company J.J. about the cost savings of switching to ETS. **Hall Mandichak** stated that "ETS would offer you Cost Plus [Interchange-Plus] .20% (20 basis points) over cost on credit cards with a $.10 markup per item." **Hall Mandichak** never disclosed the markup in the Interchange fees.

21. The defendants were confronted by merchant clients regarding the hidden markup within the Interchange fees. In response to these inquiries, the defendants reiterated the transparency of ETS' "Interchange-Plus" model and gave varying explanations about the markup on the Interchange fees. For example:

 b. On June 14, 2018, an undercover law enforcement officer ("UCE") acting as a contractor for government entity N.P., an ETS merchant client, met with **Nguyen** at the ETS office in Virginia. When asked about the 0.30% ETS fee markup, **Nguyen** acknowledged the fraud: "[A]nd and you are 100% correct in saying that the .30 essentially should be up here [Plan Summary section of the merchant statement ending in 3831] for reflecting what is paid to ETS." On or about August 28, 2018, the UCE asked **Nguyen** over the phone whether government entity N.P. was the first ETS client to bring the 0.30% markup to ETS' attention. **Nguyen** responded, "That is correct," despite being alerted to the hidden markup via email nearly two years prior. In that email, sent on or about October 4, 2016, an employee from merchant client I.E. emailed **Nguyen**, "… I see that this account in particular is already competitively priced, however there is a surcharge of 0.30% being applied to all debit transactions above interchange cost…"

22. The defendants internally discussed the fraud, the markup, and how to conceal the fraud from merchant clients. For instance:

 a. On or about June 28, 2016, in an email message that was sent to **Akkad** and then forwarded to **Vaughan,** a customer complained: "[Merchant client] is currently being charged a .30% markup on top of all debit volume. The most discourteous measure is that the markup is hidden within the interchange transactions, not labeled with a rate, and sometimes not labeled with the correct description…"

 b. On or about October 21, 2016, in an email thread discussing cost comparisons with a competitor, **Lynch** emailed **Akkad**: "I think we are charging an additional .20% for all DB tiers. Looks like we are charging .20% under the

Plan Summary section and then adding the .30% to all DB tiers under the Interchange Fees section."

c. On or about October 11, 2018, in an email thread titled "Confidential: Debit Markup," **Vaughan** discussed a merchant client's concern regarding markup. "The issue they have is that on the pricing scheduled we only mention the 30 bps markup for Debit, we do not separate out the Discount for that. So we are actually collecting Discount and the markup of Interchange for every signature debit transaction." **Vaughan** confirmed the effective rate and stated "Okay. Got it."

*Vaughan and Akkad's Concealment of the Scheme and Sale of the Company*

23.    In order to conceal their criminal scheme, **Vaughan** and **Akkad** created a workplace environment at ETS with monetary and non-monetary incentives to reward loyalty and discourage exposure of the ETS' true business operations. As such, **Vaughan** and **Akkad** paid employees, including their co-defendants, substantial bonuses and bought them vehicles. For instance, **Vaughan** gifted **Nguyen** a 2017 Mercedes Benz GLS 450. From July 2013 to January 2016, **Vaughan** and **Akkad** authorized multiple payments to **Hall Mandichak**, in addition to her regular salary payments, totaling approximately $200,000. Similarly, from January 2013 to December 2015, **Vaughan** and **Akkad** authorized multiple payments to **Lynch**, on top of his regular salary, totaling over $87,000.

24.    The defendants' concealment of the hidden markups also inflated the valuation of ETS, enabling **Vaughan** and **Akkad** to profit from the sale of ETS in 2018. ETS was valued at and purchased by a payment processing company for approximately $170 million. As part of the acquisition, **Vaughan** received an approximate $107 million

buyout for his ownership interest in ETS, while **Akkad** received approximately $33 million. **Vaughan, Akkad,** stayed with ETS after the ETS acquisition and continued to coverup the fraudulent overcharging. However, once the hidden fees were revealed, the acquiring entity corrected the billing practice, offered refunds, and contacted all affected merchant clients. During the course of the scheme, ETS fraudulently overcharged on approximately 87 million card transactions, affecting approximately 7,000 merchant client accounts.

All in violation of 18 U.S.C. § 1349.

A TRUE BILL

*[signature]*
GRAND JURY FOREPERSON

ABE McGLOTHIN
ACTING UNITED STATES ATTORNEY

*[signature]*

3/5/2025

ANAND VARADARAJAN
HEATHER RATTAN
G.R. JACKSON
Assistant United States Attorneys

Date